# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN RE: | : Bankruptcy No. 04-28075 |
| | : |
| | : |
| EUROGAS, INC., | : |
| | : |
| Debtor. | : |

## HEARING ON MOTIONS MAY 4, 2006

### BEFORE

### JUDGE WILLIAM T. THURMAN



**ORIGINAL**

FILED IN THE
UNITED STATES
BANKRUPTCY COURT
DISTRICT OF UTAH
2006 MAY 30 P 1: 48
BY
DEPUTY CLERK

## CAROLYN ERICKSON, CSR
## CERTIFIED COURT TRANSCRIBER
1775 East Ellen Way
Sandy, Utah 84092
801-523-1186

Proceedings recorded by electronic sound recording, transcript produced by
transcription service.



## APPEARANCES

| | |
|---|---|
| Eurogas, Inc Estate: | JOEL MARKER<br>Attorney at Law |
| For Sinofirst: | STEVE MCCARDELL<br>PENROD KEITH<br>Attorneys at law |
| For Mr. Robertz: | ROBERT LOCHHEAD<br>CRAIG PERRY<br>Attorneys at Law |
| For Chapter 7 Trustee: | ANNETTE JARVIS<br>Attorney at Law |
| For Consolidated Seven<br>Rocks Mining, LTD: | MATTHEW BOLEY |

* * *

## INDEX

OPENING STATEMENTS                                   Page
    Mr. Lochhead                                  4
    Mr. McCardell                                 5
    Mr. Boley                                     6
    Mr. Marker                                    8
    Ms. Jarvis                                    9

WITNESS
JOEL MARKER
    Direct Examination by Mr. Lochhead           13
    Cross Examination by Mr. Boley               31
    Cross Examiantion by Mr. McCardell           33
  Recalled
    Direct Examination by Mr. McCardell         130
    Cross Examination by Mr. Lochhead           137

| WITNESS (Continued) | Page |
|---|---|

**ROBERT FINLEY**

| | |
|---|---|
| Direct Examination by Mr. Lochhead | 50 |
| Cross Examination by Mr. Boley | 78 |
| Cross Examiantion by Mr. McCardell | 79 |
| Redirect Examination by Mr.Lochhead | 94 |

**ANDREW ANDRACZKE**

| | |
|---|---|
| Direct Examination by Mr. Perry | 96 |
| Cross Examination by Mr. McCardell | 117 |
| Cross Examination by Mr. Boley | 126 |
| Recalled | |
| Direct Examination by Mr. Perry | 139 |
| Cross Examination by Mr. McCardell | 143 |

**CLOSING ARGUMENTS**

| | |
|---|---|
| Mr. Lochhead | 144, 169 |
| Mr. Boley | 151 |
| Mr. Marker | 155 |
| Ms. Jarvis | 157 |
| Mr. McCardell | 161 |

**EXHIBITS**

| | |
|---|---|
| No. 1 - E-mail | 14 |
| No. 2 - Copy of Court Order | 15 |
| No. 3 - E-mail to Mr. Smith | 17 |
| No. 4 - E-mail to Mr. Smith | 17 |
| No. 5 - E-mail | 18 |
| No. 6 - Weisbar E-mail | 19 |
| No. 7 - E-mail from Mr. Tietze | 24 |
| No. 8 - E-mail from Ms. Zalewska | 29 |
| No. 9 - Handwritten Letter | 71 |
| No. 10 - E-mail to Ms. Zalewska | 74 |
| No. 11 - Mr. Tietze's report | 75 |
| No. 12 - Sinofirst Financial Statement | 76 |
| No. 13 - | 130 |
| No. 14 - Mr. Lochhead's Declaration | 12 |
| Tab 1 - Wolfgang Raubal's Signature | |
| No. 15 - Polish Government Registry of Eurogas Polska | 12 |

EXHIBITS (Continued)                                                    Page
A -                                                                      39
B - E-mail from Mr. Finlay                                              39
C - Mr. Andraczke's Resignation                                         130
D - E-mail                                                          132, 136
E - E-mail from Mr. Freeman from Mr. Melzak                             136
F - E-mail from Mr. Andraczke                                           40
G - E-mail from Mr. Tietze - Affidavit                                  44
H - Mr. Marker's Response                                               45
I - E-mail from Mr. Tietze                                              45
J - Mr. Tretze's Reply to Exhibit I                                     46
K - E-mail from Mr. Tietze                                              49
R - Reponse to E-mail                                                   137
Y - Financial Statement                                                 85
Z - Wire Transfer                                                       87
AA - Accounts of Mr. Finlay                                             89
BB - Certificate of Good Standing                                       92
CC - Duplicate of Exhibit 7                                             92
DD - Duplicate of Exhibit 7                                             92
EE - Mr. Tietze's Report                                                94


MOTION TO FIX FORM OF ASSIGNMENT                                        181


EXHIBITS
No. 1 through 14 -                                                      184
No. 15 - Sale and Purchase Agreement                                   192

1          SALT LAKE CITY, UTAH – MAY 4, 2006

2          JUDGE WILLIAM T. THURMAN PRESIDING

3          (Transcriber's note: Speaker identification

4          may not be accurate with audio recordings)

5                  P R O C E E D I N G S

6     COURT CLERK:  This is in the matter of Eurogas Inc.

7     THE COURT: Let's get appearances on the record of

8     those who are participating with us here today.

9     MR. MCCARDELL:  If it please the Court, Steve

10    McCardell and Penrod Keith of Durham Jones and Pinegar

11    appearing on behalf of Sinofirst.

12    MR. LOCHHEAD:  Robert Lochhead and Craig Perry of

13    Parr, Waddoups, Brown, Gee and Loveless appearing for Bernd

14    Robertz, that's B-E-R-N-D  R-O-B-E-R-T-Z.

15    MS. JARVIS:  Annette Jarvis of Ray, Quinney,

16    Nebeker on behalf of W. Steve Smith as the Chapter 7 trustee

17    of the (inaudible) Michael Kinsey Estates et al.

18    MR. BOLEY:  May it please the Court, Matthew Boley

19    appearing on behalf of Consolidated Seven Rocks Mining

20    Limited.

21    MR. MARKER:  Joel Marker, Trustee at the Eurogas

22    Inc. Estate.

23    THE COURT:  All right.  Well, we have two matters

24    that we set on the calendar for today and we have read the

25    papers very extensively and tried to make some sense out of

1

1   what's going on in this case but I'll take the parties

2   representations and evidence if you have some today.  But

3   who'd like to start on this?  The matter we have on the

4   calendar first is the motion - I don't know if this makes

5   sense, motion to - it does - Motion to Set Aside the sale

6   order and that's your motion, Mr. Lochhead.

7           MR. LOCHHEAD:  It is, Your Honor.

8           THE COURT: I think it makes sense to go forward

9   with that one first.

10          MR. LOCHHEAD:  Before I make an opening statement

11  there's a housekeeping matter bearing on a matter of ethics

12  I'd like to clear with the Court.  I inadvertently this last

13  week found myself in a situation where I may have become a

14  witness at the hearing today and I think we can resolve this

15  my stipulation.  There was a Polish document that I seek to

16  get into evidence that was signed by Mr. Hank Blankenstein.

17  I  talked to Mr. Blankenstein and got representations from

18  him regarding his participation in meetings, his signature on

19  the document.  There was an E-mail exchange between Mr.

20  Blankenstein and myself.  He would not tell me where he is so

21  I couldn't subpoena him.  So I prepared a declaration which

22  is our Exhibit 14 which has the Polish documents and my e-

23  mail exchange with Mr. Blankenstein attached.  I don't

24  believe that my communications with Mr. Blankenstein is

25  subject of a dispute and I believe that Sinofirst is going to

1   stipulate to entry of the key documents.  So on that basis I

2   believe I can go forward and participate in the case but I

3   wanted the Court to be aware of that potential issue.

4           THE COURT:  Okay, I understand the issue.

5           I had another preliminary matter.  Tell me about

6   the notice that was given for this hearing, Mr. Lochhead.

7           MR. LOCHHEAD:  The notice went out by e-mail last

8   Friday which was the same day that I appeared in chambers

9   with Your Honor and notice went that day pursuant to the

10  Court's order to counsel for Sinofirst, to the Trustee, and

11  to counsel for Consolidated.  We also gave notice, or the

12  trustee gave notice, I'm really not quite sure, to the estate

13  which is the principal creditor and that's the notice that's

14  been given.  I believe all of the interested parties are

15  present and represented in the court today.

16          THE COURT:  Do I have a certificate that says that

17  in here somewhere?

18          MR. LOCHHEAD:  I believe so, Your Honor.  I need to

19  go through it. It was really rushed but I believe that the

20  certificate is there.  If not, that is what was done and if I

21  need to amend the certificate, I'm certainly prepared to do

22  that.

23          THE COURT:  Take a look at that following the

24  hearing if it needs to supplemented, you do that please.

25          MR. LOCHHEAD:  I will.

                                                          3

1          THE COURT:  All right, go ahead.

2          MR. LOCHHEAD:  Thank you.  I'll be as brief as I

3     can.  The time is short today.  There was an auction held in

4     this case on March 28, at which Sinofirst Capital and Trading

5     purchased a Eurogas Polska from the debtor.  Eurogas Polska

6     being a subsidiary.  At a hearing held on March 30 to confirm

7     the sale, Mr. David Finlay who was is the president of

8     Sinofirst testified that he was acting independently. Since

9     then we have discovered evidence that Mr. Finlay was acting

10    in cooperation and in active concert with Wolfgang Roble,

11    that's W-O-L-F-G-A-N-G, Rauball,  R-A-U-B-A-L-L who is the

12    former CEO of Eurogas who was named by order of this Court as

13    a debtor with debtor's responsibilities but who consistently

14    failed to comply with those responsibilities in the court

15    order.  That Mr. Finlay was acting in concert with Mr.

16    Rauball and Mr. Jochen Tietze, that's J-O-C-H-E-N, Tietze,

17    T-I-E-T-Z-E was is a German individual and a friend and

18    business associate of Mr. Rauball's, that Rauball through

19    Tietze and Finlay, acted in concert to acquire this asset for

20    the benefit of Rauball and his associates.

21          The agreement or the understanding among the

22    parties was for Finlay's company to bid at the auction.

23    Tietze who had initially indicated he was going to bid,

24    backed off once Finlay came on board with the tacit

25    understanding that once Mr. Finlay was able to acquire the

                                                              4

1    company that he could then flip or sell it onto Mr. Tietze's

2    group certainly at a profit for Mr. Finlay.  So at the end of

3    the day you would have Mr. Rauball and Mr. Tietze working in

4    act of concert preserving for themselves the principal asset

5    of this estate, notwithstanding that Mr. Rauball has

6    flagrantly violated the Court's order throughout the history

7    of the case.  That is essentially what we believe our

8    evidence will show, Your Honor.  Thank you.

9           THE COURT:  Are there other parties who wish to

10   make opening statements?

11          Mr. McCardell?

12          MR. MCCARDELL:  Thank you Your Honor.  Steve

13   McCardell, appearing on behalf of Sinofirst.  Mr. Finlay is

14   in the courtroom today.  Mr. Finlay is sitting right behind

15   me.  I'd like to introduce him to you and he'll be testifying

16   at this hearing, Your Honor.  He's come down from Vancouver

17   and testified in his deposition.

18          In accordance with Your Honor's order as signed on

19   Friday, we produced the documents requested of us.  Mr.

20   Finlay, as I noted, submitted to his deposition yesterday and

21   we have stipulated with Mr. Lochhead as to the admission of

22   his exhibits attached to the motion.

23          Your Honor, we desire finality with respect to this

24   matter.  The arguments that have been made, the evidence that

25   is offered in support of today's motion is no more than a

5

1   rehash of the arguments already heard and disposed by Judge

2   Boulden which she heard this matter at a full evidentiary

3   hearing at which Mr. Finlay was cross examined at length by

4   several lawyers.  The parties appearing before you today in

5   this motion are a disappointed bidder who seeks to offer not

6   more for the asset but the same amount.  At stake in this

7   hearing is Sinofirst's significant economic interest which

8   day by day is losing value because of the uncertainty with

9   respect to this Court's order.  We desire the Court be fully

10  informed of all facts and have submitted perhaps more

11  evidence than parties wish to see with respect to the facts

12  that we're aware of.  We'll present those and ask that Your

13  Honor consider those and we're confident at the end of the

14  hearing Your Honor will conclude that the motion is not well

15  taken and that there is not a proper basis to set aside Judge

16  Boulden's order.

17           THE COURT:  Thank you.

18           Other parties?  Mr. Boley?

19           MR. BOLEY:  Yes, Your Honor.  Consolidated Seven

20  Rocks Mining Limited has filed a response and a joinder in

21  this motion.

22           With respect to the action, I'll point out that Mr.

23  Finlay was the successful bidder, not only for the company

24  known as Eurogas Polska but also for a company by the name of

25  Globe Gas, BV.  My client was the backup bidder for that

6

1   asset of the estate.

2         Your Honor, I was at the last hearing and there is

3   substantial new evidence that will be presented to you today.

4   At the last hearing there was some evidence that Finlay had a

5   long standing relationship with Rauball and some evidence

6   that he had some communications with Rauball.  The evidence

7   that will be presented to you today shows that those

8   communications were numerous, that they were serious and

9   substantial and that they related specifically to the assets

10  of this estate and the assets that were up for auction.  Mr.

11  Finlay had Mr. Rauball's ear and they worked in concert to

12  become the successful bidder.

13        Finlay had inside information in this respect from

14  Rauball and that was not brought out at the last hearing.

15  Other information in evidence that was not brought up at the

16  last hearing was the extent of the relationship and the

17  collusion between Mr. Finlay and Mr. Tietze who was a

18  competing bidder.  At the last hearing Mr. Finlay

19  conveniently forgot the substance of his telephone

20  conversations with Mr. Tietze.  Yesterday in his deposition,

21  a month and a half later, he remembered.

22        The evidence the Court will hear regarding those

23  conversations will give the Court great concern about

24  collusion between competing bidders and that collusion led to

25  one of those competing bidders withdrawing from the auction.

                                                              7

1   Since that time Mr. Finlay and Mr. Tietze have worked in

2   concert to secure Mr. Finlay's rights in Poland and many of

3   those actions were taken in violation of bankruptcy law and

4   before Mr. Finlay had any right to the assets in Poland.

5        With that Your Honor, I'll reserve the rest for

6   closing.

7        THE COURT:   Thank you.

8        Mr. Marker.

9        MR. MARKER:   Thank you, Your Honor.   I have not

10  filed any responses, written responses to the motions before

11  you today simply because of the press of time.   I'm very

12  impressed with counsel that are appearing before you here

13  today and their ability to, in good faith, gather up the

14  documents and provide the testimony that will be heard by you

15  today and file their pleadings.

16       My position on this first motion before you, the

17  motion by Mr. Robertz is that I do not support.   I conducted

18  the auction myself.   I presented the evidence at the sale

19  confirmation hearing before Judge Boulden on March 30 where

20  Mr. Finlay testified.   Much of what he testified to yesterday

21  in his deposition, over three hours of deposition, is I think

22  accumulative and not substantially different than his

23  testimony at the hearing before Judge Boulden.   My view is

24  that there is not enough evidence that will be presented to

25  you today to warrant you upsetting a final, non-appealable

1    order of this Court and confirm the sale and awarding certain

2    assets to Mr. Finlay. So I do not support that motion.

3          I will reserve comment and evidence on the second

4    motion filed by Mr. Finlay on the form of assignments if we

5    get that far.

6          THE COURT: Ms. Jarvis.

7          MS. JARVIS: Your Honor, as you may recall, I

8    represent the major creditor in this case, Mr. Smith as the

9    Chapter 7 Trustee of several estates. That's about a $113

10   million judgment against Rauballs and against Eurogas and we

11   would reserve our right to state our position at the end of

12   the day after we've heard the evidence that is submitted to

13   the Court.

14         At the auction, I stated and I'll read from the

15   transcript because this is our issue, I stated, "We're

16   relying on the sworn testimony that was given today, the

17   testimony that they have no" -meaning, and they refers to the

18   Rauballs - "no involvement, no understanding and will not get

19   any value from this. Relying on the testimony, we would not

20   object to the sale." So we reserve the right to listen to

21   the new evidence and determine what our position is at the

22   end of this hearing.

23         THE COURT: All right. Mr. Lochhead, you have some

24   evidence you want to present?

25         MR. LOCHHEAD: I do, Your Honor. Your Honor,

9

1   present in the courtroom is Maria Epic who is a neutral

2   party.  She is a native of Poland, a native polish speaker.

3   She's been in the United States for many years and is here in

4   the capacity of an interpreter or translator.  I believe

5   though that we could probably take care of what she would

6   testify to by stipulation.  So I'd like to try to do that and

7   then she needs to be excused if that's alright.

8          Exhibit 14 is the Lochhead Declaration and the

9   substantive exhibit is actually Exhibit 1 to that

10  declaration.  The first page —

11         THE COURT:  Hang on a sec, let me get the right

12  booklet.  Okay.

13         MR. LOCHHEAD:  The first page is my little one line

14  e-mail to Mr. Blankenstein.

15         THE COURT:  This is the attachment?

16         MR. LOCHHEAD:  Right, that would be Exhibit 1 and

17  then immediately behind that are four pages —

18         THE COURT:  Let me ask you this, is this a courtesy

19  copy for the Court?

20         MR. LOCHHEAD:  It is.

21         THE COURT:  I can write on it?

22         MR. LOCHHEAD:  Yes, the originals are on the

23  witness table.

24         THE COURT:  Okay.

25         MR. LOCHHEAD:  So there is a document one page

1  written in Polish, appears to be written - or signed by Mr.

2  Rauball and others and there's a second page, apparently

3  signed by Mr. Tietze.  The third page which is a receipt and

4  then an English translation is the fourth page and the

5  subject would testify that she has reviewed the translation.

6  She believes it to be accurate.  She may take occasional

7  exception for a little bit of the grammar here and there but

8  she believes it's a good translation.  So I would proffer

9  that testimony and proffer those four pages from the Lochhead

10  Declaration.

11         THE COURT:  Are there parties who wish to be heard

12  on that?

13         MR. (?):  No objection, Your Honor.

14         THE COURT:  No objections?  So are you asking me to

15  receive Exhibit 14 along with its attachments?

16         MR. LOCHHEAD:  No, Your Honor.  I'd just as soon

17  not be a witness so what I'm offering is from Exhibit 14,

18  just pages 2 through 5 of Exhibit 1 to the exhibit which are

19  those three Polish documents and the translation.

20         THE COURT:  The first one is your e-mail from you

21  to —

22         MR. LOCHHEAD:  So I'm not offering that.

23         THE COURT:  You're not.

24         MR. LOCHHEAD:  I'm offering the three Polish pages

25  and the translation, so four pages total.

11

1          THE COURT:  Four pages.

2          MR. LOCHHEAD:  And if the record could indicate

3  that that would be the substitute Exhibit 14.

4          THE COURT:  Any objection to that?

5          MR. ?: None, Your Honor.

6          THE COURT: Okay.  Exhibit 14 consisting of four

7  pages identified by Mr. Lochhead are received at this

8  contested hearing.

9          (Exhibit 14 received)

10          MR. LOCHHEAD:  Okay.  And the other, a Polish

11  document is Exhibit 15.  Ms. Epic would offer translation for

12  that.  We have another witness present in the courtroom who

13  can authenticate this to its source.  It is a copy of a

14  document maintained by the Polish government from the

15  commercial registry with respect to Eurogas Polska and

16  specifically on the third page of that exhibit it identifies

17  Mr. Tietze as a director of Eurogas Polska as of May 2, 2006.

18  I don't believe that is contested and I offer this exhibit.

19          THE COURT:  Any objections?

20          MR. ?: No objections, Your Honor.

21          THE COURT: There are none.  Exhibit 15 is received.

22          (Exhibit 15 received)

23          MR. LOCHHEAD:  And I will instruct my witness that

24  she is excused with the leave of Court.

25          THE COURT:  Any objections to that or wish to cross

1 | examine?

2 | 　　　　　MR. ?:  None, Your Honor.

3 | 　　　　　THE COURT: You're excused, ma'am.

4 | 　　　　　MR. LOCHHEAD:  Thank you.  The first live witness I

5 | would call then is Joel Marker.

6 | 　　　　　THE COURT:  Mr. Marker, come forward and be sworn

7 | in.

8 | 　　　　　　　　　　JOEL MARKER

9 | 　　　　　having been duly sworn, testified upon

10 | 　　　　　his oath as follows:

11 | 　　　　　COURT CLERK:  Please take the witness stand and

12 | state your name for the record please.

13 | 　　　　　THE WITNESS:  Joel Marker.

14 | 　　　　　　　　　　DIRECT EXAMINATION

15 | BY MR. LOCHHEAD:

16 | 　　Q　　Mr. Marker, you are the Chapter 7 trustee in this

17 | case; is that correct?

18 | 　　A　　Yes.

19 | 　　Q　　And this is involuntary Chapter 7 case that was

20 | filed in 2004, correct?

21 | 　　A　　Yes.

22 | 　　Q　　After you were named as Chapter 7 trustee, could

23 | you briefly tell the Court what you undertook to do?

24 | 　　A　　I reviewed the docket, reviewed the pleadings that

25 | had been filed in the case, contacted Steve Smith who was —

13

1      Q      Whose he?

2      A      He's the trustee for the petitioning creditors.

3      Q      And did you undertake any efforts to try to get

4  information on the debtor?

5      A      All of the information at that time in the early

6  stage of the case that I received was from the docket or some

7  information from Mr. Smith, yes.

8      Q      Would you look at the Robertz Exhibit Binder there

9  in terms of Exhibit 1 please?  Can you identify that?

10     A      That's an e-mail that I received from Mr. Smith

11  identifying addresses that he had for some of the principals

12  of the debtor.

13     Q      Did you use this document to try to contact the

14  principals of the debtor?

15     A      I used it as a form of service list for a motion

16  seeking to designate these individuals as the debtor under

17  the bankruptcy rules so that I could get some statements and

18  scheduled to work with.

19          MR. LOCHHEAD: Okay, offer Exhibit 1.

20          THE COURT:  Any objections?

21          MR. BOLEY:  None, Your Honor.

22          THE COURT:  Received.

23          (Exhibit 1 received)

24     Q      (BY MR. LOCHHEAD)  So you filed such a motion?

25     A      Yes.

14

1    Q    And who did you propose to designate as debtors on

2    behalf of this company?

3    A    As set forth in Exhibit 2, Wolfgang Rauball,

4    Reinhart Rauball and Hank Blankenstein.

5    Q    Exhibit 2 is a copy of the Court's order

6    designating those individuals as debtor?

7    A    Yes.

8    MR. LOCHHEAD: Offer Exhibit 2.

9    THE COURT:  Received.

10    (Exhibit 2 received)

11    Q    (BY MR. LOCHHEAD)  What did you understand the

12    duties of Mr. Wolfgang Rauball, Mr. Reinhart Rauball and Mr.

13    Hank Blankenstein to be?

14    A    As set forth in the order, they were directed by

15    the court to prepare and file statements of schedules and to

16    turn over to me all books and records of the debtor entity.

17    Q    Did they in fact do that?

18    A    No.

19    Q    Did they do anything to assist you?

20    A    Indirectly, they had prior, to the enter of the

21    order for relief, provided some information in the form of

22    draft statements and schedules that they gave to Roger Segal

23    who was at that time counsel for Eurogas in this case.  Mr.

24    Segal explained to me that he thought that the information he

25    received was incomplete and not sufficient to file actual

15

1    statements and schedules and so he did not do so.  When I

2    found out that information had been given by these

3    individuals to Mr. Segal, I contacted Mr. Segal.  He was kind

4    enough to retrieve his boxes from storage and provided me

5    with the draft schedules.

6         Q    Were statements and schedules ever filed in this

7    case?

8         A    No.

9         Q    Did you make any attempts to contact Mr.

10   Blankenstein or Messieurs Rauball?

11        A    By mail according to the list that I was given by

12   Mr. Smith, yes.

13        Q    Were you successful?

14        A    No, much of the mail, for example the mail to the

15   Vancouver address and to the Melody Ann Circle address for

16   Mr. Blankenstein was all returned.  The mail to Vienna,

17   Austria was not returned but there was no response.

18        Q    So other than the documents you received through

19   Mr. Segal, did you receive any assistance or cooperation from

20   Mr. Wolfgang Rauball, Reinhart Rauball or Hank Blankenstein

21   in administering the asset in this case?

22        A    No.

23        Q    Would you turn to Exhibit 3 please?  Can you

24   identify that please?

25        A    That's my responsive e-mail to Mr. Smith.  He was

16

1   requesting information on what had happened to the Motion to

2   Designate the individuals as the debtor.   There was no

3   response to the motion and I told him that I would submit an

4   order which is Exhibit 2 and strike the hearing.

5       Q    What did you mean by no response and no records?

6       A    There was no response to the motion and I had

7   received no records from the individuals.

8       Q    Is that a truthful statement?

9       A    Yes.

10           MR. LOCHHEAD: Okay, offer Exhibit 3.

11           THE COURT:   Received.

12           (Exhibit 1 received)

13      Q    (BY MR. LOCHHEAD)   Would you turn to Exhibit 4

14   please?

15      A    Yes.

16      Q    Can you tell the Court what that is?

17      A    That's my e-mail to Mr. Smith asking him whether he

18   intended to proceed with assisting me in administering the

19   estate.

20           MR. LOCHHEAD:   Okay.   Offer Exhibit 4.

21           THE COURT:   Received.

22           (Exhibit 4 received)

23      Q    (BY MR. LOCHHEAD)   As of the time that you sent

24   this e-mail, September 2005, were you aware of any assets of

25   this estate you could administer as trustee?

                                                            17

1      A     No.

2      Q     Were you prepared to close the case?

3      A     I did shortly after this.

4      Q     And you filed an No Asset report?

5      A     I did.

6      Q     Would you turn to Exhibit 5 please?  Can you

7   identify that?

8      A     That was an e-mail that followed a telephone call

9   from Mark Weisbar indicating that he had a client later

10  identified as Consolidated Seven Rocks Mining that was

11  interested in purchasing the estate's interest in several

12  subsidiaries.

13     Q     How did you use this e-mail if at all?

14     A     How did I use it?

15     Q     Yes.  I'll ask if it helped you in any way in the

16  administration of this estate?

17     A     Oh yes.  I mean, this was the beginning of the

18  string of events that led to the auction.  I now had $715,000

19  in my trust account.

20          MR. LOCHHEAD: Offer Exhibit 5.

21          THE COURT:  Received.

22          (Exhibit 5 received)

23     Q     (BY MR. LOCHHEAD)  Was this e-mail, end of October

24  2005, the first indication to you that you might assets that

25  you could sell for the benefit of creditors?

1      A    Yes.

2      Q    All right.  Would you turn to Exhibit 6 please?

3  What is that?

4      A    After several more telephone conversations with Mr.

5  Weisbar to define the terms of the purchase and sale

6  agreement, Mr. Weisbar sent me this e-mail as a form of term

7  sheet that I forwarded discreetly to Mr. Smith as the

8  largest, by far the largest creditor.  I wanted his input on

9  it before I proceeded.

10           MR. LOCHHEAD: Offer Exhibit 6.

11           THE COURT:  Received.

12           (Exhibit 6 received)

13      Q    (BY MR. LOCHHEAD)   This is an offer for $10,000?

14      A    Yes.

15      Q    For what assets?

16      A    Consolidated had identified four subsidiaries,

17  direct or indirect of Eurogas Inc., one called Eurogas

18  Polska, another company called Globe Gas, a company called

19  Pol-Tex Methane and a company called McKenzie Methane

20  Jestrazebi.

21      Q    Are those the same subsidiaries that ultimately

22  were sold at the auction?

23      A    Yes.

24      Q    Were you as trustee prepared to accept the $10,000

25  offer subject to higher and better bids?

19

1    A   I did.

2    Q   All right.  What did you do then after you received

3 this e-mail which is Exhibit 6?

4    A   In the process of putting together a motion seeking

5 court authority to sell the assets to Consolidated pursuant

6 to a form of sales and purchase agreement that Mr. Weisbar

7 and I negotiated, I started receiving calls from other

8 parties interested in joining in the auction.

9    Q   Who did you hear from?

10    A   I got a call from Mr. Finlay representing his

11 company, Sinofirst Trading and Capital Corporation.  I got a

12 call from, I think the second call actually that I received

13 was from your client, Mr. Robertz.

14    Q   Did you receive word from anyone named Herb Zimmer,

15 Z-I-M-M-E-R?

16    A   Yes.

17    Q   What did you receive from Mr. Zimmer?

18    A   A letter from him that was first faxed and then I

19 received a hard copy expressing his interest.  I believe this

20 was after I had mailed out, circulated the motion seeking

21 approval to sell the assets to Consolidated.

22    Q   Did Mr. Zimmer send you money to qualify as a

23 bidder?

24    A   He sent me a form of bank draft.  I don't know

25 whether it was a cashier's check or just a normal check

1   denominated in Euros, 15,000.

2        Q      Did you ultimately disqualify Mr. Zimmer as a

3   bidder?

4        A      In the early stages of the process I did.

5        Q      Why is that?

6        A      Both Mr. Smith and Mr. Finlay identified Mr. Zimmer

7   as an accountant for Mr. Rauball, Wolfgang Rauball and

8   because of that relationship, I made a decision to disqualify

9   him as a bidder and notified him.

10        Q      And you returned the 15,000 Euros?

11        A      Yes.

12        Q      Did you receive expressions of interest from any

13   other potential bidders?

14        A      At the time that we presented the matter to Judge

15   Thurman on the first occasion, there were I believe three

16   bidders in addition to Consolidated; Consolidated, Mr.

17   Finlay, Sinofirst; Mr. Robertz and a fellow named Walter

18   Storm.  His company was called Falcon Energy Holding.

19        Q      And he later withdrew?

20        A      The day before the hearing, the first sale hearing,

21   yes.

22        Q      Did you ever received word from Mr. Jochen Tietze

23   that he was interested in bidding?

24        A      Not at that stage of the case.

25        Q      When did that occur?

21

1     A     After Judge Thurman approved the sale but required

2     further marketing and advertising and I couldn't tell you

3     exactly when, it was between that time in early February of

4     2006 and when the auction took place on March 28th, 2006.

5     Q     All right.  Did you prepare a due diligence package

6     or a bid package that you sent to interested parties?

7     A     Yes.

8     Q     What did that consist of?

9     A     There were a number of documents, some geological

10    information.  There was a map showing blocks of the Polish

11    landscape similar to mining claims, something that we'd be

12    accustomed to here in the west and other items prepared by

13    Mr. Andrew Andraczke who I believe is - was at the time

14    managing director of Eurogas Polska and Pol-Tex.

15    Q     At the time that the auction took place on March

16    28, 2006, did you personally have any idea what those assets

17    were worth?

18    A     No.

19    Q     Did you even have actual knowledge that the assets

20    actually existed?

21    A     I did not have any of the underlying corporate

22    documents, no.

23    Q     Did you have any knowledge regarding liens on any

24    of those or potential liens on any of those assets?

25    A     No.

22

1     Q    So the due diligence package to your knowledge did

2     not disclose that information, would that be a fair

3     statement?

4     A    If the information existed, I mean if there are

5     positive liens out there, it wasn't in the package because I

6     didn't know about it.

7     Q    Okay.  I believe you testified a minute or two ago

8     that you disqualified Mr. Zimmer because (disk froze 2:37:27

9     to 2:37:54.)

10    A    - he was going to oppose the motion. He was also

11    suspicious of Mr. Finlay because of his past representation

12    of Eurogas in his relationship with Wolfgang Rauball and he

13    was concerned about your client but he didn't know anything

14    about him.

15    Q    Would it be fair to say that you felt it was

16    inappropriate for Mr. Rauball or anyone acting on his behalf

17    to bid on assets since Mr. Rauball had refused to cooperate

18    in th administration of the estate?

19    A    My real concern about Mr. Zimmer was that he'd been

20    identified by everyone I talked to as the accountant for

21    Rauball and he did not provide any further information to me

22    when I tried to reach Mr. Zimmer.

23         On the other hand, for example, Mr. Finlay when I

24    asked for further clarification about his relationship to Mr.

25    Rauball, he was forthcoming and he gave me the information I

1   requested.

2       Q    Didn't you tell me the other day when we visited

3   about this that you had concerns about anyone bidding on

4   behalf of Rauball because Rauball had not cooperate with you?

5       A    Yes.

6       Q    So that was a concern?

7       A    Yes.

8       Q    Would you turn to Exhibit 7 please?  What is that?

9       A    That's an e-mail I received from Mr. Tietze the day

10  before the auction.  This was the last day, March 27, 2006

11  for parties to pay the $15,000 earnest money deposit to

12  participate in the auction.  This is his e-mail to me

13  withdrawing from the auction.

14           MR. LOCHHEAD:  Offer Exhibit 7.

15           THE COURT:  Received.

16           (Exhibit 7 received)

17      Q    (BY MR. LOCHHEAD)  You don't need to read this

18  whole thing out loud but will you tell the Court your

19  understanding of the reasons offered by Mr. Tietze for his

20  withdrawal?  I can help you with it if you'd like, if that

21  would speed things up.

22      A    The document speaks for itself.  My recollection is

23  he was very concerned.  His relationship with Mr. Andraczke

24  had become strained and there was some conflict between the

25  two of them and he didn't feel comfortable in bidding.

24

1      Q      The second paragraph from the end Mr. Tietze

2   writes, "Based on these findings, I informed my client about

3   these new facts and recommended to him not to pursue the

4   matter further.  My client has taken my advice and I'm

5   therefore withdrawing my bid."  Did I read that correctly?

6      A      Yes.

7      Q      Did you understand that to be the reason why Mr.

8   Tietze was withdrawing?

9      A      Yeah, I don't know any other reason.

10     Q      The auction was then held.  Was that in your office

11  on March 28?

12     A      Yes.

13     Q      Did Mr. Finlay participate in the auction?

14     A      Yes.

15     Q      Did he ask for a break in the bidding to make a

16  phone call?

17     A      May I consult my notes of the auction?

18     Q      Sure.

19     A      Your Honor may I?

20            THE COURT:  Yes.  Are there any objection from

21  anybody to that?

22            MR. BOLEY:  None from us.

23            THE COURT:  Go ahead.

24            THE WITNESS:  I'm going through this very quickly.

25  The answer to your question is yes but in clarification, I

25

1    conducted the auction in two tracks.  First was one lot for

2    the four companies.  Then I backed up and re-auctioned the

3    four companies separately to see which would get a higher

4    price.  During the first one lot auction, Mr. Robertz bid

5    $275,000.  They were going up in $5,000 increments from

6    $10,000 and it was quite tedious for all concerned.  At that

7    point he requested a break.  The next break came after

8    Consolidated —

9            THE COURT: Wait a minute, who requested the break?

10           THE WITNESS: My notes indicate it was Mr. Robertz.

11           THE COURT: Thank you.  That's your client.

12           MR. LOCHHEAD: Yes.

13           THE WITNESS: Consolidated requested a break after

14   the bidding had reached $385,000.  Robertz requested another

15   break at $450,000.

16      Q    (BY MR. LOCHHEAD) When you say Roberts, who was

17   there representing Mr. Robertz?

18      A    Ralph Maybe was his counsel, was the only agent

19   present at the auction.

20      Q    Okay, would you continue please?

21      A    Mr. Finlay requested a break at $600,000 and again

22   at $620,000 and a final break at $630,000 I think was

23   requested by Mr. Finlay and at that point when we came back

24   from the break, no one wanted to advance the bid and Mr.

25   Robertz submitted a backup bid of $450,000 and Consolidated

26

1   submitted a backup bid of $400,000.

2   Q   Let me make sure that I'm getting this straight.

3   During the first bid as a single lot, Mr. Finlay asked for a

4   break when the bidding got to $600,000 and again at $620,000;

5   is that correct?

6   A   Yes.  I think when Mr. Finlay bid $630,000, I think

7   somebody else asked for the break and then when we came back

8   no one advanced the bid.

9   Q   Okay.  What happened then?

10   A   Then again, I backed up and conducted the auction

11   with four lots.  My notes don't reflect any break in the

12   Eurogas Polska auction which resulted in Mr. Finlay's high

13   bid of $375,000 and Robertz submitting a backup bid of

14   $350,000.  And the Pol-Tex Methane auction, at the point that

15   Consolidated bid $325,000, someone requested a break.  Again,

16   I don't have information in my notes about who that was.

17   When we came back from that break, no one advanced the bid

18   but Mr. Robertz submitted a backup bid of $100,000.

19   Q   Okay, so the final results of the four lot auction

20   was Sinofirst made the high bid for Eurogas Polska at

21   $375,000, Consolidated for Pol-Tex Methane at $325,000 and

22   let's see, who made the high bid for – first of all, is that

23   correct for lots one and two?

24   A   Yes.

25   Q   And who made the high big for Globe Gas?

27

1       A      Sinofirst at $10,000.

2       Q      And Consolidated the made high bid for McKenzie

3   Methane at $5,000, correct?

4       A      Yes.

5       Q      Those were the bids that you accepted subject to

6   court approval?

7       A      Correct.

8       Q      Would you turn in the exhibit binder in front of

9   you to Exhibit 8 please?  This a two page exhibit purports to

10  be an e-mail exchange.  Can you identify these e-mails

11  please?

12      A      This is an e-mail received from, I believe it's a

13  woman identifying herself as the Deputy Director of the

14  Department of Geology and Geological Concessions of the

15  Administrative Environment in Warsaw, Poland, Ewa E-W-A,

16  Zalewska, Z-A-L-E-W-S-K-A.

17      Q      Stop there for just a minute.  She identifies

18  herself with at the bottom of that first page as Deputy

19  Director of the Department of Geology and Geological

20  Concessions, does that phrase Geological Concessions mean

21  anything to you in this context?

22      A      What I understand from discussions of the parties

23  that were involved in the bidding is that the main interest

24  in these subsidiaries of the debtor is that they may hold one

25  or more concessions to explore for oil and gas or methane

1  type assets.

2      Q     What do you understand a concession to be in this

3  context?

4      A     I think it's similar to what we would recognize

5  here in Utah as a mining claim.  It's just a right to look.

6            MR. LOCHHEAD:  Offer Exhibit 8.

7            THE COURT:  Received.

8            (Exhibit 8 received)

9      Q     (BY MR. LOCHHEAD)  Okay, looking at the first page

10 of Exhibit 8, that's the correspondence to you from Ms.

11 Zalewska.  Would you look at paragraph 4, please?

12     A     Yes.

13     Q     She writes that she's received a document from Mr.

14 J. Tietze which states that "On November 25, 2005 during the

15 Eurogas Polska Partner's Meeting Mr. Jurgen Tony Prose and

16 Mr. Jochen Tietze were enacted as new members of the board.

17 The resolution has been signed by W. Rauball, Hank

18 Blankenstein and A. Devenchek.  Would you please tell me if

19 this resolution in your opinion is still valid in the context

20 of the sale of Eurogas Polska?"  Have I read that correctly?

21     A     Yes.

22     Q     What was your reaction to this?

23     A     It's on the second page of the same exhibit.

24     Q     Would you summarize that please, what you responded

25 to her?

29

1    A    My response was that those individuals including

2  Mr. Tietze and Mr. Rauball had no authority in November of

3  2005 to vote the shares of Eurogas Inc., this debtor, in

4  order to affect a change in management or the officers of the

5  subsidiaries.

6    Q    Did you authorize any such board meeting on or

7  about November 25, 2005?

8    A    No.

9    Q    Were you aware of any such meeting prior to this e-

10  mail?

11    A    I don't - I mean, not - there were - in this case

12  I've never been involved in 22 years of practice in a case

13  where e-mails have flown like December snow and at some point

14  maybe a couple of days before this I got an e-mail

15  referencing this purported shareholder's meeting prior to

16  this but it was about this time.

17    Q    So this approximate time frame was when you first

18  heard about it?

19    A    Yes.

20    Q    And that was without your authorization?

21    A    Correct.

22       MR. LOCHHEAD:  All right.  I offered Exhibit 8 did

23  I not?  It's been received?

24       THE COURT:  I believe it has, yes.  Exhibit 8 is

25  received.

30

1          MR. LOCHHEAD:  I have no further questions.

2          THE COURT:  Other parties with questions of this

3    witness?  Mr. Boley?

4                        CROSS EXAMINATION

5    BY MR. BOLEY:

6          Q    Mr. Marker, you testified that you had some

7    conversations with Mr. Finlay to put at ease in your mind his

8    connection with Wolfgang Rauball; is that correct?

9          A    Yes.

10         Q    What did he tell you about that relationship to put

11   you at ease?

12         A    I asked him on several occasions beginning in

13   February and continuing through my direct examination of him

14   at the sale confirmation hearing on March 30.  I asked him on

15   many occasions, one, are you acting as an agent for Wolfgang

16   Rauball, to which he repeatedly answered no.  Two, are you

17   biding with your own money, to which he repeatedly answered

18   yes.  Three, like a lawyer, I always try to ask the same

19   question five different ways.  I asked those two basic

20   questions five different ways and he always responded in a

21   way that led me to believe that he was not acting as a shill

22   for Mr. Rauball which was my concern.

23         Q    Did Mr. Finlay inform you that he had had numerous

24   conversations with Mr. Rauball regarding the auction?

25         A    That, no.  He did express to me that he had known

                                                              31

1   Mr. Rauball for 30 years and considered him a good friend.

2        Q    Did he share with you that he'd been in recent

3   communication with Mr. Rauball regarding the subject of the

4   auction?

5        A    I don't recall that.

6        Q    I'm going to turn your attention real quick to the

7   auction date and I have a question about the events during

8   the sale of the second lot in the four lot portion of the

9   auction.  Can you summarize for the Court the various bids

10  and counterbids that were made for Pol-Tex Methane?

11       A    My notes and I didn't keep - we were having - I had

12  the auction recorded by a court reporter and so I didn't keep

13  detailed notes of each advance but my notes do reflect that

14  Consolidated at one point had bid $275,000.  My next note

15  indicated that Mr. Finlay on behalf of Sinofirst had bid

16  $300,000 and the final bid with Consolidated at $325,000.

17       Q    So at the time - and I believe you testified that

18  someone, you can't recall whom, requested a break after

19  consolidated made that bid for $325,000?

20       A    Correct.

21       Q    Had Mr. Robertz made any recent bid before that

22  break was requested?

23       A    My notes don't reflect that.  My notes only reflect

24  that his backup bid after I awarded that portion of the sale

25  to Consolidated, that Mr. Robertz backup bid was $100,000.

32

1    Q    So the bidding at that point when the break was

2    requested was between Consolidated and Finlay; is that

3    correct?

4    A    That's the only participation noted in my notes.

5    Q    To the best of your recollection is that true?

6    A    I can't recall anything different.

7         MR. BOLEY:  Okay.  That's all I have, Your Honor.

8         THE COURT:  Other parties?  Mr. McCardell.

9         MR. MCCARDELL: Thank you, Your Honor.

10                    CROSS EXAMINATION

11   BY MR. MCCARDELL:

12   Q    Mr. Marker, you testified concerning the order

13   entered designating principals of the debtor to file schedule

14   of statements; isn't that right?

15   A    Yes.

16   Q    Do you have any evidence that Mr. Finlay or

17   Sinofirst was involved in any way in the evident disobedience

18   to that order?

19   A    No.

20   Q    And when you had a concern about Mr. Zimmer

21   participating in the auction, Mr. Finlay was one of the

22   persons who identified the connections, correct?

23   A    Yes.

24   Q    Having dealt with Mr. Finlay over this period of

25   time, do you have a view as to whether he has been

33

1    forthcoming in respect to the auction?

2            MR. LOCHHEAD:  Objection, vague and foundation.

3            THE COURT:  Your response?

4            MR. MCCARDELL:  My question is whether he has a

5    view.  It's a yes or no question.

6            MR. LOCHHEAD:  Your Honor, I object because he's

7    essentially asking Mr. Marker to make a credibility

8    determination.  That's up to the sole determination of the

9    Court.

10           THE COURT:  There is a determination for the Court

11   to make an assessment of those sort of things but this is a

12   preliminary, goes to helping the trustee form an opinion as

13   to the character and nature of the sale.  Objection

14   overruled.  You may answer.  Do you have a view?

15           THE WITNESS:  Mr. Finlay as a witness can be quite

16   excitable and I have argued with him on several occasions

17   during this process but I have not known him to do anything

18   but tell the truth.

19       Q    (BY MR. MCCARDELL)  You testified that e-mails flew

20   like December snow, a phrase that I'll always remember.  As

21   you received e-mails from parties what was our custom and

22   practice with respect to receiving those e-mails?

23       A    To the extent possible, if I received, for example,

24   an e-mail from Mr. Andraczke, many E-mails from him saying

25   that there was a problem with the companies.  If a payment

34

1  wasn't made to the landlord or something wasn't done right

2  away with the concessions, they would be lost.  The course of

3  conduct would be for me to circulate that e-mail to all of

4  the interested parties as quickly as I could.

5      Q    Occasionally some of those E-mails included e-mails

6  to or from Mr. Wolfgang Rauball didn't they?

7      A    Yes.  Mr. Smith was on the side communicating with

8  Mr. Rauball by e-mail.  I'm sure Mr. Smith whose been chasing

9  Mr. Rauball for about 10 years would like to get his hands on

10  him but all he can do is trade e-mails with him and I did see

11  some of those as well.

12     Q    To your knowledge, the parties who were receiving

13  these e-mail chain would have received his e-mail address

14  along with their copies of the e-mails?

15     A    Yes.

16     Q    If you could please turn to Mr. Lochhead's exhibit

17  book, Exhibit 7.

18     A    Yes.

19     Q    As I understand it, this is an e-mail you received

20  from Mr. Tietze the day before the auction, correct?

21     A    Yes.

22     Q    He identified his reasons for withdrawing as a

23  potential bidder, correct?

24     A    Yes.

25     Q    First reason was that Mr. Andraczke had demanded a

1    $550,000 salary; isn't that right?

2        A    That's what it says, yes.

3        Q    And whose Mr. Andraczke?

4        A    Again, I described him as the man on the ground in

5    Poland operating, as much as I know, these entities.

6        Q    Is he in the courtroom today?

7        A    Yes.

8        Q    Could you please identify him?

9        A    He's the distinguished gentleman in the back with

10   the grey hair.

11       Q    Thank you.   His second reason was to the effect

12   that he'd learned through Mr. Andraczke that Globe Gas had

13   been struck off from the records in the Netherlands?

14       A    That's what he expresses in this e-mail, yes.

15       Q    And did you circulate this to parties as well as

16   you did with others?

17       A    I don't know.   It was so close to the auction, I

18   may, I know that at the auction I did announce and tried to

19   let people know as soon as possible that he was not going to

20   participate.   All of the other bidders were concerned about

21   who their competition was going to be so I was in constant

22   contact with them.   Mr. Smith was also of course interested

23   in who was going to be bidding.

24       Q    Mr. Finlay wasn't the only person who asked for

25   breaks during the auction, correct?

                                                              36

1      A      That's correct.

2      Q      And there were lots of breaks to your knowledge?

3      A      There were lots of breaks and the parties were all

4  getting a little testy with each other, yes.

5      Q      And were parties other than Mr. Finlay making phone

6  calls during these breaks to your knowledge?

7      A      Yes.

8      Q      And did those parties come back and say anything to

9  you or anybody else in the auction that you were aware of

10  indicating to whom they were speaking with?

11      A      I understand from Mr. Maybe that he was talking on

12  his cell phone during the auction directly with Michael

13  Freeman, an attorney in the Miami area who also represent Mr.

14  Lochhead's client, and that they were on a telephone

15  connection with a gentleman in London named Melzak who was a

16  consultant for Mr. Robertz in the auction process.  I also

17  know that Consolidated was, Mr. Zachiavich was contacting his

18  money people to make sure that he had enough to consummate

19  the bids he was making.

20      Q      Thank you.  If you could turn to my exhibit book.

21  If you'd please turn to Exhibit A.  I'll ask if that's a

22  document you have seen before?

23      A      Yes.  I first received a copy of this from Ralph

24  Maybe just prior to the start of the auction on March 28th,

25  2006.

37

1      Q     And to your knowledge what was this agreement?

2   What did this document represent?

3      A     As I read it and as I understood from Mr. Maybe,

4   this was a contract between Mr. Smith and Mr. Robertz that if

5   Mr. Robertz was the successful bidder at the auction that Mr.

6   Smith would have an interest in the entity in which Mr.

7   Robertz would place these assets.

8           MS. JARVIS:  Your Honor, I would object to that,

9   that mischaracterizes what's on the —

10          THE COURT:  I can hear you but you don't have a

11  record on that.  Would you please come forward into a mike?

12          MS. JARVIS:  Your Honor, I would object to the

13  extent that he's explaining this agreement.  I think it

14  stands for itself.  In addition there was an explanation of

15  the agreement given on the record at the auction.

16          MR. (?):  I join in that objection of best

17  evidence.

18          THE COURT:  Response?

19          MR. MCCARDELL:  I'll move the exhibit's admission.

20          THE COURT:  Any objection to the Court's receipt of

21  Exhibit A?

22          MR. LOCHHEAD?:  May I consult please, Your Honor?

23          THE COURT:  Yes.

24          MR. LOCHHEAD?:  No objection to the admission of

25  the exhibit.

38

1          THE COURT:  Exhibit A is - the book or the exhibit?

2          MR. LOCHHEAD?:  The exhibit.

3          THE COURT:  Exhibit A is received.

4          (Exhibit A received)

5     Q    (BY MR. MCCARDELL)  Mr. Marker could you turn to

6  Exhibit B?

7     A    Yes.

8     Q    Can you identify that or any portion of it that is

9  something you can identify?

10    A    This is an e-mail from Mr. Finlay when Mr. Smith

11  indicated concerns about the notice of the initial sale

12  motion.  This was Mr. Finlay's e-mail to me encouraging me to

13  postpone the auction.

14    Q    Did any other potential bidder encourage you to

15  continue the auction as Mr. Finlay did along with Mr. Smith?

16    A    Not that I recall.

17         MR. MCCARDELL: Move the admission of Exhibit B.

18         MR. LOCHHEAD?:  No objection.

19         THE COURT:  Received.

20         (Exhibit B received)

21         MR. MCCARDELL:  Your Honor, for the record, Mr.

22  Lochhead and I had had a side bar in which I asked Mr.

23  Lochhead if he desired that I stay within the scope of his

24  direct or whether I should proceed with additional questions.

25  By agreement, I will contain Mr. Marker's examination within

39

1    the scope of direct and reserve some questions.  So some

2    documents will go out of sequence at this point, Your Honor.

3         THE COURT:  Okay.

4         Q    (BY MR. MCCARDELL)  Would you please turn to

5    Exhibit F?

6         A    Yes.

7         Q    Is this a document that you recognize?

8         A    This is an e-mail from Mr. Andraczke to Mr. Tietze

9    that I was copied on.

10        MR. MCCARDELL: Move the admission of Exhibit F.

11        MR. LOCHHEAD:  Can I ask the relevance?

12        THE COURT:  Mr. McCardell?

13        MR. MCCARDELL:  Yes Your Honor, the examination of

14   Mr. Marker went into the contacts between bidders, including

15   Mr. Tietze, with respect to the matters of the auction and so

16   this document relates to a contact between Mr. Tietze and Mr.

17   Andraczke.

18        THE COURT:  Objection overruled.  Well, you didn't

19   make one.  You asked as to relevance.

20        MR. LOCHHEAD:  I don't have any objection.

21        THE COURT: Then Exhibit F is received.

22        (Exhibit F received)

23        Q    (BY MR. MCCARDELL)  Please turn to Exhibit G.  Can

24   you identify Exhibit G?

25        A    This is Mr. Tietze's e-mail to me.  This might have

                                                              40

1    been the first direct contact dated March 9, 2006 where he

2    expresses an interest in bidding on the Eurogas assets.

3    These are the type of e-mails and contacts that are received

4    from people that I use to generate a list of people to which

5    I served the due diligence package.

6        Q    All right, and I don't know if you recall this

7    e-mail but I'd like to ask you a couple of specific questions

8    about it.  In the second paragraph he says, "Over the last

9    three months I've tried unsuccessfully to receive a

10   confirmation from Mr. Andrew Andraczke, president of both

11   Polish companies that the Polish companies can enter into

12   negotiations with myself on behalf of my clients."  Had you

13   had any contact with Mr. Andraczke about who the officers of

14   the companies in Poland were?

15       A    No.

16       Q    Had you asked Mr. Andraczke to prepare any

17   information with regard to the officers?

18       A    No.  I had asked him to prepare financial

19   information that both Mr. Smith and the bidders were looking

20   for and he did provide that and that was in the due diligence

21   package.

22       Q    Thank you.  In the third paragraph you see a

23   reference to an affidavit sworn March 8, 2006 before an

24   officer of the U.S. Consulate in Dusseldorf.  Is that a

25   document you have seen Mr. Marker?

41

1       A     I believe so.

2       Q     Do you know whether that document was circulated by

3   your, meaning the affidavit, to parties in interest in the

4   case?

5       A     I don't specifically recall.

6       Q     Turn your attention to paragraph 4.  Mr. Tietze

7   says that he's contacted Mr. Robertz about one of the bidders

8   to get confirmation that everything is in good order - I'm

9   sorry, good standing.  Do you know anything else about that

10  statement or about what was going on there between Mr. Tietze

11  and Mr. Robertz?

12      A     No.

13            MR. MCCARDELL: Move for the admission of Exhibit G.

14            MR. LOCHHEAD:  Objection, hearsay.

15            THE COURT:  Why isn't this hearsay, Mr. McCardell?

16            MR. MCCARDELL:  Well, Your Honor, first of all

17  we've been receiving into evidence a festival of hearsay e-

18  mails.  This is the first one to which there is an objection

19  and it seems to me that have, having received so many like

20  documents that this one has equal circumstances of

21  credibility, i.e. Mr. Marker received it just like he

22  received the other

23  e-mails and under the residual exception, the Court can

24  receive it.

25            THE COURT:  The residual exception?

                                                            42

1          MR. MCCARDELL:  Yes.

2          THE COURT:  Do you want to explain that?

3          MR. MCCARDELL:  Yes, under Rule 807, the Court can

4  receive evidence if it's - Rule 807 provides that "A

5  statement not specifically covered by Rule 803 or 804 but

6  having equivalent circumstantial guarantees of

7  trustworthiness, is not excluded by the hearsay rule if the

8  Court determines that it's offered as evidence of a material

9  fact, that is more probative on a point which is offered than

10  any other evidence which is the proponent can procure with

11  reasonable efforts."  And (c) the general purposes of these

12  rules and the interests of justice will be best served by

13  admission."  Now there's a requirement that the document be

14  submitted to parties in advance.  I did that.  You can see

15  the Bates stamp on the bottom.  This was in our document

16  production and I simultaneously advised Mr. Lochhead and all

17  parties that all of these documents might be used as evidence

18  at the hearing.

19          Now with respect to the elements of the rule, the

20  Court has before it the question of what was happening

21  between the bidders.  This document is related to that

22  material fact; (b) more probative than other evidence - well,

23  we don't have Mr. Tietze or Mr. Robertz here.  We don't have

24  other evidence that we can submit with respect to this

25  contact; and (c) the general interests of justice with

43

1   respect to the court's inquiry into circumstances of alleged

2   fraud or collusion, the Court I believe has a very broad

3   discretion to receive evidence; therefore, we would move for

4   its admission under the rule.

5          THE COURT:  Mr. Lochhead?

6          MR. LOCHHEAD:  Your Honor, first of all I don't see

7   that this goes to any material question which is one of the

8   requirements of Rule 807.  Secondly, the problem I have with

9   this is Mr. Tietze isn't here to explain what he wrote.  I

10  don't challenge the authenticity.

11         THE COURT:  If he was here, we wouldn't be talking

12  about Rule 807.

13         MR. LOCHHEAD:  Exactly, and I believe that I'm

14  prejudiced by having a statement here without any explanation

15  and that just makes it difficult to meet these statements.

16         THE COURT:  Well, we've brought this thing on with

17  lightening speed and I feel under the circumstances that the

18  party has met his burden under Rule 807.  Objection

19  overruled.  Exhibit G is received.

20         (Exhibit G received)

21         MR. MCCARDELL:  Thank you, Your Honor.

22  Q    (BY MR. MCCARDELL)  Please turn to Exhibit H.

23  A    Yes.

24  Q    Is this a document you can identify?

25  A    Yes.  This is my response to Mr. Tietze's e-mail

                                                    44

1    expressing an interest in participating in the auction.  My

2    e-mail back to him is dated March 9, 2006.

3              MR. MCCARDELL: Move admission of Exhibit H on the

4    same grounds, same argument.

5              THE COURT:  This is from Marker to Mr. Tietze.

6              MR. LOCHHEAD:  I have no objection.

7              THE COURT:  All right, received.

8              (Exhibit H received)

9    Q    (BY MR. MCCARDELL)  Please turn to Exhibit I.

10   A    Yes.

11   Q    Is this a document you can identify?

12   A    This is an e-mail from Mr. Andraczke to me with a

13   copy to Mr. Tietze dated March 16, 2006 asking my authority

14   to provide financial and engineering data to Mr. Tietze.

15             MR. MCCARDELL: Thank you, move the admission of

16   Exhibit I.

17             MR. LOCHHEAD:  No objection.

18             THE COURT:  Received.

19             (Exhibit I received)

20   Q    (BY MR. MCCARDELL)  Please turn to Exhibit J.

21   A    Yes.

22   Q    Can you identify this document?

23   A    Yes.  This is Mr. Tietze's transmittal to me of the

24   procedures and disclosures document which I required all

25   bidders to sign and to deliver to me prior to the auction

1  where they agreed to the procedures by which the auction was

2  conducted.  I think the signed document was attached to this

3  e-mail.

4       Q    Thank you.  I call your attention to the second

5  paragraph of this document which says, "I would like to point

6  out that we will participate in the auction because Mr.

7  Andraczke has invited us to do so."  Do you know anything

8  about what Mr. Andraczke might have been doing with respect

9  to inviting Mr. Tietze's bid?

10      A    Not specifically, no.

11           MR. MCCARDELL: All right.  Your Honor, I move the

12  admission of Exhibit J.

13           MR. LOCHHEAD:  No objection.

14           THE COURT:  Received.

15           (Exhibit J received)

16      Q    (BY MR. MCCARDELL)  Please turn to Exhibit K.

17      A    Yes.

18      Q    Can you identify this document?

19      A    This is the, I guess the evidence of the sudden

20  decline in the relationship between Mr. Tietze and Mr.

21  Andraczke.  This is an e-mail from Mr. Tietze to Mr.

22  Andraczke with a copy to me and as you can see from the

23  e-mail, their relationship has deteriorated.

24           MR. MCCARDELL: Move the admission of Exhibit K.

25           MR. LOCHHEAD:  Objection, hearsay.

46

1          MR. BOLEY:  Your Honor, I echo that objection.

2          THE COURT:  All right.  Let's take a look at it,

3  Mr. McCardell.

4          MR. MCCARDELL:  Yes Your Honor.  Going with respect

5  to the elements of the rule, as I should —

6          THE COURT:  807 again?

7          MR. MCCARDELL:  Yes, Your Honor.

8          THE COURT:  Where is your material fact?

9          MR. MCCARDELL:  During direct Mr. Marker was asked

10  a question with respect to the withdrawal of Mr. Tietze's bid

11  and received into evidence — offered into evidence and it was

12  received, the e-mail from Mr. Tietze specifying the two

13  reasons why he was withdrawing his bid and I went through

14  those just now with Mr. Marker.  This e-mail is directly

15  related to that as Mr. Marker just testified, namely, it's

16  evidence of the deterioration between the relationship

17  between Mr. Andraczke and Mr. Tietze, therefore, it is

18  evidence of a material fact.

19          THE COURT:  All right.  B?

20          MR. (?):  Your Honor?

21          THE COURT:  Why don't we let him finish all this

22  first before I hear from you.

23          MR. MCCARDELL:  Your Honor, we don't have other

24  evidence which spells out the detail given in this e-mail,

25  mainly that there is, in the middle of this e-mail,

47

1    information with respect to the tax liabilities of Globe Gas

2    and the financial situation of the two subsidiaries at noted

3    in the e-mail.

4         THE COURT:  C?

5         MR. MCCARDELL:  I might add that it has a secondary

6    purpose with respect to the testimony with regard to what

7    parties may or may not have known with respect to the assets.

8         And with respect to item C, once again, since Your

9    Honor is dealing with a Rule 60B motion as to allegations of

10   collusion and fraud, Your Honor has a wide discretion to

11   receive it.

12        THE COURT:  Mr. Boley?

13        MR. BOLEY:  If I could borrow the podium for a

14   minute?  I was too slow to get up the last time we talked

15   about the residual exception although I didn't have specific

16   concerns about that document anyway but I think the exact

17   meaning of that rule has been somewhat misstated to you, Your

18   Honor.  If you look at Rule 807, before you can get to a, b,

19   c the statement has to be not covered by one of the

20   exceptions to the hearsay rule under Rule 803 or 804 and it

21   has to have equivalent circumstantial guarantees of

22   trustworthiness to the exceptions in Rules 803 and 804 are

23   not equivalent guarantees of trustworthiness to other

24   documents that were received without objection.  In this

25   case, the document that's been offered has none of the

48

1    equivalent guarantees of trustworthiness of the types of

2    documents that are listed in Rules 803 and 804 as enumerated

3    exceptions to the hearsay rule.

4          THE COURT:  Mr. Lochhead?

5          MR. LOCHHEAD:  Yeah, I join in that statement and

6    would also argue that this is really fairly tangential stuff.

7    It doesn't go to the material issues before Your Honor.

8          THE COURT:  Objection overruled.  Exhibit K is

9    received.

10         (Exhibit K received)

11         MR. MCCARDELL:  No further questions at this time,

12   Your Honor.

13         THE COURT:  All right.  Any in rebuttal?

14         MR. LOCHHEAD:  I have no questions.

15         THE COURT:  All right.  Sir, you may step down.

16         THE WITNESS:  Thank you.

17         THE COURT:  Do you have other witnesses, Mr.

18   Lochhead?

19         MR. LOCHHEAD:  I do.  Call David Finley.

20         THE COURT:  Will you come forward, sir?

21              DAVID BAIRD FINLAY

22         having been first duly sworn, testified

23         upon his oath as follows:

24         COURT CLERK:  Please take the stand and state your

25   name and spell it for the record.

49

1              THE WITNESS:  David Baird B-A-I-R-D Finlay,

2      F-I-N-L-A-Y.

3                          DIRECT EXAMINATION

4      BY MR. LOCHHEAD:

5          Q     Mr. Finlay you are the president of Sinofirst

6      Capital and Trading; is that correct?

7          A     Yes.

8          Q     And you were present at the auction which is the

9      subject of this hearing?

10         A     Yes.

11         Q     You're an attorney by training and profession?

12         A     Yes.

13         Q     And you are licensed to practice in British

14     Columbia?

15         A     Yes.

16         Q     Let's see, you have significant experience in the

17     mining field, do you not?

18         A     Yes.

19         Q     Would you tell the Court briefly what you've done

20     in mining over the years?

21         A     I've been a mining lawyer and I've also run a

22     mining operation, a public company for a few years, two or

23     three years.

24         Q     I believe you've testified in deposition that you

25     have limited experience with oil and gas; is that a fair

50

1    statement?

2        A    I've had experience.  I don't know what you mean by

3    limited.

4        Q    Do you recall —

5        A    I've done operating agreements and

6    [unintelligible].

7        Q    Have you ever purchased a company before other than

8    in connection with this Eurogas?

9        A    Purchased a company.  I've certainly been involved

10   in the purchase of companies, yes.

11       Q    That wasn't my question.  Have you personally or on

12   behalf of the company that you own or have a substantial

13   ownership in ever purchased a company?

14       A    No.

15       Q    Have you ever attended a bankruptcy auction prior

16   to this case?

17       A    No.

18       Q    You've known Wolfgang Rauball for many years; is

19   that correct?

20       A    Many years, yes.

21       Q    Been friends for about 30 years?

22       A    I would judge 30 years, yes.

23       Q    You learned about this auction from Mr. Rauball

24   back in January; is that correct?

25       A    Yes.

51

1     Q    Now between that time in January when you first

2  heard about this auction and the time of the auction you had

3  a number of telephone conversations with Wolfgang Rauball;

4  isn't that true?

5     A    Yes.

6     Q    And you would estimate those between, to be about

7  10 or 20 conversations, would that be a fair statement?

8     A    Yes, I think it's a fair statement.

9     Q    Did Mr. Rauball mention Mr. Tietze's name to you?

10     A    Not that I - one of the later calls, yes, he would.

11  Not at the beginning.

12     Q    Prior to that time you had no connection with Mr.

13  Tietze, correct?

14     A    I had never met the man, never talked to the man.

15     Q    Mr. Rauball told you that Mr. Tietze was interested

16  in may be a bidder; is that a fair statement?

17     A    No, be told me that Mr. Tietze had a group that

18  were interested in getting involved and would like to get an

19  interest in the concessions, in other words a deep pocket

20  buyer.

21     Q    Mr. Rauball indicated he was going to suggest that

22  Mr. Tietze give you a call; is that correct?

23     A    I think the last telephone conversation probably

24  because then in fact a few days later Mr. Tietze did give me

25  a call.

1     Q    That was about a week before the auction?

2     A    It was on a Thursday night before the auction.  It

3 was four days before the auction.

4     Q    That was the first time you had spoken with Mr.

5 Tietze, correct?

6     A    Yes.

7     Q    And you understood that Mr. Tietze was calling you

8 at the suggestion of Mr. Rauball; would that be a fair

9 statement?

10     A    Yes.

11     Q    You also met Mr. Rauball personally on more than

12 one occasion between January and March, didn't you, of this

13 year?

14     A    January and March of this year, yes, yes.

15     Q    And you met for lunch in Vancouver?

16     A    North Vancouver.

17     Q    And among other things you talked about Eurogas?

18     A    Oh yes.

19     Q    In fact, in your several telephone conversations

20 you talked about Eurogas with Mr. Rauball, didn't you?

21     A    Amongst other things, yes.

22     Q    And you testified that in January of this year you

23 went to the Rauball home in Whistler, British Columbia to

24 talk about Eurogas?

25     A    No, that's an error.  I checked last night with Mr.

53

1   Rauball and I said, you know, I was up to see you at one

2   point in the last six months or so and he said, no, you

3   haven't been here since June of last year when you brought up

4   Mr. Po who was another Chinese client of mine that wanted to

5   get Mr. Rauball involved in working with one of his companies

6   and that was in June 2005.

7       Q    You remember having your deposition taken in this

8   case yesterday morning?

9       A    Yes, I do.

10      Q    You were placed under oath at that time?

11      A    That's right.

12      Q    And you gave a truthful testimony to the best of

13  your ability?

14      A    To the best of my knowledge at that time, yes.

15      Q    You understood that a transcript is being made of

16  that?

17      A    Yes I do.

18           MR. LOCHHEAD: May I approach the witness?

19           THE COURT:  Yes.

20           MR. LOCHHEAD:  Would the Court like a copy?

21           THE COURT:  What have you got?

22      Q    (BY MR. LOCHHEAD)  Could you turn to Page 27 of the

23  transcript please?

24      A    Yes.

25      Q    Starting on line 1, the question was put to you,

                                                              54

1    "When did you meet him?"  Answer, "Well, I went up to

2    Rauball's place at one time and Hank was staying with me."

3         A    That is incorrect.

4         Q    Please allow me to finish.  Question, "When was

5    that?"

6              Answer, "It was, I'm not sure whether it was before

7    the auction or after the auction."

8              Question, "Sometime in 2006?"

9              Answer, "Yeah."

10             Question, "Do you remember what month it was in?"

11             Answer, "Well, I guess it would have been at the

12   time, it would have been in January when I went up to

13   Wolfgang's when this thing started."

14             Then I'm skipping a little bit and then further

15   down, question, "What was the occasion of you going to Mr.

16   Rauball's place?"

17             Answer, "I guess it was to talk about this

18   auction."

19             Have I read that correctly?

20        A    Yes.

21        Q    The Hank you refer to is Hank Blankenstein?

22        A    Yes.

23        Q    He was an officer Eurogas?

24        A    As far as I know.

25        Q    After you heard about this auction from Mr.

1  Rauball, you undertook some investigation of the company,

2  would that be a fair statement?

3     A    I don't think I really undertook - which company

4  are we talking about?

5     Q    The Eurogas Polska?

6     A    I knew it have concessions.

7     Q    How did you know that?

8     A    Because its held concessions ever since about 1992

9  or 3, somewhere in there.

10    Q    Isn't it true that the concessions it owns today

11  were issued in 2001?

12    A    That may be, I don't know.

13    Q    You don't know one way or the other?

14    A    No, I have no knowledge of that.  I understand from

15  recent information I received that the concessions run until

16  2036 or 33, something like that.

17    Q    But you don't know when they were issued?

18    A    I think from the information I just saw the other

19  day, they were reissued in 2001 or something because they

20  were initially issued in early times.

21    Q    You received a packet of information from Mr.

22  Marker, the trustee, correct?

23    A    Yes, I did.

24    Q    A lot of that was in Polish, wasn't it?

25    A    The material on the fields was in Polish, yes.

56

1    Q    You don't read or understand Polish?

2    A    No, I don't.

3    Q    The only person you talked to about Eurogas Polska

4    was Mr. Wolfgang Rauball; isn't that true?

5    A    Yes.

6    Q    He was your principal source of information?

7    A    Yes, I didn't get any from Mr. Andraczke.

8    Q    You didn't talk to anyone in Poland about Eurogas

9    Polska?

10    A    No, I felt no need to.

11    Q    Would it be fair to say that you understood that

12    Eurogas Polska owned some concessions but you weren't clear

13    whether they were oil or gas?

14    A    I thought they were coal concessions that had gas,

15    methane gas was the principal reason why people wanted it

16    because of the gas content in the coal fields.

17    Q    So it was your understanding that Eurogas Polska

18    primarily had a coal and gas asset; is that your testimony?

19    A    That's my understanding.

20    Q    Okay.  And I believe you testified earlier that you

21    first heard of Mr. Jochen Tietze through Wolfgang Rauball,

22    correct?

23    A    Correct.

24    Q    You understand that Mr. Rauball and Mr. Tietze are

25    friends?

57

1     A    I don't know whether they're friends or business

2  associates.   I presume they're friends.

3     Q    And I believe you said Mr. Tietze contacted you a

4  few days prior to the auction, have I got that right?

5     A    On Thursday evening prior to the auction.

6     Q    And he said he represented people who were prepared

7  to spend a lot of money, to put a lot of money into the

8  Eurogas projects?

9     A    That's right.

10     Q    And you understood that Mr. Tietze's people

11  appeared to have unlimited funds?

12     A    Not unlimited funds, the figure quoted to me was

13  $30 million.

14     Q    Mr. Tietze said he thought he would come in and bid

15  but he didn't want to if he didn't have to?

16     A    That's correct.

17     Q    You confirmed to Mr. Tietze that you were planning

18  to bid?

19     A    I put my bid in.   That is, I became a bidder on

20  January the 20th.   I was probably one of the first bidders

21  that entered into the operation.

22     Q    My question though was in your telephone

23  conversation with Mr. Tietze a few days prior to the auction,

24  you confirmed to him that you were planning to go and bid; is

25  that correct?

58

1      A    Absolutely.

2      Q    And you indicated to Mr. Tietze that you did not

3   want to hold any of these companies, you wanted to flip them

4   or resell them at a profit?

5      A    That has been my stated intention to everyone at

6   the auction and everyone I've talked to.

7      Q    And Mr. Tietze indicated to you that he had

8   understood that to be a fact from Mr. Rauball?

9      A    What was that?

10      Q    Mr. Tietze told you he understood you were going to

11   flip the asset and he understood that from a conversation

12   with Wolfgang Rauball?

13      A    No, I've never heard of that.

14      Q    Would you turn to page 33 of the deposition in

15   front of you please?  Starting on line 12, question, "Tell me

16   as best you recall what you and he said in that

17   conversation."

18           Answer, "Well, he said he was potentially, he said

19   he was very interested.  He had clients very interested in

20   these assets and he thought he would come up and bid on it

21   but he wasn't sure.  He said, you know, I'm a German and I

22   really don't want to do it if I don't have to do it and I

23   said, I am doing it and he said, yeah, I understand from Mr.

24   Rauball that you are a bidder and essentially that you are

25   interested in flipping the property once gets it and I said,

59

1   that's right, I'm not a long term holder."  Have I read that

2   correctly?

3        A    That's correct.

4        Q    So Mr. Tietze in that conversation said he may or

5   may not show up at the auction?

6        A    That's right.

7        Q    You figured at that point that if you acquired

8   Eurogas you could sell it to Mr. Tietze or his clients?

9        A    I figured he was a good potential buyer as are

10  other people.

11       Q    Between the time of your telephone conversation

12  with Mr. Tietze that you just talked about and the auction

13  itself, you also spoke with Mr. Rauball, did you not?

14       A    Probably.

15       Q    Do you recall what you and he said in that

16  conversation?

17       A    No.  I don't remember calling him.

18       Q    You don't remember calling him?

19       A    No, I think I did but it was nothing of

20  consequence. I don't have a memory like an elephant like some

21  people have.

22       Q    When you went into the auction on March 28, you

23  understood that Eurogas Polska was worth a lot money based on

24  the level of interest that Mr. Tietze had as represented by

25  Mr. Rauball and confirmed by Mr. Tietze; is that a fair

60

1    statement?

2        A    Yes, I think it is.

3        Q    Do you believe that coal bed methane was hot stuff,

4    in your words?

5        A    Yes. Vancouver is a market place where a lot of

6    junior oil and gas companies are spawned.  There's a great

7    deal of interest now because of coal bid, because of the tar

8    sands in Alberta.  It's a financial center now for this type

9    of thing and coal bed methane is a very hot item amongst the

10   underwriting houses in Vancouver.

11       Q    And you understood and believe that there was value

12   in Eurogas Polska because of the coal bed methane?

13       A    Yes.

14       Q    But you really don't know whether Eurogas Polska

15   has coal of gas concessions, do you?

16       A    Yes, they have gas concessions.  I don't know

17   whether based on the coal is a part of it or whether they're

18   separate unto themselves.

19       Q    Do you know whether Eurogas Polska has a gas

20   concession or a coal concession?

21       A    I know it has a gas concession.

22       Q    Would you turn to page 81 of the deposition

23   transcript please?

24       A    Yes.

25       Q    Starting on line 16,

1           MR. McCardell?:  May I ask whether this is for

2     purposes of impeachment or —

3           MR. LOCHHEAD:  It is.

4      Q    (BY MR. LOCHHEAD)  Question, "I am asking about how

5     you came to believe that Eurogas Polska owned a concession

6     for coal bed methane?  Am I explaining that right?"

7           Answer, "I am not sure whether there are

8     concessions for a gas concession or a coal concession.  It's

9     all there in the material that Mr. Marker sent around but

10    it's all in heavy duty Polish.  I understand it's gas

11    concession but it may be one in the same thing in Poland, I

12    don't know."  Did I read that correctly?

13     A    That's exactly correct.

14     Q    To get coal bed methane you need coal deposits,

15    don't you?

16     A    That's right.  In some jurisdictions they're united

17    and in other jurisdictions, they're separated.

18     Q    On March 28 you went into that auction prepared to

19    bid whatever it took to acquire the assets, didn't you?

20     A    No, I was prepared to bid whatever I felt was worth

21    bidding.  I'm not unlimited in my capacities.

22     Q    Did you have a maximum price in your mind over

23    which you were not prepared to go?

24     A    No, no.

25     Q    And the reason for your belief that there was value

                                                              62

1    there is because Mr. Tietze has represented to you that he

2    had people that were interested in the property; is that a

3    fair statement?

4        A    Not entirely, no.  There's many people interested.

5    Why would you talk about Mr. Tietze alone?

6        Q    Well, here's my question to you, was a factor in

7    your personal valuation of what you were prepared to pay for

8    Eurogas Polska based on the indication from Mr. Tietze that

9    he represented people that had a lot of money and were

10   interested in the property?

11       A    I would say partially but I mean, the main - I'm

12   the one that makes the decisions.  I'm the one who

13   understands about coal bed methane.  Yes, it's nice to know

14   that maybe there's a buyer there that I can work with but

15   there's lots of other buyers.  There's a buyer that Mr.

16   Andraczke was talking to, Totel, various other buyers

17   available.

18       Q    Would you turn to page 43 of your deposition

19   transcript please?

20       A    Forty-three?

21       Q    Yes, sir.  Starting on line 3, question, "Why did

22   you think it was so valuable?"

23            Answer, "I have given that answer, because whether

24   it's hot down here I don't know but in the Vancouver market,

25   CBM and coal bed methane gas is a very hot item now.

63

1    Everything is promoted on that.  Happen to know that because

2    as I said, I'm involved in a potential big CBM operation in

3    China, nothing to do with anybody here, nothing to do with

4    Wolfgang Rauball, nothing to do with James Po but a new

5    Chinese client, so..."

6              Question, And you had gotten some positive

7    indication from Mr. Tietze, he represented people that had

8    interest in the property, that was part of your thinking?"

9              Answer, "Oh yeah, absolutely."

10        A    Absolutely correct.

11        Q    During the auction, during a break, you made a call

12   to Mr. Tietze, correct?

13        A    That's right.

14        Q    Did you hear Mr. Marker's testimony today that that

15   occurred when the bidding in the first round was up in the

16   $600 and $620,000 range?

17        A    Yes.

18        Q    Is that correct?

19        A    Yes.

20        Q    Did you give any contrary testimony yesterday about

21   that?

22        A    I don't know.

23        Q    Would you turn to page 40 of your transcript

24   please?  Starting on line 18, question, "So your conversation

25   with Mr. Tietze was after the first round of bidding but

                                                              64

1   before the subsequent bidding of the four lots?"

2           Answer, "Right, definitely."

3           Did I read that correctly?

4           MR. MCCARDELL:  Your Honor, may I raise an

5   objection here?  There seems to be something missing from

6   this transcript.  We go from a question to a question, a

7   question mark and then the A says, right definitely.  I can't

8   tell whether there's a missing question and a missing answer

9   or whether there's just an error.

10          MR. LOCHHEAD:  It's just a rough transcript, Your

11  Honor.  It's the best we could get overnight.

12          THE COURT:  Okay, it makes a difference here.  You

13  don't know if Mr. Finlay is responding to the blank of the

14  question - I'm going to sustain any objection there because

15  there is some sort of ambiguity there.

16          THE WITNESS:  Your Honor —

17          THE COURT:  Just a moment, sir.  There's no

18  question posed.

19          THE WITNESS:  Sorry.

20      Q   (BY MR. LOCHHEAD)  In your telephone conversation

21  with Mr. Tietze while the bidding was going on, you told him

22  in essence, hey, this thing is getting to be quite expensive.

23  Are your people really interested?  Would that be a fair

24  statement?

25      A   The way you put it, my answer would be yes.  There

65

1   was a question I wanted to tell him that this was no longer a

2   $10,000 deal which is what it started out at.  When you get

3   up to over $600,000, that's a lot of money and I wanted to

4   make sure that he wasn't going to say, oh well, no, no, this

5   is tough one, you're on your own, I don't want to bother, you

6   know, this is just out of the ballpark.  He had said before

7   that they were deep pockets so I just wanted to reassure

8   myself that he was still going to be interested, his people

9   would be interested in doing a deal.

10      Q    So what did he tell you in response to your

11   comment?

12      A    He said yes, you should know that's not out of the

13   way.  That's fine, my people have lots of money.

14      Q    Do you believe your recollection of this

15   conversation you had with Mr. Tietze on March 28 was better

16   today or was it better yesterday or was it better two days

17   after the conversation occurred on March 30 of this year?

18      A    Please show me the...

19      Q    I'm just asking you, do you think your recollection

20   was better yesterday at your deposition or was it better on

21   March 30, two days after the conversation took place?

22      A    I suspect it was about the same.

23      Q    Do you recall giving testimony at a hearing before

24   Judge Boulden in this matter on March 30th of 2006?

25      A    Yes.

66

1        MR. LOCHHEAD:  I don't have a lot of copies of this

2    but I believe a copy of the transcript of the March 30

3    hearing is appended to the opposition to our motion that was

4    filed today by Mr. Finlay's client.

5        May I approach the witness?

6        THE COURT:  Go ahead.

7    Q    (BY MR. LOCHHEAD)  Would you turn to page 34 of

8    that transcript please sir?  It's a little tricky because it

9    says page 33 down at the bottom but in the middle of the page

10   it says 34 so I want you to turn to that page.  This is

11   another one of those preliminary transcripts.  Are you with

12   me?

13   A    Yes.

14   Q    So it's actually starting on I guess transcript

15   page 33, starting on line 24.  Question, "There was a second

16   recess you sought in order to make a phone call, and to whom

17   did you speak at that time?"

18       Answer, "Mr. Tietze at that time."

19       Question, "And what was the subject matter of your

20   call?"

21       Answer, "I just told him that the bidding was

22   carrying on, simple as that."

23       Question, "And what did he tell you?"

24       Answer, "Well, what do you mean?  What are you

25   suggesting?"

67

1          Question, "What did he say to you?"

2          Answer, "Are you suggesting to me that Mr. Tietze

3     was governing what I was doing?  Is that would you're

4     suggesting?"

5          Question, "I'm just asking what he said to you?"

6          Answer, "Well, I can't remember what he said to me.

7     We just talked about it.  I said the bidding is going on,

8     we're up to, at that point I think it was, I was buying it at

9     $610,000, I think at that point."

10         Question, "You don't recall what he said to you.

11    Do you recall..."

12         Answer, "If you want to ask me something

13    specifically, did he say this or did he say that, I can

14    answer it."

15         Question, "Do you recall what he said to you?"

16         Answer, "Well, he thanked me for the call."

17         Question, "And do you recall anything else he said

18    to you?"

19         Answer, "No, not really.  It was just a call to let

20    him know that, was happening with the bidding and I thought I

21    would be the bidder.  I was at that point, I thought I had

22    won the auction."

23         Have I read that accurately?

24    A    Yes.

25    Q    That was your testimony at that hearing?

1    A    Yes, it was.

2    Q    Yesterday - well let me start over.  Now is it your

3  recollection that in that conversation Mr. Tietze told you

4  not to worry, the price is okay?

5    A    I can't remember his exact words.  The point is I

6  indicated to him how high the bidding had got and he said

7  well, his indication was, that's alright, that doesn't change

8  anything, my people if they're interested in buying, they can

9  afford to buy.

10    Q    You didn't know how high to bid did you without

11  talking to Mr. Tietze?

12    A    That's absolutely wrong.  I am the bidder, it's my

13  money.  I pay the money and I take the chance.  If I end up

14  dealing with Mr. Tietze, that's fine if his people are

15  offering me more money than someone else.

16    Q    Did you have any idea going to the auction what the

17  value of those properties might have been?

18    A    I thought they worth a lot more than $10,000,

19  that's why I entered the auction.

20    Q    Did you have any idea of the amount?

21    A    No.

22    Q    In your mind today are Mr. Tietze's people still

23  the most likely purchasers?

24    A    I don't know.

25    Q    Would he be your prime prospect at this point?

69

1      A     I suppose to save time, I'm advised that the

2   concessions run out, would need to be negotiated or something

3   by July 6 and that every day that goes by that the time gets

4   shorter and shorter to deal with new people and some of the

5   people I'm dealing with, they don't move as quickly as

6   others.

7      Q     Would you turn to page 61 of your deposition

8   transcript please?

9      A     Yes.

10     Q     Starting on line 15, question, "What are your plans

11  for Eurogas Polska sitting here today?"

12           Answer, "To sell it."

13           Question, "Do you have any prospects?"

14           Answer, "I think Mr. Tietze's company, the people

15  he represents are a very good prospect."

16           Question, "He would be your prime prospect at this

17  point?"

18           Answer, "At this point, yes, yeah."

19           Did I read that correctly?

20     A     Yes.

21     Q     Did you have any communication with Mr. Wolfgang

22  Rauball since the auction on March 30?

23     A     Yes.

24     Q     About how many communications with him have you

25  had?

1      A      Once again, I don't know.

2      Q      Ten to twenty?

3      A      Quite possibly, yes.

4      Q      Did you talk about business with Mr. Rauball during

5  those conversations?

6      A      What do you mean by business?

7      Q      About Eurogas?

8      A      Sure.

9      Q      Shortly after the auction, did you instruct Mr.

10  Tietze to hire a Polish lawyer and to meet with Mrs. Zalewska

11  of the Polish Administration of Environment to represent your

12  interests with respect to the concessions with the Polish

13  government?

14      A      Yes, with respect to my potential interest.

15      Q      Would you turn in the exhibit book in front of you

16  to Exhibit 9 please?

17      A      Yes.

18      Q      Is that a copy of a handwritten letter from

19  yourself to Mr. Tietze that you sent on April 2 of this year?

20      A      Yes.

21          MR. LOCHHEAD: Move the admission of Exhibit 9.

22          THE COURT:  Any objections?

23          MR. MCCARDELL:  None Your Honor.

24          THE COURT:  Received.

25          (Exhibit 9 received)

71

1     Q   (BY MR. LOCHHEAD)  To your knowledge did Mr. Tietze

2  and the Polish lawyer meet with Mrs. Zalewska?

3     A   Yes.

4     Q   Is Mr. Tietze charging you for his services in what

5  he's doing over in Poland?

6     A   I don't know.  It was not discussed.

7     Q   Would you turn to page 89 of your deposition

8  transcript please?

9     A   Yes.

10     Q   Starting on line 19, question, "Why did you chose

11  Mr. Tietze to represent you in Poland before the Polish

12  government?"

13         Answer, "Because I consider him to be an honest man

14  although I don't him that well.  Who else am I going to get?

15  I don't know anybody else over there.  He is my contact."

16         Question, "What consideration are you paying him

17  or-"

18         Answer, "Absolutely zero."

19         Question, "So he's representing your interests for

20  fee?"

21         Answer, "Yes, I suppose you would put it that way

22  because he has an interest."

23         Have I read that correctly?

24     A   That's right.

25     Q   Did Mr. Tietze report back to you on his meeting

1   with Mrs. Zalewska?

2        A    Yes.

3        Q    Would you turn to Exhibit 10 in the binder in front

4   of you?

5        A    Yes.

6        Q    Is that a copy of an e-mail transmission to

7   yourself - strike that, I'm sorry.

8             Did you advise Mrs. Zalewska that you had appointed

9   Mr. Tietze and Mr. Adamiec I believe it is, A-D-A-M-I-E-C, to

10  represent Sinofirst before the Polish government?

11       A    That's in the letter of the 21st to Mr. Tietze.

12       Q    Well, look at Exhibit 10.  That's an e-mail from

13  yourself to Mrs. Zalewska; is that right?

14       A    Yes.

15       Q    What's your understanding of who Mrs. Zalewska is?

16       A    I understand that she's a key person in the

17  geological department in Poland that handles the gas

18  concessions.  She's the number one lady, Deputy Minister or

19  something.

20       Q    And that's the principle asset of Eurogas Polska?

21       A    That's right.

22       Q    So what was your reason for sending Mrs. Zalewska

23  this e-mail on April 24?

24       A    Because at that point, I want to get on the record

25  who Sinofirst was and that I had heard various sources that

73

1   Mr. Andraczke and his associates, Mr. Robertz and Mr. Melzak

2   are or will at tempt to have the company's Polish concessions

3   revoked and reissued to a company that they control.

4       Q    So this Exhibit 10 is your e-mail to Mrs. Zalewska?

5       A    Yes.

6            MR. LOCHHEAD: Move the admission of Exhibit 10.

7            THE COURT:  Received.

8            (Exhibit 10 received)

9       Q    (BY MR. LOCHHEAD)   In Paragraph 4 of this exhibit,

10  you advise her that Mr. Tietze and Mr. Adamiec, A-D-A-M-I-E-C

11  are authorized to represent you; is that correct?

12      A    That's right.

13      Q    And then the last line of the paragraph where you

14  say, "Mr. Tietze will present concession development

15  proposals to you at the meeting."  Have I read that

16  correctly?

17      A    Yes.

18      Q    Do you know whether he did that?

19      A    I don't know.

20      Q    Did Mr. Tietze then report back to you?

21      A    Yes, he did.

22      Q    Would you turn to Exhibit 11 please?

23      A    Yes.

24      Q    Is that Mr. Tietze's report back to you?

25      A    Yes.

74

1          MR. LOCHHEAD: Move the admission of Exhibit 11.

2          THE COURT:   Received.

3          (Exhibit 11 received)

4     Q    (BY MR. LOCHHEAD)   A little more than halfway down

5    that e-mail Mr. Tietze writes, "During our meeting, Mr.

6    Adamiec provided Mrs. Zalewska with certain legal documents

7    referring to the employment of myself and Mr. Prose on

8    November 25, 2005 as well as legal documentation in

9    connection with the notification of appointment of Managing

10   Directors or Eurogas Polska to the Polish Commercial Court.

11   Mrs. Zalewska confirmed that she has received the power of

12   attorney of you authorizing myself and Mr. Adamiec to discuss

13   matter of Eurogas Polska."   Have I read that correctly?

14    A    That's right.

15    Q    Were you aware that Mr. Tietze had been appointed

16   on November 25, 2005 as described in this paragraph?

17    A    No.

18    Q    Would you turn to Exhibit 12 please?   Could you

19   tell the Court what that is?

20    A    Financial statements.

21    Q    Of Sinofirst Trading Capital Corporation?

22    A    Yes.

23    Q    And these are the most recent financial statements

24   you have for Sinofirst Trading?

25    A    Yes.

1        MR. LOCHHEAD: I move the admission of Exhibit 12.

2        THE COURT:  Received.

3        (Exhibit 12 received)

4     Q    (BY MR. LOCHHEAD)  So as of the end of March 2005,

5   Sinofirst Trading had assets of a little more than $117,000

6   Canadian dollars?

7     A    Right.

8     Q    That's on the third page of the exhibit there; is

9   that right?

10    A    Yes.

11    Q    And on the next page it had net income before

12  expenses for the year ending March 31, 2005 of a little less

13  than $8,000 Canadian dollars?

14    A    That's right.

15    Q    So the payment for the Eurogas Polska came

16  primarily from your personal assets, not from Sinofirst

17  Trading; isn't that correct?

18    A    That's correct.

19    Q    Would you turn to Exhibit 14 please in the binder

20  and that's the - actually I need you to look at the Tab 1 in

21  that Exhibit 14.  That has an e-mail from myself dated May 1.

22  Now turn to the second page which is writing in Polish.

23    A    Exhibit 14?

24    Q    Yeah, it's a little hard to understand.  Exhibit 14

25  has a Tab 1 okay?

76

1      A     Maybe I'm in the wrong book.

2            THE COURT:  You may approach the witness and show

3     him.

4      Q     (BY MR. LOCHHEAD)  Here's Tab 14 and here's Tab 1

5     here.

6      A     Oh okay, yeah.

7      Q     Are you looking at the page with the Polish

8     writing?

9      A     Yes.

10     Q     And do you recognize Wolfgang Rauball's signature

11    on that page?

12     A     I believe it's his signature.

13     Q     You're familiar with his signature?

14     A     Yes.  I can't guarantee it but it looks like it.

15           MR. LOCHHEAD: No further questions at this time.

16           THE COURT:  We're going to take a break right now

17    before we have cross examination.  Court stands in recess.

18           (Whereupon a recess was taken 3:57 to 4:07)

19           THE COURT:  All right, is there cross examination

20    of this witness?

21           MR. BOLEY:  Your Honor, would it be more

22    appropriate to continue direct?

23           THE COURT:  Oh go ahead, yes Mr. Boley.

24           MR. BOLEY: I don't have a lot to add.  I don't want

25    to be repetitive so I really only have one question.

                                                              77

DIRECT EXAMINATION

BY MR. BOLEY:

Q    I'm going to take you back, Mr. Finlay, and you understand you're still under oath, right?

A    Huh?

Q    You understand you're still under oath?

A    Yes.

Q    Okay.  I'm going to take you back to the Thursday before the auction telephone call with Tietze, okay?

A    Yes.

Q    Are you there with me?  You earlier testified that during that telephone call he told you, "I really don't want to come out there if I don't have to."  Is that correct?

A    He said he would rather not because he was German and, you know, that was his – and I think he mentioned something about visiting family or having other people that he wanted to see.

Q    I don't want to rehash the rest of that conversation but there's one thing that happened at the end of the conversation I don't think we've mentioned in court here today.  Isn't it true that at the end of that conversation Mr. Tietze told you that "based on what I know now, I don't think I'll bother coming to the auction"?

A    I suppose my answer is I really can't remember.  I can't remember things that specifically.  I'm sorry, but his

1    indication was that he might show up, he might not show up.

2    I said if you come, I'll be happy to meet you.

3        Q    Will you turn to page —

4        A    That was it.

5        Q    — 75 of the transcript of yesterday's deposition?

6        A    Mine only goes up to 61.

7        Q    The deposition yesterday.

8        A    Oh, yesterday's.  All right.  Seventy-five?

9        Q    Yeah, starting at line 2, read along with me.  I

10   asked you, "Now you also said at the end of that conversation

11   Mr. Tietze told you based on what I know now, I don't think

12   I'll bother coming to the auction."

13       A    He could well have said that.

14            THE COURT:  Wait — let him do his thing.

15            MR. BOLEY:  I think that answers my question Your

16   Honor.  I'll tender the witness.

17            THE COURT:  Mr. McCardell?

18                        CROSS EXAMINATION

19   BY MR. MCCARDELL:

20       Q    Do you have before you the transcript of your

21   deposition, Mr. Finlay?

22       A    Yes, I do.

23       Q    Please turn to page 27, line 10.

24       A    Yes.

25       Q    You were guessing about — were you guessing about

                                                              79

1    the time you visited Mr. Wolfgang Rauball's home?

2        A    Yes.

3        Q    Please look at line 18, were you guessing about the

4    content of your call or  -of your talk about the auction —

5        A    Yes.

6        Q    About the - please let me finish —

7        A    Because it turns out —

8             THE COURT:  Sir, wait a minute, let him finish his

9    question.

10       Q    (BY MR. MCCARDELL)   The question was, what was the

11   occasion of your going to Mr. Rauball's place with reference

12   to line 18, were you guessing as to the occasion?

13       A    Yes.

14       Q    Please turn to page 28, lines 12 through 16.

15       A    Yes.

16       Q    What is your age, Mr. Finlay?

17       A    75.

18       Q    If people ask you generalized kinds of questions

19   about what happened when or the specific content or

20   conversation, do you have any difficulty in remembering the

21   specifics without a specific question?

22       A    In past events I do.  I find I've always been a

23   fairly forward thinking person, I think about the future and

24   present and the past has a tendency to blur together fairly

25   quickly.

1  Q Please turn to page 33.  Mr. Lochhead was asking

2 you about Mr. Tietze's phone call to you, line 12, were you

3 telling him to the best of your recollection at the time what

4 you thought you and he said?

5  A Yes.

6  Q And have you done that today as you've testified?

7  A Yes, but it's difficult when I'm asked repeatedly

8 what was said at a certain telephone conversation to the best

9 of my ability.  If someone asked me specific points, I think

10 I'm quite able to answer them well.

11  Q Perhaps I can do that.  Had you met Mr. Tietze in

12 any way directly, indirectly prior to this telephone call he

13 made to you Thursday before the auction?

14  A Absolutely not.

15  Q Had you ever heard of him?

16  A I had heard of him through Mr. Rauball because Mr.

17 Rauball said that Mr. Tietze, he had a group that were really

18 interested in getting involved in coal bed methane or gas in

19 Europe, I was going to say Poland but it was Europe and they

20 had a lot of money to spend and Mr. Tietze was their

21 representative.

22  Q And did Mr. Tietze call you or did you call him?

23  A He called me, Thursday night prior to the auction.

24  Q Did you know whether he was going to come or not at

25 the end of that conversation?

1    A    No, I didn't.  I suppose it was 50/50 whether he

2    would show up or not.  I said to him, if you come to the

3    auction, I'll be glad to meet you.  That was...

4    Q    Did you ask him not to come?

5    A    Absolutely not.

6    Q    Did you have any understanding, direct, indirect,

7    verbal, written to the effect that he would not attend the

8    auction because he could then buy it from you if you wanted

9    to sell it to him?

10   A    No, because he didn't know that I'd be the bidder,

11   the high bidder.

12   Q    Do you have now or have you at any time had any

13   agreement direct or indirect to resell the assets to Mr.

14   Tietze?

15   A    No.

16   Q    Or anyone he represents?

17   A    No, absolutely not.

18   Q    Or anyone at all for that matter?

19   A    At this point, subject to the Court's decision, I'm

20   the owner of the asset.  I can give it away, I can make $10

21   million on it, I can lose money on it.  It's all up in the

22   air.

23   Q    Would you please turn to Mr. Lochhead's exhibit

24   book, Exhibit 9.  Please tell the Court what this is and why

25   you wrote it.

1       A       As has come out in the evidence but I will repeat,

2    basically, my concern at this point was what was the status

3    of the leases that Eurogas Polska had because of information

4    that I'd received that there were, certain people were

5    interested in taking away the assets so that I would be left

6    buying a $375,000 shell with no assets.  So naturally the

7    first thing I'm going to do is try to find out and protect my

8    potential interest in those assets and the only way I could

9    do it was to get someone to go to see Ewa Zalewska, the lady

10   that's obviously the key person in the department and Mr.

11   Tietze was going back to Germany.  He had an interest because

12   his people may be the eventual buyers.  It was obvious he was

13   a man that was interested in doing a good job and find out

14   exactly what the situation was.  So he was a logical person.

15   I did not know anybody else in Poland.  I did know any Polish

16   lawyers.  As a lawyer, I felt it was important that somebody

17   understanding oil and gas in Poland also went to the meeting

18   with Mrs. Zalewska.  That's how it occurred and I knew that I

19   had to do it right away.

20       Q       This letter was before or after Judge Boulden

21   confirmed you as the good faith, winning bidder?

22       A       April 2.  It would be - I guess it would be - you

23   asked me a question there.  The auction was on March, 28th I

24   think, then there was a 10-day period, so it would be after

25   the auction but before, I guess before the confirmation.

83

1    Wait a minute, no, it was after the confirmation because I

2    didn't go - it was after the confirmation because I was up

3    here.  I didn't go back to Vancouver and I had Mr. Tietze

4    come to my home in Vancouver and gave him the letter.

5         Q    And you knew about that 10-period, correct?

6         A    Oh yes.

7         Q    And you knew you hadn't yet signed the Purchase

8    Agreement, correct?

9         A    That's right, and that's why I said in Paragraph 2,

10   I will be the sole beneficial owner upon completion of the

11   transfer from Eurogas Inc. to my company, Sinofirst.

12        Q    Thank you.  Please turn to Exhibit 10 in the same

13   book.  What was the date of this e-mail?

14        A    April 24.

15        Q    And by this time had you signed the Purchase

16   Agreement?

17        A    I think we had signed the Purchase and Sale

18   Agreement.

19        Q    And had you paid the $375,000?

20        A    And I paid the money.  Yeah, I think that was

21   right.  I hadn't got all the documents but...

22        Q    Could you turn to the larger exhibit book?  Please

23   turn to Tab Y.

24        A    Yes.

25        Q    Is this the same financial statement that Mr.

84

1    Lochhead asked you about?

2        A    I hope so.

3            MR. MCCARDELL: I'll move it's admission, Your

4    Honor.

5            MR. LOCHHEAD:  I think it's already in but I have

6    no objection.

7            THE COURT:  Exhibit Y, is it in?

8            MR. LOCHHEAD:  It's not in as Exhibit Y.  It's the

9    same as my Exhibit 12 but I don't have any objection.

10            THE COURT:  Let's admit then if you have no

11    objection, Exhibit Y.  Received.

12            (Exhibit Y received)

13        Q    (BY MR. MCCARDELL)  And you brought this with you

14    from Vancouver?

15        A    Yes, I did.

16        Q    In response to Mr. Lochhead's discovery request?

17        A    It was in one of the, yeah, it was one of the legal

18    documents, said they wanted to know about the financial

19    aspects of Sinofirst.

20        Q    Did you also bring with you and show to Mr.

21    Lochhead, a bunch of other documents in that regard?

22        A    Yes.  I showed him the incorporation papers for

23    Sinofirst.  It was incorporated back in 1989.

24        Q    Let's go one by one.  Please turn to Tab Z.  I'll

25    ask if you can identify Tab Z?

1      A     Yes, I can.

2      Q     What is it?

3      A     It's the Bank of Montreal, the bank that I deal

4   with.  It's their requisition to wire transfer $370,000 U.S.

5   to Mr. Marker's account at the bank, whichever bank it is.

6      Q     Was this your payment for the assets we're talking

7   about today?

8      A     This is the balance of the payment.  What happened—

9      Q     On the next page?

10     A     On the next page you'll see the same thing, another

11  wire transfer for $15,030 U.S. and this arose because Mr.

12  Marker found that it would take perhaps up to two weeks to

13  get clearance of the Sinofirst check which I had mailed to

14  Mr. Marker back on January the 20th when I put in my bid,

15  when I became a bidder and properly, he didn't cash it until

16  I guess after the auction or try to cash it and his bank

17  advised him that they couldn't guarantee he'd get the money

18  by a certain day so I said, okay, I'll cancel the check and

19  I'll send you another wire transfer plus the $30 that the

20  bank had charged Mr. Marker for handling the deal for them.

21     Q     What was the source of the funds used to make these

22  wires?

23     A     It was all my funds because at that point, you

24  know, we were doing things here on a day to day basis to get

25  this money to Joel.

1          MR. MCCARDELL:  Move the admission of Exhibit —

2          THE WITNESS: A matter of fact, the ordering

3    customer on the second one is - no, it's Sinofirst. Sinofirst

4    sent the second wire transfer.

5          MR. MCCARDELL: Perhaps for the record I should ask

6    one more question which I keep forgetting of Mr. Finlay, Your

7    Honor, so I beg your indulgence.

8          Q    (BY MR. MCCARDELL)  Mr. Finlay, do you have a

9    hearing problem in one of your ears?

10         A    My right ear is not too good, according to my wife.

11         MR. MCCARDELL:  Your Honor, I'd like to move the

12   admission of Exhibit Z.

13         MR. LOCHHEAD:  NO objection.

14         THE COURT:  Received.

15         (Exhibit Z received)

16         Q    (BY MR. MCCARDELL)  Please turn to Exhibit AA.

17   I'll ask if you can identify that.

18         A    Yes.  This is a personal line of credit I had to

19   sign with the bank of Montreal for $450,000.

20         Q    For what?

21         A    Well, for anything but I took it out in order to

22   pay the money to Mr. Marker because I didn't want to sell

23   assets to pay the money.

24         Q    Did you have to put any security to secure this

25   line of credit?

87

1      A     Yes, I did.

2      Q     Please turn to Page 3 of this exhibit and Page 4.

3  What are these pages, marked Sino 144 and Sino 145?

4      A     Well, 144 is two of my accounts at the Bank of -

5  well, they're actually Bank of Montreal but Nesbitt Burns is

6  a brokerage house associated with a bank so it's a joint

7  operation and Nesbitt Burns holds most, not all, but most of

8  my stocks and at the present time the value of the stock, one

9  of the stock accounts is $1,052,128.68 in Canadian funds.

10  There's a U.S. dollar account for U.S. stocks, $28,898.40 and

11  then there's another Canadian dollar account, the same

12  Nesbitt Burns for $248,209.54.

13      Q     Who owns these accounts?

14      A     These are personal accounts of mine.

15      Q     Does anybody else besides you own an interest in

16  these accounts?

17      A     No.

18      Q     Do any of the funds that have gone through these

19  accounts represent funds that have come from Mr. Tietze or

20  anybody he represents?

21      A     No.

22      Q     Mr. Rauball or anybody connected with him?

23      A     Absolutely not.

24      Q     Or Mr. Rauball's brother or anyone he represents?

25      A     No.  There's - Reinholt Rauball, there's an error

88

1    in the notation at one point that indicated I had contacted

2    Reinholt Rauball and I haven't talked to Reinholt Rauball for

3    probably 10 years I would think.

4              MR. MCCARDELL: Your Honor, I'll move the admission

5    of Exhibit AA.

6              MR. LOCHHEAD:  No objection.

7              THE COURT:  Received.

8              (Exhibit AA received)

9         Q    (BY MR. MCCARDELL)  Please turn to Exhibit BB.

10        A    BB?

11        Q    BB.  Unfortunately we got into double letters. It's

12   BB.

13        A    BB, okay.

14        Q    Can you identify this document?

15        A    Well, in dealing with many overseas companies and

16   all the rest of it, in British Columbia it's quite often they

17   purchase or a vendor may want from a corporate vendor or

18   purchaser, a Certificate of Good Standing to show that the

19   company that they're dealing with is in good standing with

20   the registrar of companies and under the Business

21   Corporations Act and this is a certificate that I got issued

22   to me on April the 21st, 2006.

23        Q    Please turn to Page Sino 140.

24        A    Yes.

25        Q    You see the date is 1998?

89

1       A       March 26, 1998 was the date of incorporation of

2    what we call a numbered company.  In other words, if you

3    don't know what you want to call your company, the government

4    will give you a number and this is 561912BC, Ltd.

5       Q       Now if you turn to the next page to it, I'm going

6    in a reverse direction of normal.  Do you see the next page

7    dated January 1999?  Is that going from a numbered company to

8    a named company?

9       A       Yes.  I changed the name to VinRock Management

10   Limited.

11      Q       Turn the next page going the same direction.  Did

12   you then change the name to Sinofirst?

13      A       Yes, Sinofirst Trading and Capital Corp., September

14   the 17th, 2001.

15      Q       And why did you do that?

16      A       Because I do business in China and Chinese confers

17   tell me that in China they're used to dealing with people

18   that are presidents or chairman of the board of companies,

19   that they really don't like dealing with lawyers.  So I said

20   alright, I'll do business as Sinofirst Trading and Capital

21   Corp and they thought that was a very good idea.

22      Q       Thank you.  Now please turn to Page Sino 0137, just

23   one more page to the left, going in the same direction we've

24   been going.

25      A       Okay.

90

1   Q Who are the directors of Sinofirst?

2   A Well, this document states the directors is what

3 we call a transition application that every company has to

4 file as a result of a change in our company.

5   Q I'm sorry. I think you've gone one page too far.

6 Do you see a page that has the names of David Finlay, James

7 Finlay and Margo Finlay?

8   A That's correct but that's part of this transition

9 application.  It's a 2-page document.  So I filed this on

10 February the 16th, 2006 and the directors are myself, my

11 daughter Margo, my son James and they have always been the

12 directors, the three of us.

13   Q Who owns the shares of Sinofirst?

14   A My son and daughter own the majority of the shares

15 and I own a minority of the shares.

16   Q No owners besides you and your children?

17   A Absolutely not.  It's a vehicle that hopefully can

18 get some tax sheltering in it.

19   Q Does Sinofirst have any contracts of any kind with

20 any entity directed or controlled by the Rauball brothers?

21   A Has none and never has had any.

22   Q How about with Mr. Tietze or anybody he represents?

23   A No one he represents or himself nor or ever.

24   MR. MCCARDELL: Move the admission of Exhibit BB.

25   MR. LOCHHEAD:  No objection.

91

1              THE COURT:  Received.

2              (Exhibit BB received)

3              MR. MCCARDELL:  Your Honor, Exhibit CC is

4    duplicative of Mr. Lochhead's 7 but just for purposes of

5    clarity, I'd like to offer its admission.

6              THE COURT:  Received.

7              (Exhibit CC received)

8              MS. MCCARDELL:  And the same with respect to

9    Exhibit DD which I think is a duplicate of Mr. Lochhead's

10   same next exhibit.

11             THE COURT:  It's received.

12             (Exhibit DD received)

13        Q    (BY MR. MCCARDELL)  Now please turn to Tab EE.

14        A    Yes.

15        Q    What is this document?

16        A    This is the report that Mr. Tietze sent to me after

17   his meeting with the ministry and the meeting he held

18   obviously with a Mr. Galbas.

19        Q    Is that where you got the July 6 date?

20        A    Yes.  He - yes.

21        Q    I think you were asked a question about this but I

22   want the record to be really clear on this point, close to

23   the end of this, about five paragraphs up, it mentions this

24   directors meeting held in November 2005.

25        A    Yes.

                                                          92

1      Q    Had you heard of this directors meeting in any way?

2      A    No.

3      Q    Had Mr. Marker called you with respect to this

4  matter?

5      A    At one point he called me.  It was after the

6  auction.  I can't tell you when but he said, David, have you

7  been appointing Jochen Tietze as a managing director of

8  Eurogas Polska and I said, absolutely not, what are you

9  talking about?  He said, well, I've heard he's a managing

10  director and I said no, I appointed him as my agent with

11  power of attorney to attend a meeting with the ministry on

12  the 25th to find out what's going on on the concessions.

13      Q    Did you know at the time you appointed him as your

14  agent for that meeting that this event in November had taken

15  place?

16      A    No, no.

17      Q    Had you seen the Polish documents that Mr. Lochhead

18  admitted —

19      A    Not until they appeared with Mr. Robertz appeal

20  here or application.

21      Q    Did you know Mr. Thomas Adamiec whose mentioned in

22  the second paragraph?

23      A    No, I don't know him. No.

24           MR. MCCARDELL:  Move the admission of Exhibit EE.

25           MR. LOCHHEAD:  No objection.

93

1          THE COURT:  Received.

2          (Exhibit EE received)

3          MR. MCCARDELL:  No further questions for the

4  witness at this time, Your Honor.

5          THE COURT:  All right.  Any other parties on cross

6  examination?  All right.  Do you have some rebuttal?

7          MR. LOCHHEAD:  Just a bit, Your Honor.

8                  REBUTTAL REDIRECT EXAMINATION

9  BY MR. LOCHHEAD:

10      Q    Mr. Finlay, did I hear you correctly testify when

11  Mr. McCardell was questioning you that Mr. Tietze came to

12  your home in Vancouver?

13      A    Yes.

14      Q    When was that?

15      A    That was on the date of the 21st when I gave him

16  the letter.  It was a handwritten letter.

17      Q    The 21st of what month?

18      A    April.  I'm sorry, what is - I'll have to look up

19  the exhibit.  April 2nd.

20      Q    Of this year?

21      A    Yes.

22      Q    And he came from Germany to Vancouver to visit you?

23      A    No, no, he was over here - I don't know where he

24  was but he was in Vancouver at that point, staying in a hotel

25  in Vancouver.

94

1    Q   How long did you meet with him when he came to your

2  home?

3    A   I think it was – everything was rather rushed as

4  you can tell from having to produce this but I would think he

5  was there for an hour.

6    Q   What did you talk about?

7    A   Pleasantries as well as this.

8    Q   As well as Eurogas?

9    A   Yes, this is what produced this.

10    Q   Do you remember any specifics of your conversation

11  with Mr. Tietze about Eurogas on that occasion?

12    A   The whole conversation apart from pleasantries was

13  about the fact that I wanted to give him something so that he

14  could go that meeting and show the people in Poland that I

15  was a real person, that I was potentially going to be the

16  final owner of these assets.

17        MR. LOCHHEAD:  No further questions.

18        THE COURT:  You may step down.  Leave all the

19  documents there.

20        Do you have other witnesses, Mr. Lochhead?

21        MR. LOCHHEAD:  Yes, we have one more, Your Honor.

22        THE COURT:  For the record just identify yourself

23  again, sir.

24        THE WITNESS:  Yes, I'm Craig Perry from the same

25  law firm of Parr Waddoups.  If it please the Court, I'd like

95

1    to call Andrew Andraczke.

2             THE COURT:  You may.

3             Come forward, sir.

4                       ANDREW ANDRACZKE

5             having been first duly sworn, testified

6             upon his oath as follows:

7             COURT CLERK:  Please take the witness stand and

8    state your full name and spell it for the record.

9             THE WITNESS:  My name is Andrew K. Andraczke,

10   A-N-D-R-A-C-Z-K-E.

11                       DIRECT EXAMINATION

12   BY MR. PERRY:

13        Q    Good afternoon, Mr. Andraczke.  What is your

14   current employment?

15        A    It is very difficult to say but I am President of

16   Pol-Tex Methane and Eurogas Polska.

17        Q    What's your history with Eurogas Polska, your

18   history of your involvement with that company?

19        A    This company was created to explore and develop oil

20   and gas concessions.

21        Q    When did you first become involved with Eurogas

22   Polska?

23        A    It was from 1999 but the company received the - the

24   concessionS were granted in 2001.

25        Q    When you say the concessions were granted in 2001,

1  to what concessions are you referring?

2      A    We are taking about oil and gas concessions.

3      Q    And where are those located?

4      A    They are located in southeastern Poland in

5  Karpacion, in mountains.

6      Q    What was your initial position with Eurogas Polska?

7      A    I was the President of Eurogas Polska from the

8  beginning.

9      Q    From the beginning of what?

10     A    From the beginning of the company which is from

11  year 2001.

12     Q    Are you saying the company began in 2001?

13     A    Company, I became a president when the company was

14  officially registered.

15     Q    And that was in 2001?

16     A    Yeah.

17     Q    I thought you stated earlier that your involvement

18  began in 1999.

19     A    Yes, but it took some time in Poland to establish a

20  company and to get a concession.   In fact, the concession was

21  received in 2001.

22     Q    Did the company hold or have any rights in any

23  concessions prior to 2001?

24     A    No, not at all.

25     Q    Were the concessions in 2001 a renewal of old or

97

1    prior concessions?

2        A    No, not at all.

3        Q    Were you involved in the obtaining of those

4    concessions?

5        A    Yes.

6        Q    What was your involvement?

7        A    Well, we had to prepare technical documents as well

8    as present the papers showing financial capability to Polish

9    government to have the concession adopted.

10       Q    Was it your responsibility to provide that

11   information to the Polish government?

12       A    If we are talking about technical matters, yes.   If

13   we are talking about financial matters, it came from Eurogas,

14   Inc.

15       Q    How many employees of Eurogas Polska were there in

16   2001?

17       A    We had only three employees.   We have part-time

18   accountant and every technical work that we did we were using

19   external sources, external engineers.

20       Q    When you say three employees are you including

21   yourself as one?

22       A    Yes, that's right.

23       Q    And who were the other two and what were their

24   positions?

25       A    There was Director Galbas who was a technical

1    manager and there was a secretary.

2        Q    These concessions that you've spoken about that

3    were obtained in 2001, what were they concessions for?

4        A    These concessions were to explore for oil and

5    natural gas.

6        Q    Was there any coal included in these concessions?

7        A    Not in this area.  Coal is in completely different

8    area -

9        Q    Pardon, I didn't mean to interrupt.

10       A    - in Poland.  In completely different area in

11   Poland.  It's around 250 kilometers from this area.

12       Q    And this area meaning the area of the concessions

13   held by Eurogas Polska?

14       A    Exactly.

15       Q    So there were no coal beds in -

16       A    There's no coal bed there.

17       Q    Did these concessions include any coal bed methane?

18       A    Eurogas Polska, no.

19       Q    Can coal bed methane exist separate and apart from

20   a coal bed deposit?

21       A    Not separate from coal, no.  It is connected with

22   coal.

23       Q    Did you provide information on Eurogas Polska to

24   Mr. Marker from time to time pursuant to his request?

25       A    That's right, yes.

1      Q    What types of information did you provide to him?

2      A    It was general information, information about

3  concession, information about resources.

4      Q    In the information about the concession did you

5  ever provide him any information that there was a coal bed

6  methane in any of these concessions?

7      A    Not in Eurogas Polska, absolutely not.

8      Q    What is your understanding of whose currently on

9  the board of directors of Eurogas Polska?

10     A    We receive today a copy of the commercial registry

11  in Eurogas Polska is I am president and Mr. Tietze and Mr.

12  Proese are members of the board.

13     Q    Please turn to Exhibit 15, it's in the smaller of

14  the two black binders.

15     A    Which one?  If you can show me.

16          THE COURT:  You may approach.

17          THE WITNESS:  This one, yes.

18     Q    (BY MR. PERRY)  You have in front of you Exhibit

19  15?

20     A    Yes.

21     Q    Have you seen this document before?

22     A    I received this document today.

23     Q    From whom did you receive it?

24     A    The document was sent by counselor to Eurogas

25  Polska.

1     Q    Was it sent pursuant to your request?

2     A    Yes.

3     Q    What is this document?

4     A    This document is showing the actual registry of

5 Eurogas Polska.

6     Q    Is there a date on the document?

7     A    Yes.  This is dated May 2, 2006.

8     Q    Just generally where is that date located on this

9 document for us of us who don't speak Polish?

10    A    It's on the top of the first page.  It is written

11 status for today, 2005, 2006, 10, 26.

12    Q    By whom is this document issued?

13    A    The document is issued by the Commercial Court in

14 [unintelligible], in Poland.

15    Q    And to what company does this refer?

16    A    Refers to Eurogas Polska, limited liability

17 company.

18    Q    And does it have information here about the current

19 officers and directors?

20    A    Yes, that's right.  It's on Page 3.

21    Q    And what does it say?

22    A    It is written that the board has the following

23 members:  myself, Andraczke, Andre as the president; below

24 there is - it's very difficult to see but there is a Jurgen

25 Prose, Jurgen Tony Proese.  He's a member of the board and

1   below this there is a Jorchen Tietze, member of the board.

2       Q    And you've looking at Page 3 of the document but

3   Page 4 of the facsimile; is that correct?

4       A    Yes, that's right.

5       Q    Just so we're clear.  When did you first become

6   aware that Mr. Tietze was on the board of Eurogas Polska?

7       A    When I received a call from the ministry.  Ministry

8   contacted me because I am, according to registry, I am the

9   president or Eurogas Polska.  So they contacted me to let me

10  know that they have a meeting with representative of Eurogas,

11  Inc. I was very surprised.  I've never heard about any board

12  meeting appointing them and in fact, the paper which I

13  received appointing them during this board meeting of

14  November 25, I received from the ministry on March 25.

15      Q    Of which year?

16      A    2006.

17      Q    When you talk about the paper you received, turn if

18  you will in the same binder to - you said March 25.

19      A    Sorry, maybe I - April 25, yes.

20      Q    Maybe it would help keep it straight, turn to

21  Exhibit 14 in the same binder.  Behind 14 it has Tabs 1, 2,

22  3, 4.

23      A    Fourteen.  Yes.

24      Q    Look behind the Tab 1 which follows Tab 14.

25      A    Yes.

102

1      Q      Is this the document to which you were referring?

2      A      Yes.

3      Q      And what does this document purport to be?

4      A      Let me check again, okay?  Fourteen?

5             MR. PERRY:  Yes.  May I approach.

6             THE COURT:  Go ahead.

7             THE WITNESS:  Oh, okay, all right.  Yes.  This is

8    the document that I'm referring to.

9      Q      (BY MR. PERRY)  And when did you first see this

10   document?

11     A      After the meeting in the ministry which I presume

12   was on April 25.

13     Q      And what does this document purport to be?

14     A      This document is appointing - this is a document

15   which is showing that there was a shareholder meeting of the

16   Eurogas, Inc. with (inaudible) in Salt Lake City and

17   represented by Wolfgang Rauball, Hank Blankenstein and

18   (inaudible) Devenchek and there's only one resolution which

19   is appointing Jargen Tony Price and Jochen Tietze as members

20   of the board.

21     Q      Turn to the last page behind Tab 1.

22     A      Yes.

23     Q      It's a page written in English.

24     A      Yes.

25     Q      Do you recognize that which is listed as Attachment

                                                              103

1    1?

2         A    Yes.

3         Q    What do you recognize that to be?

4         A    This is a translation, translation of the

5    resolution, rather of the minutes of the board meeting.

6         Q    Did you do that translation?

7         A    Yes I did this translation, yes.

8         Q    Do you know Wolfgang Rauball?

9         A    Yes, I know Wolfgang Rauball for many years.

10        Q    How do you know him?

11        A    We started to work together on some projects in

12   Poland when - I'd say from 1993 when I was a Deputy President

13   of Pol-Tex Methane.

14        Q    Was he the one who appointed you or asked you to be

15   president of —

16        A    No.  No, no, no.  During this time I was appointed

17   to this position by Mr. Michael McKenzie.

18        Q    Who is he?

19        A    Mr. Michael McKenzie was investor in Poland in coal

20   bed methane.  He was from Texas and he was doing some

21   development, coal bed methane development on a huge scale in

22   United States and he became very interested in coal bed

23   methane development in Poland because Poland has a very huge

24   coal reserves.

25        Q    But those reserves are unrelated to Eurogas

104

1    Polska's concessions?

2        A    They are unrelated to Eurogas Polska concession.

3        Q    What's Mr. Rauball's relationship with Eurogas,

4    Inc.?

5        A    Mr. Rauball was a chairman and CEO of Eurogas, Inc.

6        Q    To your knowledge is he still serving in that

7    position?

8        A    According to him from these papers, it seems to be

9    this way.

10       Q    How did you first learn of the bankruptcy of

11   Eurogas, Inc.?

12       A    Oh, it was mentioned to me by Mr. Rauball in 2005.

13       Q    What did he tell you?

14       A    He told me that Eurogas, Inc. is in bankruptcy and

15   we have to use Polish projects to raise the money to get out

16   of Chapter 7.

17       Q    Did he explain to you what he meant by using Polish

18   projects to get out of Chapter 7?

19       A    Yes.  He wanted to raise the money through Polish

20   projects, primarily to settle with Mr. Smith.

21       Q    What did he tell you about settling with Mr. Smith?

22       A    He told that if you will be able to raise $2.5

23   million then he will be able to settle with Mr. Smith and he

24   will be able to bring company from Chapter 7 to Chapter 11.

25       Q    Did you ever have any discussions with him about

1    his acquiring ownership or control of Eurogas Pol-Tex?

2        A    Of Eurogas Polska?

3        Q    Polska, sorry.

4        A    According to his opinion, Eurogas Polska was of

5    course 100 percent owned by Eurogas, Inc.

6        Q    And do you have any information as to his ownership

7    interest in Eurogas, Inc.?

8        A    No.  I know that, to my best knowledge, he is the

9    biggest shareholder or Eurogas, Inc.

10       Q    And what's that knowledge based on?

11       A    It's based on knowledge on the information that he

12   gave me.  He told me, oh, I own over 30 percent of Eurogas

13   Inc. stock.

14       Q    Did you ever have any discussions with Mr. Rauball

15   about the auction of Eurogas Polska?

16       A    Not at all.

17       Q    Are you aware of the current financial condition of

18   Eurogas Polska?

19       A    Yes, I am aware.

20       Q    How would you describe that?

21       A    The situation is very bad.

22       Q    What do you mean?

23       A    Eurogas Polska was not financed, the last injection

24   of the funds we received in the amount of 10,000 Euros

25   probably in October 2005 and before we receive 48,000 Euros

1   in March and April 2005 as a condition for making initial

2   joint operating agreement with the company named McCullin.

3      Q    Currently is Eurogas Polska able to meet its daily

4   or regular operating expenses?

5      A    No.  I have to say that for last five months, the

6   only way how this company survived was because I was paying

7   some expenses out of my pocket.

8      Q    Does this financial condition have any effect on

9   the concessions it owns?

10      A    Yes, of course.

11      Q    What's that?

12      A    Well, we could not realize work program which means

13   a concession is given with, is granted together with certain

14   work programs.  If you will not do work program then the

15   concessions can be revoked.  Eurogas Polska did not fulfill

16   work program at all but I was able to get extension of

17   concession twice.  The last extension that I got was in

18   December 2005.  When I saw that there will be an auction and

19   new investor will come who will invest into the project and

20   on this basis I was able to convince ministry to give us

21   additional time.

22      Q    Additional time until when?

23      A    Additional time is until July 6, 2006.

24      Q    And what must be done before then in order to

25   prevent losing the concessions?

107

1     A     We have to make 200 kilometers of seismic

2   [unintelligible] seismic data.   In December when I had a hope

3   that the auction will be completed in January, this was

4   doable.

5     Q     Is it currently doable?

6     A     No, it's not doable.

7     Q     Because why?

8     A     Because it will take me even two months to organize

9   and to get approval to get into the field to make a seismic,

10  to start and another three to four months to complete.

11    Q     Is there a risk of the company going into

12  liquidation as a result of its current financial condition?

13    A     Yes, it is.

14    Q     And how might that happen?

15    A     It will happen in very simple way.   Eurogas Polska

16  has some unpaid bills and under Polish legal system, if we

17  have, for example, if landlord will evict us from the office,

18  then we are losing address, seat of the company and in this

19  situation we have to inform Commercial Court that we don't

20  have a seat of the company which automatically is causing the

21  Court is appointing liquidator of the company.   In addition

22  to this, tax authorities have to be informed and, of course,

23  ministry and for ministry, if the company is in liquidation

24  then ministry will revoke automatically the concession.

25    Q     Is what you just described something that could

108

1   occur in the near future?

2       A    In very near future.

3            THE COURT:  What do you mean by near future?

4            THE WITNESS:  I mean days.

5            THE COURT:  Thank you.

6       Q    (BY MR. PERRY)  So next week?

7       A    It could happen.

8       Q    It's possible?

9       A    It's possible because we have two final calls to

10  make a payment.

11      Q    Other than what you've previously described, did

12  you have any other conversations with Mr. Rauball about the

13  Eurogas, Inc. bankruptcy?

14      A    No, I didn't.

15      Q    Did you have any discussions with him about how it

16  affected Eurogas Polska?

17      A    Sure, of course.

18      Q    What was the substance of those discussions?

19      A    Well, the whole idea was as I told you, the whole

20  idea was to raise money, to raise money based on Polish

21  projects.  There was an idea to do this through the deal with

22  the company name Pol-Tex.  Company Pol-Tex wanted to finance,

23  wanted to inject funds into Polish projects through the

24  company which has the name McCullin.  McCullin signed joint,

25  initial joint operating agreement with Eurogas Polska and got

                                                        109

1    until April 30, exclusivity —

2        Q    Of what year?

3        A    April 30, 2005, exclusivity to negotiate a deal to

4    finance the projects.  Unfortunately, even this money was

5    suppose to be put as a guarantee for exclusivity clause were

6    not paid and after this until October 2005, we did not get

7    any injection of the funds, neither from projects or

8    McCullin.  Pol-Tex came with the idea to raise the money for

9    the project through going to investors and selling Polish

10   projects to investors.  They prepared the brochure which was

11   showing, you know, how rosy picture is and how beautiful this

12   project will look in future.  They presented this brochure to

13   me and I could not agree to sign this brochure because this

14   brochure was presented to investor that their investment is

15   guaranteed by the reserves of oil, 300 million barrels of

16   oil.  Unfortunately, there was no reserve of 300 million

17   barrels.  There is a potential structure which can contain up

18   to 300 million but we don't know what, oil, gas, water or

19   maybe nothing.

20       MR. (?):  Your Honor, we're short on time and I'm

21   sort of wondering myself where we're headed in this.  I don't

22   see the relevance.

23       THE COURT:  What's the relevance of this, counsel?

24       MR. PERRY:  Give me one more question and I'll get

25   there.  It's the relevance in the relationship between Mr.

110

1    Tietze and Mr. Rauball.

2          THE COURT:   I understand that question but oil

3    reserves are probably fair beyond.

4          MR. PERRY:   I understand that.

5      Q    (BY MR. PERRY)   Mr. Andraczke, to your

6    understanding did Mr. Tietze have any involvement in this

7    Pol-Tex/McCullin transaction?

8      A    Yes, Mr. Tietze was a director of Pol-Tex.

9      Q    And did Mr. Rauball have any involvement in this

10   transaction?

11     A    Mr. Rauball had involvement with McCullin.

12     Q    Do you know his involvement with McCullin?

13     A    Sure, he's in reality, he's the owner of McCullin.

14     Q    When did you first meet Mr. Tietze?

15     A    In May 2005.

16     Q    Under what circumstances?

17     A    It was in Vienna.   There was a meeting during which

18   we discussed the potential deal between McCullin and Pol-Tex.

19     Q    The deal you've just described?

20     A    Yes.

21     Q    What was your involvement with the bankruptcy of

22   Eurogas Polska?

23     A    Until the auction there was no involvement at all.

24     Q    Were you asked from time to time to provide

25   information in connection with the bankruptcy?

111

1    A    Yes, I was asked by Mr. Marker.

2    Q    And did you provide that information to him?

3    A    I hope to his satisfaction.

4    Q    Did you ever provide information directly to people

5    or companies that you understood to be potential bidders?

6    A    Only informing Mr. Marker about it and told if Mr.

7    Marker approved this.

8    Q    Do you recall providing information to Consolidated

9    Seven Rocks?

10   A    Yes, only on Mr. Marker approval.

11   Q    What about a Walter Storm?

12   A    Yes.

13   Q    And Mr. Robertz?

14   A    Yes.

15   Q    And Total Petroleum?

16   A    Yes.

17   Q    And Mr. Tietze?

18   A    Yes.

19   Q    Was there any information that you would have

20   provided to one of these individuals or companies that wasn't

21   provided to others.

22   A    No.

23   Q    Did you ever provide any information to Mr. Finlay?

24   A    No.

25   Q    Did he ever request any information from you?

1        A      No.

2        Q      Prior to the auction had you had any contact with

3    Mr. Finlay?

4        A      No.  I mean, I know, I met Mr. Finlay but it was a

5    long time ago.  It was in, let's see 2001 in Vancouver but it

6    was - yeah, but not connected with the auction at all.

7    During last five years I did not meet or contact with Mr.

8    Finlay.

9        Q      Did you ever represent to Mr. Finlay that the

10   concessions include coal bed methane?

11       A      No, not in Eurogas Polska.

12       Q      Eurogas Polska concessions?

13       A      No.

14       Q      Just about five more minutes.  If you would turn in

15   the larger binder.

16       A      This one?

17       Q      Yeah, the one that has lettered tabs instead of

18   numbers, to Exhibit J.

19       A      Yes.

20       Q      I believe we had a little bit of testimony on this

21   and Mr. Finlay's attention was directed to the second

22   paragraph "I would like to point out."  Do you see that

23   paragraph?

24       A      Yes.

25       Q      Is it true that you invited Mr. Tietze to

113

1  participate in the auction?

2      A    No.  I told Mr. Tietze - Mr. Tietze was interested

3  in making a deal through McCullin and I told him that I

4  cannot make a deal through McCullin and if he wants to get

5  these assets then the cleanest way to get these assets is to

6  participate in bidding.

7          THE COURT:  Counsel, let me interrupt you here for

8  a second.  Mr. McCardell, you're standing up there.

9          MR. MCCARDELL:  I apologize, Your Honor.  Mr.

10  Finlay when he came down booked a flight out of town at 7:00

11  tonight and wondered if we might inquire of the Court as to

12  what he should do with respect to his flight, whether we

13  intend to continue later tonight or tomorrow or what.

14          THE COURT:  We're finishing this tonight.  I have

15  no time tomorrow.

16          MR. MCCARDELL:  Thank you, Your Honor.

17      Q    (BY MR. PERRY)  Why weren't you able to - I can't

18  remember the verb you used, approve or participate in the

19  McCullin deal?

20      A    Because of the auction and because McCullin deal

21  did not bring any funds to the project.

22      Q    Okay.  Lastly, turn if you will, I'm sorry, in the

23  other binder to Exhibit 7.

24      A    Yes.

25      Q    You may recall that this was shown to Mr. Marker

                                                              114

1    and he stated that he received it and it purports to be Mr.

2    Tietze's reasons for pulling out of the auction.  Have you

3    seen this before?

4        A    Yes.

5        Q    Have you read those reasons numbered 1 and 2

6    before?

7        A    Yes, I had.

8        Q    Is it true that you had a claim of salary of

9    $550,000 against Eurogas Polska?

10       A    No, it's not a claim again Eurogas Polska.  I have

11   a contract with Eurogas, Inc. but for the projects of Eurogas

12   Polska and Pol-Tex Methane.

13       Q    And you see the date on this e-mail of March 27,

14   2006?

15       A    Yes.

16       Q    Do you have any reason to believe that Mr. Tietze

17   knew about this $550,000 salary issue before March 27, 2006?

18       A    No.

19       Q    Did you talk to him about this issue?

20       A    I talk with him about this issue as a part of the

21   discussion about McCullin.

22       Q    And when did that discussion occur?

23       A    Oh, the problem of my outstanding salary was known

24   to all the members of Pol-Tex, from May 2005.

25       Q    From May 2005?

                                                            115

1       A     Yes.

2       Q     And by all the members of Poltec, are you including

3   Mr. Tietze?

4       A     Yes, exactly.

5       Q     You spoke about it with him in May 2005?

6       A     Yes, and again in October 2005 in Vienna.

7       Q     The second item on there refers to monies owed to

8   the Dutch tax authorities.

9       A     Yes.

10      Q     Are you aware of that issue?

11      A     Yes, I found about this, yes.

12      Q     When did you first become aware of that issue?

13      A     In October 2005.

14      Q     Did you speak about that issue with Mr. Tietze

15   during or about October of 2005?

16      A     I told during meeting in Vienna, 1 inform the

17   members of the board of Pol-Tex that Eurogas, Inc. can have a

18   lot of legal problems.  I wanted to find more about this.

19      Q     And was that Vienna meeting in October of 2005?

20      A     Yes.

21      Q     Did the situation with either the $550,000 in

22   salary or the one million dollars in tax liability, did

23   either of those situations change from October of 2005 to

24   March of 2006?

25      A     I have only bigger outstanding salary by then.

116

1            MR. PERRY:  That's all I have sir.

2            THE COURT: Thank you.

3            Is there cross examination of this witness?

4            MR. MCCARDELL:  Yes, Your Honor.

5                        CROSS EXAMINATION

6    BY MR. MCCARDELL:

7        Q    Mr. Andraczke, you testified concerning Exhibit 14,

8    the documents that you translated from Polish, didn't you?

9        A    Fourteen?

10       Q    Yeah.  Do you have one?

11       A    Yes.

12       Q    How does one go about getting these kinds of

13   documents?  Are they hard to get or easy to get?  How do you

14   get them?

15       A    I got this document from the ministry because Mrs.

16   Zalewska told me that I am, according to the registry, I am

17   president of Eurogas Polska.

18       Q    I think I'm asking you a different question.  Can

19   anyone obtain these documents?

20       A    No.

21       Q    There's a restriction on who can obtain them?

22       A    Yes.

23       Q    Who can obtain them?

24       A    The members of the board of Eurogas Polska.

25       Q    All right.  Now you made some testimony with

                                                          117

1    respect to the concessions of Eurogas Polska, correct?

2        A    Yes.

3        Q    Now how does one go about finding out what the

4    concessions are in any public record?

5        A    Yes, absolutely.

6        Q    Is there such a public record?

7        A    Yes.

8        Q    Where is it?

9        A    This is - it's very easy.  The concessions office

10   handles not only oil and gas concessions but handles all

11   mineral resources of Poland and if you will access government

12   page of the ministry, you can get all information about the

13   concessions, yes.

14       Q    They have a website, don't they?

15       A    Yes.

16       Q    And that website is in English and Polish?

17       A    Sure.

18       Q    And it has a list of all the concessions?

19       A    Yes.

20       Q    And it has a list of Eurogas' concessions, correct?

21       A    Yes.

22       Q    And it shows Eurogas has concessions for oil and

23   gas?

24       A    Yes.

25       Q    And it shows that Pol-Tex Methane has concessions

118

1    for coal bed methane?

2        A    Yes.

3        Q    That's not secret information, right?

4        A    No, absolutely not.

5        Q    Who is Julian Melzak?

6        A    Julian Melzak is a financial consultant to Bernd

7    Robertz.

8        Q    The same Bernd Robertz whose the movant here today?

9        A    Yes, the same, the same, yeah.

10       Q    And what sort of a financial consultant is he?

11       A    I don't know.

12       Q    How do you know the relationship?

13       A    Because Mr. Robertz asked me for the information

14   and he told me that Mr. Melzak also is authorized by him to

15   ask for information concerning Polish concessions.

16       Q    And Melzak is an officer of Pol-Texc, correct?

17       A    I am not an officer of Pol-Tex, I don't know.

18       Q    Mr. Melzak is an officer of Pol-Tex?

19       A    In May meeting in Vienna he was as a president of

20   Protec, yes.

21       Q    You're going to have to forgive my inability to

22   pronounce this name, Arnie P-R-Z-Y-B-I-L-L-A.

23       A    Arnie Przybilla.

24       Q    Who is he?

25       A    He was one of the directors of Pol-Tex in the

119

1    meeting in Vienna, 2005.

2         Q    Edgar Luber, whose he?

3         A    He was there as well.

4         Q    All right.  Wolfgang Beneckinstein?

5         A    He was there as well.

6         Q    Jochen Tietze?

7         A    He was there as well.

8         Q    And Dr. Helmet Steiner?

9         A    Dr. Helmet Steiner was a counselor for Pol-Tex.

10        Q    All right and you were there too?

11        A    In the meeting, yes.

12        Q    And you were there to provide information about

13   Eurogas Polska.

14        A    Yes.

15        Q    Because they might invest money in Eurogas Polska?

16        A    Yes.

17        Q    And this was in 2005, correct?

18        A    May.

19        Q    Do you know - you've met Mr. Wolfgang

20   Beneckinstein, correct?

21        A    I met Mr. Beneckinstein in Vienna, yes.

22        Q    Do you have an opinion as to his credibility or

23   lack thereof?

24        A    I think he's a credible person, yes.

25        Q    Did you receive an affidavit from me made by Mr.

                                                              120

1   Wolfgang Beneckinstein yesterday?

2        A    Yes.

3        Q    Did you read it?

4        A    Yes, I read it.

5        Q    Please turn to Exhibit MM in my book.

6        A    In this one, yes?

7        Q    Yes, the bigger one.

8             MS. JARVIS:  Your Honor?

9             THE COURT:  Yes.

10            MS. JARVIS:  I'm going to object to the use of this

11   letter from Mr. Rauball.  He has willfully disobeyed the

12   orders of this Court in refusing to file statements of

13   schedules.  I think we have previously seen the testimony of

14   Mr. Smith indicating the filing (inaudible) now here today

15   that apparently he was dealing with assets of this estate

16   before Mr. Marker (inaudible) Mr. Smith (inaudible).

17   (inaudible) nothing that he has said is purely hearsay and

18   shouldn't be allowed to be discussed (inaudible).

19            MR. PERRY:  I would also object on hearsay basis to

20   Exhibit MM.  One of the requirements on Rule 807, the

21   residual exception, that it has some indicia of reliability

22   and I would suggest - there's two issues.  There's one,

23   there's no foundation or explanation for the English

24   translation.

25            Secondly, there's actually indicia of unreliability

                                                              121

1    in that if you would turn to Page SINO 101, we have a

2    declaration that was purportedly signed on April 24, yet it

3    was notarized on April 21, three days before it was signed.

4    So on that basis alone, I would suggest under the hearsay

5    rule it should not be accepted.

6              THE COURT:  Well, Mr. Boley, you going to gang up

7    here too?

8              MR. BOLEY:  I'm just going to say this is clearly

9    out of court testimony, Your Honor, and 807, whatever it was

10   meant to be was not meant to be this broad.

11             THE COURT:  All right.  Well, the only question

12   that was posed by Mr. McCardell was would you turn to Exhibit

13   MM.  There was no asked other questions but I'll keep your

14   data and your positions in mind if there is any other

15   questions by Mr. McCardell on that.  For the time being I'm

16   going to hold them in abeyance.

17        Q    (BY MR. MCCARDELL)  Let me lay some foundation.

18   Mr. Andraczke, attached to Mr. Robertz motion is an e-mail

19   that you received from Mr. Rauball saying something to the

20   effect of your problems are only now beginning?  Do you

21   recall that?

22        A    Yes.

23        Q    All right, and did you give that e-mail to Mr.

24   Robertz or his counsel?

25        A    [unintelligible] directly from Mr. Rauball.

                                                        122

1    Q    Right, and then did you give it to somebody to

2    attach to the motion?

3    A    Yes.

4    Q    All right.  And what in your view is the

5    significance of that e-mail?

6    A    For me it was very significant.  It was a threat.

7    Q    And what threat did you understand?

8    A    With Mr. Rauball I don't know what can happen.

9    Q    Have you read Exhibit MM?

10   A    Yes.  I read Exhibit MM.

11   Q    And to your understanding is there anything in

12   Exhibit MM with which you disagree?

13   A    With everything.

14   Q    With everything?

15   A    Yes.

16        MR. BOLEY:  Your Honor, I would reinterpose my

17   objection at this point.  The witness is now testifying about

18   out of court testimony.

19        MR. PERRY:  We'll join the reinterposition.

20        THE COURT:  I'm going to sustain that objection.

21        MR. MCCARDELL:  We're laying foundation for later,

22   Your Honor.  I'm not offering it at this time.

23        THE COURT:  You asked - I'm sustaining.  You asked

24   the question is there is anything in Exhibit MM to which he

25   disagrees and that presupposes it's been received into

123

1    evidence.

2            MR. MCCARDELL:  Of course.  Yes, Your Honor.

3    Q    (BY MR. MCCARDELL)  Please turn to Exhibit FF.

4    A    Yes.

5    Q    Is this a document that you recognize?

6    A    (inaudible) Polish I hope.  This is what you meant?

7    Q    Yes.

8    A    Yes.

9    Q    And the final page, it's actually duplicated but

10   the last page is clearer, Item 13, do you see that on the

11   final page?

12   A    Yes.

13   Q    Is that the 48,000 Euros you testified about?

14   A    Yes.

15   Q    McCullin through Mr. - which you said was

16   controlled by Mr. Rauball had made this payment.

17   A    Yes.

18   Q    What does Number 12 represent, Consolidated Seven

19   Rocks Mining, Ltd.?

20   A    Consolidated Seven Rocks Mining Limited is a loan.

21   Q    A loan to?

22   A    A loan to Eurogas Polska, yes.

23   Q    And did you understand Consolidated Seven Rocks

24   Mining to be Mr. Boley's client?

25   A    Yes.

1      Q    When did you first meet Mr. Robertz?

2      A    I'd have to say probably in January of 2006.  I did

3  not meet him.  He called me.

4      Q    And what was the subject of his contact with you?

5      A    The subject was that he got information from the

6  ministry, general information open to other people and he is

7  very interested in bidding for Eurogas Polska.

8      Q    You said that Eurogas Polska has not been able to

9  pay its bills?

10     A    Yes, that's right.

11     Q    If somebody paid the rent, the landlord would be

12  satisfied?

13     A    Yes.

14     Q    Payment could be made by wire transfer I assume?

15     A    Yes.

16     Q    The other bills could be paid if someone simply

17  paid them, right?

18     A    Yes.

19     Q    Who has been paying the bills up to this point

20  besides you, as you testified?

21     A    Nobody.

22     Q    Mr. Melzak or his company has never advanced any

23  funds?

24     A    No.

25     Q    They intended to, correct, Pol-Tex?

1        A       Pol-Tex, no.

2        Q       There was a plan for them to do business with the

3    entity, correct?

4        A       Yes.

5        Q       And that didn't come to fruition?

6        A       No.

7        Q       Do you have any evidence that Mr. Finlay is

8    operating under the control or direction of anyone but

9    himself?

10       A       I don't have.

11               MR. PERRY:  Objection, vague as to what operation.

12               MR. MCCARDELL:  I'm sorry, with respect to the

13    auction.

14               THE COURT:  Objection overruled.  You may answer

15    that question.

16               THE WITNESS:  I don't have.

17               MR. MCCARDELL:  No further questions, Your Honor.

18               THE COURT:  Thank you.

19               Other parties with cross examination?  Mr. Boley?

20                       CROSS EXAMINATION

21    BY MR. BOLEY:

22       Q       Doctor, if you'll turn to Exhibit 14 with me.

23       A       Fourteen?

24       Q       Yeah.

25       A       Yes.

1      Q    I want you to explain again where - turn to the

2  documents that are behind Tab 1.  There are three documents

3  that are in a language I don't recognize.  I guess maybe it's

4  Polish; is that right?

5      A    Yes, it's Polish.

6      Q    Where did you obtain these three documents?

7      A    I obtained these three documents from Bureau of

8  Concession of Department of Geology of Ministry of

9  Environment.

10     Q    Now turn to the third one, what is that?

11     A    The third one is just a copy of the payment if you

12  want to register, if you want to register changes, you have

13  to pay certain fee to the court and this is just a copy of

14  the payment which was made on March 24, 2006.

15     Q    Does this copy tell us to whom —

16          THE COURT:  Hang on a second.  I don't know that

17  I'm on the same page.  What page are you referring to?

18          THE WITNESS:  This is 14, 1 and the last page

19  before translation.

20          MR. BOLEY:  We're referring to the document that

21  has, it's like a square document with —

22          THE COURT:  The last page?

23          MR. BOLEY:  Right here.

24          THE COURT:  Second to last page?

25          MR. BOLEY:  Yes.

127

1          THE COURT:  Okay, I've got that.

2          MR. BOLEY:  And then there's a...

3      Q    (BY MR. BOLEY) Doctor, is there a translation of

4  that at the bottom of the next page?

5      A    No.  There's no translation because there is

6  nothing to translate.  It's just - on the top is just a court

7  in [unintelligible], the amount 650 Polish [unintelligible]

8  and it is written that this is connected with Eurogas Polska.

9  That's it.  Was application to court register.  That's it.

10     Q    This was a receipt issued by - tell us the court

11  again.

12     A    This receipt was received by Mr. Adamiec.

13     Q    What court issued this receipt?

14     A    What do you mean court?  Oh, he went to —

15     Q    What governmental body issued or gave the receipt?

16     A    This come from the government.  He had to pay

17  certain fee for processing so he went to the bank and this is

18  the receipt from the bank.

19     Q    Oh, from a bank?

20     A    Yes.

21     Q    Okay.  I thought you said it was issued by a court?

22     A    No, no, it was - the payment was issued to the

23  court.

24     Q    So when you pay a payment to the court in Poland

25  you go to the bank?

128

1        A    Yes.

2        Q    Okay.  Can you tell on what day this payment was

3   made?

4        A    This was made on March 24, 2006.

5        Q    And did you obtain these from doctor - maybe she's

6   not a doctor.  What's the name of the head minister in Poland

7   from who you obtain these documents?

8        A    Mrs. Zalewska.

9        Q    And did she obtain all three of these at one time?

10       A    Yes, during the meeting.

11       Q    With who?

12       A    During the meeting with Mr. Tietze and Mr. Robertz

13   and Mr. Galbas.

14       Q    So these three documents were presented together in

15   one group by Mr. Tietze and Adamiec to the ministry?

16       A    Yes.

17            MR. BOLEY:  Okay.  Thank you.

18            THE COURT:  Thank you.  Counsel?

19            MR. PERRY:  I have no further questions but Mr.

20   McCardell referred to Exhibit 13 from our book.  Just so the

21   record is clean, I wanted to offer that.  I could ask a

22   foundation question if anyone has any objections.

23            THE COURT:  Any objections to receipt of Exhibit

24   13?  It's received.  You may step down, sir.  Leave all the

25   papers there.

1           (Exhibit 13 received)

2           MR. PERRY:  We have no further witnesses, Your

3  Honor.

4           THE COURT:  All right.  Mr. McCardell?

5           MR. MCCARDELL:  Yes, Your Honor, I'd like to call

6  to the stand Mr. Marker.

7           THE COURT:  Mr. Marker come forward.  You were

8  sworn in a little while ago, you're still under oath.

9                    JOEL L. MARKER

10          having been previously sworn, testified

11          upon his oath as follows:

12                    DIRECT EXAMINATION

13  BY MR. MCCARDELL:

14     Q    Please turn to my exhibit book under Tab C.

15          THE COURT:  Would you repeat that?

16     Q    (BY MR. MCCARDELL)  Yes.  Please turn to Tab C of

17  my exhibit book.

18     A    Yes.

19     Q    What is this?

20     A    It's Mr. Andraczke resignation from his position

21  with Eurogas Polska and Pol-Tex Methane.

22          MR. MCCARDELL: Move admission of Exhibit C.

23          MR. PERRY:  No objection.

24          THE COURT:  Received.

25          (Exhibit C received)

130

1    Q    (BY MR. MCCARDELL)   The date of this was the day

2    after Judge Boulden held the hearing to confirm the sale,

3    correct?

4    A    Right, March 31, 2006.

5    Q    What did you do with this when you received it?

6    A    I forwarded the resignation to all of the parties

7    in interest so that they would be aware that the man on the

8    ground in Poland was resigning, although this is the second

9    time he's resigned.

10   Q    Tell the Court about the first time he resigned.

11   A    He just e-mailed me and said he was quitting and

12   that was some time earlier.  It was either late February or

13   early March.  I think it was after the court required

14   additional marketing and moved the auction back.

15   Q    This time though was he serious to your

16   understanding?

17   A    Oh, I'm sure he was frustrated and serious.

18   Q    You circulated the e-mail to other parties?

19   A    Correct.

20   Q    Did you receive some sort of response in the e-mail

21   chain?

22   A    Well, the next day I believe was a Saturday and I

23   was in the office and I received what I thought was a strange

24   e-mail from Mr. Andraczke to Mr. Melzak who is Mr. Roberz'

25   agent.  Mr. Melzak is also a former employee of Pol-Tex that

131

1   we've heard so much about and has information from prior

2   investigations about this company and it was just a strange

3   e-mail where Mr. Andraczke was accusing me of, I believe.

4   somehow being in bed with Mr. Blankenstein.

5       Q    Please turn to Exhibit D.  Is that the e-mail

6   you're talking about?

7       A    Yes.

8            MR. MCCARDELL: I'd move the admission of Exhibit D.

9            THE COURT:  D as in dog?

10           MR. MCCARDELL:  Yes.

11           THE COURT:  Received.

12           (Exhibit D received)

13      Q    (BY MR. MCCARDELL)  Is the statement up here the

14  one you're talking about, "Julian, are you surprised?"  "I am

15  not surprised at all.  I think he is in bed with Blankenstein

16  but they will get a very cold shower believe me, regards

17  Andy"?

18      A    Yes.

19      Q    Who is the he that's suppose to be in bed with

20  Blankenstein?

21      A    If you look at - this is an e-mail string.  If you

22  look at the one below that, it's an e-mail, apparently if you

23  look all the way back, when I received Mr. Andraczke's

24  resignation, I forwarded it to Mr. Freeman and Mr. Maybe and

25  Mr. Smith and Ed Jarvis, everybody that I could think of just

                                                            132

1   so they would be fully informed again.  Mr. Freeman

2   apparently, according to this e-mail string forwarded that to

3   Mr. Melzak, again Mr. Robertz's agent and Mr. Robertz's

4   agent, Melzak then forwarded to Mr. Andraczke with the

5   additional language.  "It didn't take long for Marker to

6   distribute the resignation letter.  He did it with no comment

7   to you.  There is something weird about the way Marker has

8   behaved, Julian."

9        Q    You're the one who's suppose to be in bed with Hank

10  Blankenstein?

11       A    Correct, a man who I've never met, never spoken to,

12  never received any communication from.

13       Q    Did you ask Mr. Andraczke about this e-mail?

14       A    I did.  I was upset when I received it.  It seemed

15  like an unnecessary personal attack.

16       Q    What did he say?

17       A    He denied that he had sent the e-mail.  What I

18  assume, of course, is in the digital age, instead of simply

19  replying to Mr. Melzak he hit the reply all button when he

20  sent it back and he sent his comment to Mr. Melzak which was

21  intended to be private, back to me.

22       Q    All right.  Now, Mr. Andraczke had testified about

23  a connection that Eurogas Polska had with a company by the

24  name of Total?

25       A    Yes.

133

1       Q    Is that familiar to you?

2       A    Yes.

3       Q    In a very short way can you explain to Judge

4  Thurman what that was about, to your understanding?

5       A    After you had, Your Honor, approved the sale that

6  required further marketing and a new auction date, I received

7  a call from an attorney with a New York firm, White and Case

8  which even as an attorney in the provinces who doesn't travel

9  much, I have heard of White and Case and assumed that a firm

10 like that, if they were calling me, they had a client who had

11 real money and I was quite interested.  It turned out that

12 they did have a client with money who they wanted to remain

13 anonymous because they didn't want the other bidders to get

14 excited and it was a large company, multinational called

15 Total Feinna Elff.  It's a big conglomerate that operates

16 around the world.  They were very interested in the assets.

17 They did their own due diligence.  They had a group of people

18 on the ground in Europe.  They had received information

19 directly from - and at some point what I found out is that

20 they had been receiving information directly from Mr.

21 Andraczke and Mr. Andraczke had never told me that he was

22 dealing with this large multinational corporation and so I

23 was very angry and I asked him to then produce to me all of

24 the information he had produced to them so that I could get

25 up to speed.

134

1        Q     And what again was the time frame of that?

2        A     It was between the first hearing and the auction,

3    so during March and late February.

4        Q     Now at the same time that was going on, what was

5    Mr. Andraczke telling you about the value of the assets or

6    Eurogas Polska?

7        A     I don't think he ever expressed an opinion about

8    the value.  He was very dire in his predictions about if

9    something didn't happen quickly, the concessions would be

10   lost.  He was consistent about that throughout and in trying

11   to disclose to me all of the debts of the company.

12       Q     And also did he express concerns to you about

13   getting paid?

14       A     Oh yes which I find entirely natural.

15       Q     Yes.  Do you know whether he expressed those

16   concerns to other parties in the case?

17       A     I'm sure he did.

18       Q     Why did it concern you that he hadn't told you

19   about this negotiation?  What effect did you think that would

20   have?

21       A     I didn't know what else he wasn't telling me, what

22   other parties he might have been dealing with.  Apparently,

23   and I confirmed through the White and Case attorneys in New

24   York that they had had him sign a confidentiality agreement

25   in the fall of 2005 and he felt himself bound by that and

135

1   that's why he didn't tell me who he was dealing with but when

2   he testified here today that he only produced documents to

3   Total at my direction, that couldn't have been the case

4   because I didn't even know about them until much later.

5        Q    Thank you.  Please turn to Exhibit Tab E.

6        A    Yes.

7        Q    Can you identify that?

8             I'm sorry, Your Honor, I'd move the admission of

9   Exhibit D.

10            THE COURT:  Received.

11            (Exhibit D received)

12        Q    (BY MR. MCCARDELL)  Can you identify E?

13        A    This is an e-mail I received from Mr. Freeman

14   forwarding an e-mail from Mr. Melzak expressing his concerns

15   that have been, I think stated here today by Mr. Robertz's

16   attorneys and I forwarded it directly to Mr. Finlay asking

17   him to tell me his side of the story before I responded to

18   Mr. Freeman.

19        Q    Who was Freeman?

20        A    Freeman is the attorney in Miami who is co-counsel

21   with Mr. Maybe for Robertz.

22            MR. MCCARDELL: Move the admission of Exhibit E.

23            MR. LOCHHEAD?:  No objection.

24            THE COURT:  Received.

25            (Exhibit E received)

136

1      Q    (BY MR. MCCARDELL)   And then please turn to Exhibit
2    R.

3      A    R as in Robertz?

4      Q    Yes.   What is that?

5      A    This is Mr. Finlay's response to my e-mail
6    requesting his side of the story about these allegations
7    concerning Tietze.

8      Q    All right.   After you received this e-mail did you
9    have any further concerns about the allegations raised?

10     A    I had concerns about a lot of things in this case
11   but his explanation, Mr. Finlay's explanation made sense to
12   me.

13          MR. MCCARDELL: Move the admission of Exhibit R.

14          MR. LOCHHEAD?:  No objection.

15          THE COURT:  Received.

16          (Exhibit R received)

17          MR. MCCARDELL:  No further questions for the
18   witness at this time, Your Honor.

19          THE COURT:  Any cross for this witness on these
20   matters?

21                        CROSS EXAMINATION

22   BY MR. LOCHHEAD:

23     Q    Mr. Marker, do you know whether Mr. Andraczke's
24   resignation was ever registered with the Polish government?

25     A    I don't.   He was asking me for my acceptance of the

1    resignation which I didn't understand.

2          MR. LOCHHEAD: Okay.  No further questions.

3          THE COURT:  Anyone else?  Someone needs to ask Mr.

4    Marker some additional questions, don't they?

5          All right.  You may step down.

6          Mr. McCardell, do you have additional evidence

7    you'd like to present?

8          MR. MCCARDELL:  May I confer with my client, Your

9    Honor?

10          THE COURT:  Go ahead.  Do the parties need a break?

11    We've been at this about another hour and 45 minutes since

12    our last break and now might be a good time to do that.  The

13    Court will take a brief recess.

14          (Whereupon a recess was taken)

15          THE COURT:  All right.  Mr. McCardell?

16          MR. MCCARDELL:  Thank you, Your Honor.  Before I

17    rest I want to offer to the Court Mr. Finlay as a witness in

18    my case in chief in the event, based on any of the evidence

19    Your Honor has heard so far Your Honor has any questions of

20    him.

21          THE COURT:  I do not.

22          MR. MCCARDELL:  Then I rest.

23          THE COURT:  Any rebuttal evidence?

24          MR. PERRY:  Your Honor, we'd just like to call Mr.

25    Andraczke briefly in rebuttal.

                                                    138

1          THE COURT:  Come forward, sir.  We don't need to

2    swear you in again sir.  You're still under oath.  Thank you.

3                    ANDREW ANDRACZKE

4          having been previously duly sworn, testified

5          upon his oath as follows:

6                    RECROSS EXAMINATION

7    BY MR. PERRY:

8          Q    Mr. Andraczke you were in the courtroom a short

9    while ago when Mr. Marker was discussing some communications

10   with a French company named Total?

11         A    Yes.

12         Q    You heard that testimony?

13         THE COURT:  About which company?

14         THE WITNESS:  Total.

15         THE COURT:  Spell that.

16         THE WITNESS:  T-O-T-A-L.

17         THE COURT:  Thank you.

18         Q    (BY MR. PERRY)  What's the full name of the

19   company?

20         A    Total Petroleum.

21         Q    Do you have any further explanation or illumination

22   of the transactions and events there between and among you

23   and Mr. Marker and Total?

24         A    Yes.

25         Q    Please.

139

1        A    I was asked by ministry in the beginning of October

2    2005 because there was no progress of the work on our

3    concession, I was asked by the ministry to meet with very

4    serious oil company named Total Petroleum which is number

5    four company in the world.   I told that the only way how I

6    can do this is just by signing confidentiality agreement with

7    them.   I signed confidentiality agreement and they came to

8    Poland.   They met with Polish (inaudible) Company which is

9    our partner.   They studied some information.   They went to

10   Institute of Geology and they went to the ministry and they

11   went to seismic enterprise in Kragau.   They started the data

12   and they told that they will come back if they will be

13   interested after making their engineering study after

14   evaluation of the information.   I did not provide them with

15   any information which are not in public domain.

16        Q    You mentioned at the first you were directed by the

17   ministry?

18        A    Yes, they came to me from the ministry.

19        Q    They meaning Total?

20        A    Yes.

21        Q    And by ministry that's...

22        A    Ministry of Environment.

23        Q    But the Polish government?

24        A    Yes.

25        Q    And then did you have conversations with Mr. Marker

                                                            140

1    about this transaction, this event?

2        A    They did not - I informed them about the auction.

3        Q    I'm sorry, and them is who?

4        A    Total.  I informed them about the first auction.

5    They did not participate in the first auction.  Suddenly

6    during second stage, I got a telephone call from a person at

7    Total.  I told them there is an auction process right now.

8    So I cannot go in any details with them.  If they want to

9    participate they can because it was advertised in the

10   magazines and later I got a call from Mr. Marker.  Mr. Marker

11   first sent me the e-mail about the information.  I think I

12   answered to this e-mail.  After this I got a call from Mr.

13   Marker that he was contacted by White and Case in New York by

14   the office, legal office and I asked him if I should provide

15   this information to Total and he told me yes, absolutely they

16   are very serious bidder, don't you want to make few hundred

17   thousand dollars out of this?  This was, I hope, I'm

18   referring very accurately because I remember this.

19            I want to say one thing, contrary to some common

20   belief here that I could sell the company or sell a

21   concession, it is not item that you can sell.  I could not

22   sell Eurogas Polska, everybody knows about it.  I could not

23   sell a concession because concession is granted to Eurogas

24   Polska.  I could not sell it.

25            THE COURT:  Sir, I'm going to stop you right there.

                                                            141

1    Unless you've got a question on that, I'm not going to allow

2    that continuation.

3        Q    (BY MR. PERRY)   I have two more brief questions.

4    The first is, there was some testimony earlier from Mr.

5    Marker about you e-mailing a supposed resignation in late

6    February, early March, your resignation as President or

7    Eurogas Polska?

8        A    Yes.

9        Q    What were the circumstances surrounding that?

10       A    Very difficult financial situation.

11       Q    Did you in fact resign at the time?

12       A    Well, under Polish law I cannot resign, only the

13   owner of the company can make me to resign.  So I sold the

14   property and I supported (inaudible) company.

15       Q    Turn to Exhibit C please in the binder that has the

16   lettered exhibits.  Do you recognize that document?

17       A    Yes.

18       Q    What's the date of that document?

19       A    It says March (inaudible) 2006.

20       Q    And did you send that document to Mr. Marker?

21       A    Yes.

22       Q    Why?

23       A    Because I was very upset.

24       Q    I'm sorry, sir, maybe talk into the microphone a

25   little bit more.

1     A     Because I was very upset.

2     Q     Why?

3     A     With the result of the auction.

4     Q     What didn't you like about the result?

5     A     I could not believe that during the auction Mr.

6   Finlay was accepted as a bidder.

7     Q     Why did that cause you concern?

8     A     Because I believed that behind this is Mr. Rauball

9   and I could not work with Mr. Rauball any more.

10     Q     And is that the reason you sent the document,

11   Exhibit C?

12     A     Yes, absolutely, absolutely.

13           MR. PERRY: Nothing further, Your Honor.

14           THE COURT:  Any questions?

15           MR. MCCARDALL:  Yes.

16           THE COURT:  On cross.

17                       CROSS EXAMINATION

18   BY MR. MCCARDELL:

19     Q     So you just told the Court that you sent this

20   letter because you were upset with the auction, right?

21     A     Yes.

22     Q     But you just also testified that you knew that your

23   resignation could not be effectuated, would not be legal,

24   right?

25     A     I was hoping that I sent another request to Mr.

1    Marker to accept my resignation and if I would have his

2    acceptance of my resignation, I will submit this to the

3    court.

4         Q    But for now this is just a pressure tactic, right?

5         A    No, there is no pressure tactic.

6         Q    Were you trying to mislead Mr. Marker?

7         A    No, I —

8         Q    If you can't —

9         A    — wanted to get his acceptance.

10             MR. MCCARDELL: No further questions, Your Honor.

11             THE COURT:  Thank you, you may step down sir.

12             Any additional rebuttal evidence?

13             MR. PERRY?:  No.

14             THE COURT: All right.  Is the matter deemed

15    submitted on the evidence?

16             MR. MCCARDELL?:  Yes Your Honor.

17             THE COURT:  Do the parties wish to have a summary?

18             MR. LOCHHEAD:  Yes, please, Your Honor.

19             THE COURT:   You may.

20             MR. LOCHHEAD:  I'm painfully aware of the hour.

21             THE COURT:  I've been here until midnight before.

22    So I'm prepared to put in the time, whatever you want to say

23    in five minutes Mr. Lochhead, go ahead.

24             MR. LOCHHEAD:  I'll talk fast, Your Honor.

25             THE COURT:  No, do what you need to do.

144

1          MR. LOCHHEAD:   Thank you.   Seriously though, we do

2   appreciate the Court and the Court's staff indulgence today

3   to all parties.   It's very much appreciated.

4          Just to put this in prospective and put a frame

5   around what's going on here a little bit.   This started out

6   as a no asset case.   Mr. Marker, the trustee had no idea

7   there were any assets to be available for creditors.

8   Wolfgang Rauball, Reinhard Rauball, and Hank Blankenstein

9   were ordered by the Court to prepare statements and schedules

10  which they didn't do.   They were ordered to cooperate with

11  the trustee which they didn't do.   As a consequence the

12  trustee filed a no asset report and was on the verge of

13  closing this case.

14          Had that happened Mr. Rauball and his colleagues

15  would have been successful in shielding assets worth hundreds

16  of thousands of dollars from their creditors and they would

17  have walked away with everything.   They have consistently

18  from the beginning of this case engaged in a pattern of

19  concealing assets from the estate.

20          When Mr. Marker learned from another source

21  independent of Rauball that there were subsidiaries that set

22  in motion a series of events that culminated in the auction

23  on March 28.   The trustee had no idea of what these

24  subsidiaries were and what they were worth.   He was ready to

25  sell them for $10,000.   But once word got out that there was

145

1    going to be an auction, there were a group of people that had

2    connections and various tangential relationships to this

3    property, they started expressing interest.  [unintelligible]

4    Zimmer expressed an interest.  Mr. Marker very properly

5    disqualified him because he had ties to Wolfgang Rauball.

6    Mr. Robertz, Consolidated, Sinofirst, Mr. Finlay's entity and

7    Jochen Tietze also expressed interest in bidding.  Mr. Finlay

8    learned about the auction from Rauball.  He testified that

9    much at the confirmation hearing on March 30th.  What he

10   didn't testify to on the 30th was that he and Rauball had had

11   numerous telephone conversations about Eurogas during the

12   months preceding the auction.  Although his testimony is

13   contradictory on this now, he testified at his deposition

14   yesterday that he traveled to Rauball's home, did the

15   Whistler Ski Resort to talk about Eurogas.  They met in

16   Vancouver over lunch to talk about Eurogas.  He learned about

17   Jochen Tietze through Rauball but what was not before the

18   Court on March 30 was that Rauball and Tietze had a long

19   history of dealing with Eurogas, Eurogas Polska, the other

20   subsidiaries, [unintelligible] that the Court has heard

21   testimony about today.

22        Well, Mr. Tietze then at Rauball's request

23   contacted Finlay.  Mr. Tietze said, I've got people that I

24   represent who are prepared to spend a lot of money to acquire

25   and develop these Eurogas Polska assets.  That was all the

                                                      146

1   due diligence that Mr. Finlay needed.  Mr. Finlay didn't know

2   what the assets were.  He thought he was talking about coal

3   bed methane.  Eurogas Polska doesn't have coal bed methane.

4   It has oil and gas concessions, has nothing to do with coal.

5   What he was doing was acting on assurances from Rauball and

6   Tietze that if he got  the high bid, he could sell it to

7   Tietze's people, they had plenty of money, there would be

8   profit in it for him.  They don't have a deal.  Technically

9   the testimony may well be correct that they don't have a

10  signed agreement but there certainly was an understanding and

11  there's certainly motivation there for Finlay to get involved

12  in this bidding because he had these assurances from Rauball

13  and Mr. Tietze that they would make sure he was taken care

14  of.

15          Tietze after talking with Rauball on the phone, a

16  few days later sends an e-mail to Mr. Marker, that's our

17  Exhibit 7 that says I'm resigning because I found out this

18  new information and it's terrible and I told my client about

19  that and he says he doesn't want to have anything to do with

20  us any more, that's why I'm resigning, Mr. Trustee.  That's

21  absolutely false.  That was fraud on the trustee.  That was

22  not the reason Mr. Tietze was withdrawing.  Mr. Tietze

23  withdrew from the bid because he didn't need to be there

24  because Finlay was going to be there to bid for them.

25          So Mr. Finlay goes to the auction, the bidding gets

147

1   pretty high and Mr. Finlay's testimony, this is his money and

2   I questioned that at first but I'll accept his word on that.

3   He put his own dollars at risk here but as the bidding got

4   higher he asked for a break and went and called Tietze, got

5   assurances from Tietze, it's all good, my people are here.

6   He goes back and keeps upping higher and gets the high bid.

7   This is a man whose never bought a company before, never

8   attended a bankruptcy auction before, did minimal due

9   diligence, never talked to Mr. Andraczke or anybody else in

10  Europe, didn't really look at the documents.  His due

11  diligence was talking to Rauball and Tietze and that's all he

12  needed.   That was his assurance.

13          Meanwhile what the Court didn't know at the hearing

14  on March 30 was that way back in November, Rauball,

15  Blankenstein and another fellow signed an illegal board

16  resolution without the knowledge of Mr. Marker or Mr.

17  Andraczke or virtually anyone appointing their buddy Jochen

18  Tietze to the board of Eurogas Polska.  He's their man and

19  also what the Court didn't know back at the end of March is

20  that Rauball and Tietze had been involved through Poltec,

21  McCullin, various proposals to try to get control of Eurogas

22  Polska through various other ways but they hadn't worked out.

23  This is just the next chain in that series of events, this

24  time working through Mr. Finlay.  So it's clear that Tietze

25  and Rauball have been collaborating on Eurogas Polska for a

148

1  long time, at least since November of 2005 and probably much

2  earlier.

3      I'm trying to make sure I'm being as brief as I

4  can.

5      So Mr. Finlay goes to the auction, he ends up

6  acquiring the assets and what does he do?  He immediately

7  hires Mr. Tietze to go represent him before the Polish

8  government and to make a proposal for development of the

9  concessions.  Mr. Tietze is the one who knows about the

10 concessions, not Mr. Finlay.  He doesn't even know what those

11 concessions are.  Tietze is the one that's really behind this

12 and Tietze and Rauball are joined at the hip.  They have been

13 from the very beginning.

14     So if this sale holds up, what's going to happen?

15 When the Court cuts through the debris and the layers of

16 entities and alter egos and agents and cuts down to the core,

17 what it's going to find is Wolfgang Rauball, the person whose

18 been ordered by the Court to submit these assets to the

19 estate, to the trustee for administration for the benefit of

20 creditors, who has flaunted this Court's orders from the

21 beginning and is now trying to get these same assets through

22 the backdoor, working through Tietze and Mr. Finlay.

23     Mr. Finlay in effect is aiding and abetting

24 Wolfgang Rauball's scheme to maintain control of the assets

25 of this debtor, concealing the real value from the trustee.

149

1   Whether Mr. Finlay is acting in subjective good faith or not

2   is really beside the point.  The real point here is what's

3   going on is he's working with Rauball and Tietze in a way

4   that just isn't right.  I mean, it really makes a mockery of

5   the bankruptcy system and casts dispersions upon the good

6   faith and integrity of the bankruptcy process.  We don't have

7   the luxury of time to go track down Mr. Tietze, take his

8   deposition; to track down Mr. Rauball whether he's in

9   Whistler, Vienna or wherever he is, and do a thorough job of

10  investigation.  We've done the best we can on extremely short

11  notice but what we got was a lot.  What we got was a story

12  that was total in bits and pieces to Judge Boulden on March

13  30 but we see a lot more now.  I suspect [unintelligible]

14  only seen the tip of the iceberg.

15          The principal creditor had no idea what these

16  assets were worth.  It's happy to get several hundred

17  thousand dollars.  Mr. Robertz, my client is prepared to meet

18  that high bid.

19          THE COURT:  The bid of --

20          MR. LOCHHEAD:  Of —

21          THE COURT:  — Mr. Finlay?

22          MR. LOCHHEAD:  — Finlay, right.  So there's no

23  judgment [unintelligible] to the estate.

24          THE COURT:  Why didn't he make it at the time?

25          MR. LOCHHEAD:  Well, I don't know.  There's no

1   evidence about that and frankly, I don't know.  I could

2   speculate but the answer is there's no evidence on that.

3        Really what this case comes down to is our argument that

4   the Court should not allow people like Wolfgang Rauball who

5   are masters of deception to acquire assets of bankruptcy

6   estates through the backdoor after playing games with the

7   trustee, playing games with the Court and working through

8   their agents and agent's agents to do indirectly what they

9   could never do directly.  That's our case, Your Honor.  Thank

10  you.

11        THE COURT:  Thank you.

12        Mr. Boley, do you want comment before I ask Mr.

13  McCardell?

14        MR. BOLEY:  I would like that.  I agree with Mr.

15  Lochhead that this begins and ends with Wolfgang Rauball but

16  the Court doesn't need to connect all the dots and get all

17  the way to Wolfgang Rauball as the end user of these assets

18  to disqualify Mr. Finlay as a bidder.  I submit there are

19  four separate grounds on which this Court should disqualify

20  Mr. Finlay as a bidder.  The Court's heard substantial

21  evidence for each of these four separate grounds.  The first

22  is that there is substantial evidence that Mr. Finlay has a

23  very close relationship with Mr. Rauball.  That is the sole

24  basis upon which the trustee originally disqualified Mr.

25  Zimmer as a bidder.  This relationship goes back 30 years.

1   This relationship includes business dealings, friendships,

2   and legal representation by Mr. Finlay of Mr. Rauball.

3           THE COURT:  I don't have any evidence of that.

4           MR. BOLEY:  Well, at the last hearing Your Honor,

5   you have that record in front of you.

6           THE COURT:  Was it admitted to this hearing?

7           MR. BOLEY:  Isn't this a continuation of that

8   hearing to the extent (inaudible) new evidence?

9           THE COURT:  I don't think so.

10          MR. BOLEY:  Okay, alright.  So there's no evidence

11  of that, I'm sorry, Your Honor.  That was my lapse.

12          In addition to that, there's clear evidence, Your

13  Honor, that Mr. Finlay had inside information.  Inside

14  information that was not available to other bidders, was not

15  available to my client, was not available to Mr. Robertz, it

16  was not available to Total, inside information that on the

17  New York Stock Exchange would be considered insider trading

18  and Mr. Finlay had a direct ear to Mr. Rauball, Mr. Rauball

19  who had flaunted this Court's orders and had refused to

20  provide information to the trustee that could then been

21  disseminated to all the bidders.

22          The second reason Mr. Finlay should be disqualified

23  is he had access to inside information and that's patently

24  unfair in this auction process.

25          The third reason that the Court should disqualify

1    Mr. Finlay is because he colluded with another bidder, Mr.

2    Tietze.   The Court's heard evidence from Mr. Marker that Mr.

3    Tietze was a competing bidder, he had signed and submitted to

4    Mr. Marker a signed form of auction procedures.   He had

5    submitted a $15,000 deposit and until the day before the

6    auction, Mr. Marker believed that Mr. Tietze was going to

7    appear and compete in the bidding.   Something happened.

8    Something happened five days before the auction that led Mr.

9    Tietze to withdraw as a bidder and that something, Your

10   Honor, is that he had a conversation with Mr. Finlay wherein

11   an arrangement was reached, or some kind of understanding was

12   reached that it wasn't necessary for Tietze to be there.   You

13   heard testimony by Mr. Finlay that Mr. Tietze didn't want to

14   come here if he didn't have to and after this conversation

15   with Mr. Finlay, Mr. Tietze remarked, knowing what I know

16   now, I don't need to come.   In essence this collusion which

17   would have increased the bid price and benefitted the estate

18   because there would have been two competing bidders entered

19   the estate because those two bidders were fused into one in

20   the form of Mr. Finlay.   So improper collusion which is often

21   a basis upon which courts disqualify bidders is the third

22   grounds upon which the Court should disqualify Mr. Finlay in

23   this case.

24          The fourth reason that the Court should disqualify

25   Mr. Finlay in this case is that it's clear that through his

153

1    agents on the ground in Poland, Mr. Tietze and Adamiec, Mr.

2    Finlay has acted illegally.  Mr. Tietze and Mr. Adamiec,

3    before the auction, filed documents with the Polish

4    authorities to change the corporate structure so that Mr.

5    Tietze was on the board of directors.  That happened before

6    the auction.  Immediately after the auction, Mr. Tietze and

7    Mr. Adamiec contacted the Polish authorities and set up a

8    meeting and when they met with the Polish ministry, they

9    presented these same documents.  You have those documents in

10   front of you and you have an e-mail from Mr. Tietze to Mr.

11   Finlay where Mr. Tietze says, yeah, we produced these

12   documents to the ministry.  Why did they do that?  They did

13   that because they felt like it would give more credence to

14   their position because at that point there was no deal with

15   Mr. Marker.

16            THE COURT:  Let me see if I understand the logic on

17   that.  Because they presented that and did the changes

18   whether it's legal or illegal and because Mr. Tietze talked

19   with Mr. Finlay, he should be in harmony with what they did

20   or knowledge and somehow tied to what they did?

21            MR. BOLEY:  I guess the logic is this, Your Honor,

22   that Mr. Tietze was appointed by Mr. Finlay to act as his

23   agent with the Polish government.

24            THE COURT:  When was he appointed?

25            MR. BOLEY:  He was appointed in that April 2

                                                         154

1    handwritten letter that's been presented to Your Honor and

2    that was confirmed in an e-mail that's also in evidence.

3         THE COURT:  And when did they go to the Polish

4    government to present their papers?

5         MR. BOLEY:  They originally filed with the court,

6    the registrar, these documents in March before the auction.

7    But they then again presented these documents to the

8    ministry, whose not the registrar, not the person to which

9    you record these changes but as evidence of "Hey look, we do

10   have the right to be here talking to you."  And that was all

11   set up before Mr. Finlay paid any money to Mr. Marker.

12        All this was - it was started before the auction

13   and it was continued before $1 had been paid to Mr. Marker.

14   It was only after these actions had failed and you saw an e-

15   mail from Mr. Marker to the ministry saying, until we get a

16   deal, they don't have any right to speak for Eurogas Polska.

17   It was only after that that Finlay stepped up and paid the

18   money in this case.

19        So for those four reasons, Your Honor, you should

20   disqualify Mr. Finlay as a bidder; one, the very close

21   incestuous relationship between Finlay and Rauball; two,

22   inside information, i.e. insider trading; three, improper

23   collusion between bidders; four, Finlay's representatives on

24   the ground in Poland are defrauding the Polish government.

25        Thank you, Your Honor.

155

1          THE COURT:  Mr. Marker?

2          MR. MAKER:  Thank You, Your Honor.  As the trustee

3    of this estate, I'm I think more concerned than anybody about

4    the implication that Mr. Rauball might have some hand in

5    this.  Unfortunately there's no real evidence of that.  The

6    undisputed testimony is that Mr. Finlay was bidding with his

7    own money, that he was bidding for his own account, that he

8    was not bidding on behalf of some undisclosed principal, much

9    less Rauball; and I believe all that.

10          Procedurally you'll recall that the first hearing

11   on the sale was held on February 9, 2006 and at that hearing,

12   prior to that hearing I identified Consolidated, Sinofirst,

13   Mr. Finlay and Robertz, three parties represented here today,

14   as bidders.  So as far back as the first hearing in early

15   February, everyone in this room knew Mr. Finlay was a bidder,

16   nobody raised the issue at that time, nobody proved anything

17   at that time.  You entered your first order, authorizing the

18   sale subject to further marketing.  The auction was conducted

19   on March 28, Judge Boulden conducted a lengthy confirmation

20   hearing on March 30 at which again the parties here, Mr.

21   Smith, Consolidated, and Robertz had their chance to take a

22   wack at Mr. Finlay.  Judge Boulden made a good-faith finding,

23   the sale was approved, nobody appealed the order.  Subsequent

24   to that, both Consolidated and Mr. Finlay paid the money they

25   bid.  It's in my trust account and the only thing left for

156

1    Mr. Finlay and me is to seek a resolution from you in the

2    form of the assignment that's in dispute.

3          So procedurally for someone, someone whose a

4    disgruntled bidder, somebody who didn't win the auction to

5    come in now to try to overturn an order that's been final for

6    going on five weeks, that's just, I don't think that's what

7    we want in the bankruptcy process.  As a trustee, I want

8    people who come to bid on my estate's assets to be able to

9    have some confidence that they won't have to fight battles

10   like this months down the road and I think it's important in

11   this case that this be resolved, that this motion be denied

12   and that we go on a closing sale so I can move forward and

13   administer the estate.

14          THE COURT:  Mr. McCardell?  Oh, wait a minute.

15   Let's hear from Mr. Smith.

16          MS. JARVIS:  It might be best to (inaudible).  Your

17   Honor, we've heard some new evidence for us, things we didn't

18   know today speaking on behalf of Mr. Smith which are quite

19   troublesome.  The problem for Mr. Smith is he is the major

20   creditor in this estate, the 99.98 creditor and therefore the

21   main beneficiary of this sale.  What's troublesome from the

22   evidence that was heard today is if we had more time, I think

23   Mr. Smith would take the position that the auction ought to

24   be redone, given some of the circumstances that have

25   occurred; however, and at this point in time because of what

157

1    the testimony is, is that there is no more time with respect

2    to keeping these concessions alive and therefore keeping the

3    value of this estate, that's not an option.

4         What is disconcerting, I think from his point of

5    view is the testimony with respect to Mr. Tietze that he

6    pulled out after talking to Mr. Finlay even though he told

7    him he was very, very interested in these assets and it was

8    Mr. Finlay's understanding that he was a German and he didn't

9    want to bother and yet, four days after the auction he

10   appears in North America in Vancouver to talk with Mr. Finlay

11   about these assets.  That's only two days after the hearing,

12   or I guess three days after the hearing confirming the sale.

13        In addition, he was so interested in these assets

14   even though he didn't want to bother to show up that Mr.

15   Finlay is calling him during the auction asking him if

16   $600,000 is too much with respect to whether he would still

17   be interested in [unintelligible] this.  This doesn't sound

18   like someone wouldn't bother to show up at an auction unless

19   there was some kind of, you know, understanding of some type

20   with respect to, you know, being able still to possibly

21   acquire these assets.

22        THE COURT:  Yeah, but what you're doing is asking

23   me to fill in the blanks.

24        MS. JARVIS:  What I'm asking Your Honor —

25        THE COURT:  You're saying there's something that

1   some lady said that said that something and that's kind of

2   hard isn't it?

3          MS. JARVIS:  What I think I'm expressing is a

4   frustration that you really don't have, you know, enough

5   information to fill in all the blanks and yet I think what

6   this implicates for us as a creditor, no matter how this

7   comes out today, we're talking about the same amount of money

8   and yet it looks to me like there could be possibly more

9   value.

10          Now what's before the Court today is a 363-N issue

11   issue and certainly I think that we would - and I have spoken

12   with Mr. Marker that this is not an issue before the Court.

13   However the Court rules today, we certainly would like the

14   opportunity - if we have the opportunity to look into this to

15   see if there was more value that was not put on the table

16   because of the activities or the discussions between Mr.

17   Finlay and Mr. Tietze.

18          THE COURT:  You got my attention on that, counsel.

19   You're saying 363-M is not before the Court.

20          MS. JARVIS:  Right, because it's the trustee only

21   that can bring that action to either avoid a sale or —

22          THE COURT:  N or M?

23          MS. JARVIS:  N.

24          THE COURT:  N as in Nancy.  Okay.

25          MS. JARVIS:  But he also has the option to go and

1    if there is some problem with the sale, to ask for the amount

2    to be brought back into the estate that exceeded what would

3    have been brought into the estate but for [unintelligible]

4    bid.  So, for instance, in this case if it turns out that Mr.

5    Finlay does sell these assets to Mr. Tietze for a

6    substantially higher price, that would be a fact that we

7    would want to look into, have the right to look into to see

8    if that value then belongs to the estate pursuant to that and

9    I think that is not before the Court today but it is an issue

10    of concern that this testimony raises for us as a creditor

11    and a beneficiary of this sale.

12              THE COURT:  Well, that's not before me.

13              MS. JARVIS:  No.

14              THE COURT:  That's for another day.

15              MS. JARVIS:  But this issue, I mean, so I think for

16    us today, you know, we do have some concerns about this, you

17    know, like I said as the beneficiary, the money doesn't

18    [unintelligible] to us today, you know, about this but we do

19    not want to take, you know, whatever the Court decides to do

20    today is, you know, we don't want the Court to understand

21    that we have no problems with this no matter what the Court

22    does.

23              THE COURT:  So which side do you want to sit on?

24              MS. JARVIS:  I want to sit on basically reserving

25    my rights.  I think that, you know, I think we would say that

1   there are some problems with what has gone on and we think

2   there is an issue with respect to whether this was, you know,

3   a good faith bid.  The bottom line, what we're more concerned

4   about is whether there is some value that would be

5   recoverable for the estate if there turns out to have been an

6   agreement between Mr. Tietze and Mr. Finlay which is not

7   before this Court at this time.

8           THE COURT:  You're not opposed to the sale but you

9   want further information.  You're not supporting the motion?

10          MS. JARVIS:  Well, I mean, for us economically it's

11  the same and so, you know, I think we have problems with

12  this.  I don't think we're either supporting or opposing, you

13  know, the sale. We kind of neutral, we're just simply saying

14  that no matter how the Court decides, if the Court decides to

15  go with Mr. Finlay, there still are some issues that we

16  intend to pursue.

17          THE COURT:  And you've got 98 percent of the debt?

18          MS. JARVIS:  99.8.

19          THE COURT:  99.8.  Okay.  Thank you.

20          Mr. McCardell.

21          MR. MCCARDELL:  May it please the Court, Steve

22  McCardell appearing on behalf of Sinofirst.  I would like to

23  rely on our written submission for what ought to be said

24  right now.  We are before you on a Rule 60B motion which asks

25  you to set aside a final and non-appealable order of the

1   judge of this court which bears with it a standard which has

2   to be satisfied.  We've explained in our papers, our

3   arguments as to why that standard has not been satisfied but

4   I'd like to speak today to the evidence that has been argued

5   in these last statements.

6          Your Honor, the so-called newly discovered evidence

7   is simply not new.  The relationship Mr. Finlay had with Mr.

8   Wolfgang Rauball was disclosed up front, it was testified

9   about, nobody raised an objection and there's nothing more

10  than a long standing friendship and business relationship as

11  Mr. Finlay testified and he's testified and it's unrebutted

12  that there is no agreement, understanding, direct or indirect

13  with respect to the purchase of these assets.  True, Mr.

14  Wolfgang Rauball suggested that Mr. Tietze call Mr. Finlay.

15  True, Mr. Wolfgang Rauball was the person who told Mr. Finlay

16  about the auction.  But these folks have been associates in

17  the business world, in the mining world for years and it's

18  simply not usual for folks to talk and say, look this auction

19  is happening, and that's how Mr. Finlay became involved.

20          Now Mr. Finlay is simultaneously accused of

21  contradictory things.  It's odd.  First Mr. Lochhead accuses

22  him of being so stupid that he doesn't know which entity has

23  which assets and not doing any due diligence and just coming

24  in blind.  Then Mr. Boley gets up and says, he's got so much

25  insider information from talking to Mr. Rauball that he ought

1    to be disqualified.  Well which is it?  The evidence can't

2    support both of those theories.  I don't think it supports

3    either one of them.  The evidence is that Mr. Marker prepared

4    a bid package.  Mr. Finlay received it, he reviewed it, he

5    made contacts with many people, Mr. Rauball and others as any

6    bidder would do.  Remember, this was an auction based in a

7    setting where there were no statements or schedules, a fact

8    the evidence shows Mr. Finlay had nothing to do with.  The

9    trustee was forced into a situation where he had to auction

10   these on a somewhat blind basis after Your Honor established

11   some due diligence, some marketing procedures.  The trustee

12   gave notice to the world, the world came, those who wanted

13   to.  They got the information, they reviewed it, they talked

14   to whoever they wanted to.  Nobody was barred from talking to

15   Mr. Rauball.  Everybody had his e-mail address as I pointed

16   in the testimony of Mr. Marker, up front.  Anybody who wanted

17   to get in touch with him could have.  Mr. Finlay doesn't have

18   some secret pipeline that nobody else has.  He's his friend,

19   that's what it amounts to.

20          Now, Mr. Finlay has told everybody that he was

21   going to resell these assets for a profit.  He'd be a fool to

22   come to a bankruptcy auction and not intend to do that.

23   That's what everybody does and to suggest that because Mr.

24   Finlay has the motivation to buy these assets for one price

25   and sell it for more, that's some kind of fraud on the Court,

1  is, it's just an incredible argument.

2      Now, it's true, Your Honor, that we have heard

3  evidence today that was submitted with the motion that there

4  was a November change of the officers of Eurogas Polska, that

5  Mr. Tietze was involved, Mr. Rauball was involved.  But the

6  one person who was not involved is my client, Sinofirst, or

7  Mr. Finlay its principal.  That's the missing link.  This

8  whole argument about what these guys were doing - and I don't

9  whether they had imagination going on, I don't know if they

10  had a simple misunderstanding of what the bankruptcy laws

11  mean.  I mean, these were foreigners.  They're not

12  represented by lawyers.  They don't really know what the

13  court system means.  That have Your Honor's order and they

14  ought to be obeying but in terms of what they can and can't

15  do, I don't know.  Mr. Finlay comes along and is simply blind

16  sided by this information.  Mr. Marker, as he testified,

17  called him on the phone and said what about this November

18  meeting change.  Mr. Finlay hadn't heard about it before

19  this.  He gets it in an e-mail later from Mr. Tietze as the

20  evidence shows but his first contact with it was when he

21  heard about it from Mr. Marker.  He's taken just as much by

22  surprise as anyone else.

23      Now, there was some arguments - Mr. Lochhead used

24  some pretty broad language that I don't think the evidence

25  supports.  He said in his argument that Mr. Finlay was

164

1   relying on assurances from Rauball and Tietze but where's the

2   evidence that Rauball gave Mr. Finlay any assurances about

3   anything?  In fact the evidence is just the contrary.  There

4   were none.  What assurances did Mr. Finlay receive from Mr.

5   Tietze?  There is no evidence of anything Mr. Tietze said.

6   There's no agreement, there's no understanding that he's

7   going to be the purchaser.  In fact, Mr. Finlay's testimony

8   is that yes, he might be the purchaser, he's the logical

9   purchaser because he seems to have so much interest but he

10  can sell it to anybody he wants to.  He's going to sell it to

11  the person to whom he can get the best price.

12       THE COURT:  What about the inference that several

13  days before the bidding Mr. Tietze withdraws after his

14  discussions.

15       MR. MCCARDELL:  Yes, my next point.  Let me cite

16  two pieces of evidence that I think are pretty important.  I

17  wish Mr. Tietze were here.  I know both Mr. Lochhead and I

18  tried to get him here but we have these documents, so such as

19  it is.  My Exhibit G, March 9.  This is an e-mail from Mr.

20  Tietze to Mr. Marker.  He's representing clients that are

21  interested Eurogas Polska and Pol-Tex.  "Over the last three

22  months he's tried unsuccessfully to get information from Mr.

23  Andraczke that they can get into negotiations.  "As you can

24  see from my affidavit" and this affidavit is not before you –

25  I wish there was some way to get it in but I can't even talk

1    about it but it's referred to, "I have offered substantial

2    financial investments to Mr. Andraczke and his companies.

3    Mr. Andraczke has refused to enter into an agreement with

4    myself.  Also substantial funds are available providing a

5    confirmation from Mr. Andraczke that everything is in good

6    standing."  What does that mean?  I don't know.  Does it mean

7    that Tietze was trying to bribe off Andraczke and Andraczke

8    said no way, I'm a trustee's guy and I'm not going to deal

9    with you?  Does it mean that there really was something

10   between the two that just didn't work out?  I don't know but

11   there's nothing to do with Mr. Finlay.

12           "I've also contacted Bernd Robertz, the movant, one

13   of the bidders, in order to get confirmation that everything

14   is in good standing."  See, he's not just talking to Mr.

15   Finlay.  "Mr. Andraczke was very upset in this and told me

16   two weeks ago that he'd planned to travel to Salt Lake City

17   and meet with you and Mr. Steve Smith.  He told me that he

18   spoke with you and you didn't allow him to enter into

19   agreements with parties interested in the bidding.  Is that

20   true?"  See if Mr. Tietze thought he had a pawn out there why

21   would be care about getting information and doing stuff?  He

22   asked if he could still join in the bidding process.

23           All right now, the next document, if I can find it,

24   Movant's Exhibit 7.  Okay, you've had in the argument a whole

25   bunch of speculation about why Mr. Tietze withdrew from the

166

1    bidding but this is the document.  It's the only evidence we

2    have on why he went out and it's put in here by the movant.

3    He says, "The reason for my withdrawal is the very

4    disappointing and unpolite answer I received from Mr.

5    Andraczke on March 25, 2006.  Mr. Andraczke has sent you a

6    copy."  And I apologize Your Honor, I don't know if that

7    e-mail is in our exhibits or not.  It may well be, I don't

8    know but the point is, the two reasons he gave for his

9    withdrawal, he asked Mr. Andraczke for clarification on

10   salaries which he claimed in the narrative he'd written and

11   Mr. Andraczke's answer was totally dissatisfactory.  He

12   didn't trust Andraczke.  Well, no wonder, Mr. Marker learned

13   that he shouldn't trust him either because Mr. Andraczke

14   didn't disclose the involvement of Total, one of the biggest

15   oil companies in the world at a time when everybody was

16   trying to get this assert sold.

17          The second reason, "I have also asked Mr. Andraczke

18   on March 2, 2005 to give me an explanation of the current

19   legal status of Globe Gas which is part of the estate to be

20   auctioned off tomorrow.  My due diligence has now revealed

21   that Globe Gas, BD, as parent company of Pol-Tex has been

22   struck off the registry of the commercial court of the

23   Netherlands last year.  In addition, I found information on

24   Google that Globe Gas BD has a large tax liability in the

25   amount of approximately a million dollars."  And there's

1   another e-mail in our evidence that restates the same.

2           "Based on these findings, I informed my client

3   about these facts and recommended him not to pursue the

4   matter further."  He simply decided, if I've got to deal with

5   this guy in Poland who I don't trust and if I've got these

6   tax liabilities that I'm worried about, well, I'm withdrawing

7   my bid.  Now, obviously he's still interested though.  He

8   might get it from whoever bought it at the auction.  How did

9   he find out who was going to be the successful bidder of the

10  auction?  Nobody knew in advance.  There was a conversation

11  between Mr. Tietze and Mr. Finlay the first day before the

12  auction where they discussed – you remember I asked Mr.

13  Finlay about this conversation, did you ask him not to come?

14  No.  Was there any agreement between you about him not

15  bidding?  No.  Did you think he might come?  Yes.  He said

16  maybe I'll come, maybe I won't.  So Mr. Finlay's response

17  was, if you come, I'll see you at the auction –

18          THE COURT:  What was the date of the auction?

19  March 28?

20          MR. MCCARDELL:  March 28, yes, Your Honor.

21          But Mr. Finlay's conclusion from that conversation

22  was that 50/50 chance he might come, he might not.  Mr.

23  Finlay hadn't seen this e-mail that we're talking about.

24          Now, the argument is that Mr. Finlay is going to turn

25  around and resell the assets.  There is no evidence of any

168

1   agreement with any party — and remember that the standard as

2   we have cited in our brief is that collusion, which is a word

3   that gets thrown around a lot in this hearing, referring to

4   the Colyer treatise, Page 9 of our brief, what must be shown

5   is an agreement that controls the sale price and not merely

6   an agreement which affects the price.  There's no evidence

7   before you of any agreement controlling the price.

8           I'd like to speak to the last point which we've

9   raised in our brief and that is the significance of the

10  matter before you for Mr. Finlay.  He's invested $375,000 of

11  his own funds.  We've proved that completely.  There's been

12  no contest to that.  He's not using anybody else's funds.

13  He's got a short time, 60 days, to try and make something out

14  of this.  Mr. Andraczke testified that nobody can do it and

15  maybe he did buy a pig in a poke here but he came to the

16  auction, bid in good faith like every other bidder who bids

17  in good faith and after many rounds of auctioning, was

18  confirmed as the bidder by Mr. Marker and then confirmed as a

19  good faith bidder by Judge Boulden.  Every day that passes in

20  the delay of that sale is a real economic harm to Mr. Finlay

21  and his company, Sinofirst, and so we would request that Your

22  Honor deny the motion and enforce the previous order

23  regarding the sale.

24          THE COURT:  Any reply?

25          MR. LOCHHEAD:  A couple of factual points, Your

169

1   Honor.  Mr. McCardell argued that Mr. Finlay contacted many

2   people.  Mr. Finlay testified to the contrary.  He said he

3   just talked to Rauball, that was his source of information

4   and then he talked to Tietze.  Mr. McCardell argued that Mr.

5   Finlay did not get any assurances from Mr. Tietze.  Mr.

6   Finlay testified to the contrary.  He testified that during

7   the bidding he telephoned Tietze and got assurances from him

8   that the price was okay, his people were still there.  Mr.

9   McCardell relies on Movant's Exhibit 7, the e-mail from

10  Tietze on March 27 explaining why he's withdrawing from the

11  bid.  I don't submit this for the truth of the matter

12  asserted, I submit it for the exact opposite, to show that

13  this was a facade.  On the one hand Mr. Tietze is telling the

14  trustee that his client is not interested any more.  The very

15  next day at the auction, he's telling Mr. Finlay to go for

16  it, his people were still on board.  I mean, this Exhibit 7

17  is just smoke and mirrors.

18         At the hearing on March 30 before Judge Boulden,

19  Mr. Maybe, in cross examining Mr. Finlay, asked him about the

20  conversation that Mr. Finlay had with Mr. Tietze during the

21  bidding and even though that was two days after the event,

22  the transcript of the March 30th hearing, Mr. Finlay said

23  well, Mr. Tietze said thanks for the call and I just called

24  him to let him know things are going well, looks like I'm the

25  bidder.  That was very different from what he testified to at

170

1   his deposition yesterday that the bid was getting up there

2   and before the bidding was concluded he wanted to get

3   assurances from Mr. Tietze that this was still a go.  I mean,

4   the evidence, Your Honor, is overwhelming that even though

5   Mr. Finlay was the operative agent, standing behind Mr.

6   Finlay was Jochen Tietze, standing behind Jochen Tietze was

7   Wolfgang Rauball.  Those are the people who are really behind

8   this.  They are what is driving this sale and that is, in

9   substance, vindicating their efforts to frustrate the

10  administration of this estate by its legally appointed

11  administrator and trustee and walking away with the plum.

12  And that's the essence of what's wrong about this.

13          Thank you, Judge.

14          THE COURT:  Thank you.  The Court will take a brief

15  recess and come back and rule on the record.

16          (Where upon a recess was taken)

17          THE COURT:  The matter before the Court is the

18  Motion of Bernd Robertz - I'm going to call him Roberts - to

19  set aside the order confirming sale of affiliates to

20  Sinofirst Trading and Capital Corp and to confirm as a backup

21  bidder.  This was joined by Mr. Boley representing

22  Consolidated.  We've been here a long time.  We started at

23  2:00 p.m. this afternoon on May 4.  We're now at 7:00 p.m.

24  and the Court has heard lengthy testimony and argument and

25  received a number of documents and exhibits and believes that

171

1   it has sufficient information before it to make a ruling.

2   The parties appeared and presented evidence and oral argument

3   and based upon the same, the Court issues the following

4   findings and conclusions:  The Court has jurisdiction over

5   this matter pursuant to 28 USC 157-B-2.  Venue is proper

6   under 28 USC 1408-1.  Notice of this hearing today is

7   appropriate under the circumstances and based upon the

8   representations of Mr. Lochhead that the ordering notice was

9   circulated in a timely fashion, I find that notice is

10   appropriate.

11         A little procedural background and some factual

12   matters.  First of all, I want to make a finding and I'm

13   going to reverse myself, Mr. Boley.  I'm going to take

14   judicial notice of the transcript that was attached to the

15   moving papers.  I have that, I've reviewed it and I take

16   notice on your argument that Mr. Finlay was at some time

17   counsel for, it was Mr. Rauball.  Have I pronounced that

18   right?  So you've made your point on that.  I'm accepting

19   that transcript as evidence in this matter.

20         On October 20, 2004 the Court entered an order for

21   relief under Chapter 7 against the debtor, Eurogas, Inc.  Mr.

22   Marker was appointed the Chapter 7 trustee in this matter and

23   has acted in that for that period of time.

24         On January 28, 2005, the Court granted the

25   trustee's motion to designate Wolfgang Rauball, Reinhart

172

1   Rauball and Hank Blankenstein as debtors in this bankruptcy

2   case.  As part of its order, the Court ordered these parties

3   to file statements of schedule in this bankruptcy case.  None

4   of these parties ever complied with the Court's order, that

5   part of it.  Through a series of contacts with parties in

6   interest in this case, the trustee learned that the estate

7   may hold interests in certain subsidiary corporations.  On

8   January 3, 2006, the trustee filed a motion to sell those

9   interests to Consolidated Seven Rocks.  On February 9, 2006,

10  the Court held a hearing on the motion to sell the assets in

11  certain subsidiary corporations, namely Pol-Tex Methane,

12  Eurogas Polska, Global Gas and McKinsey Methane Gestrebay.

13  The Court granted the motion but required the trustee to take

14  further efforts to market those interests.  The trustee

15  complied with the Court's order, marketing these interests in

16  national and international trade publications and through

17  different contacts.

18          On March 28, 2006 the trustee conducted an auction

19  for the sale of those interests at his Salt Lake City, Utah

20  office.  Bids were submitted at the auction by Consolidated

21  Seven Rocks, Sinofirst Trading and Capital and Bernd Robertz.

22          On March 30, 2006, the Court held a hearing on the

23  trustee's motion to confirm the results of the March 28

24  auction.  After conducting an evidentiary hearing, the Court

25  conformed the results of the auction allowing the trustee to

173

1    sell the debtor's interest in Eurogas Polska and Global Gas

2    BD to Sinofirst Trading and Capital and the debtor's interest

3    in Pol-Tex Methane and McKinsey to Consolidated Seven Rocks.

4    David Finlay, the principal of Sinofirst Trading and Capital,

5    testified at length at the March 30, '06 hearing.  Each of

6    the other bidder questioned Mr. Finlay at that hearing about

7    his relationship with Wolfgang Rauball.  Mr. Finlay testified

8    that he had known Mr. Rauball for over 30 years as his friend

9    and attorney.  He testified that he learned of the auction

10   through Mr. Rauball but that he was bidding with his own

11   money and out of his own pecuniary interests.  Mr. Finlay

12   stated that his sole interest in the auction was to resell

13   the interest to another buyer for more money.  He testified

14   further at that time that he had been in contact with another

15   interested purchaser, Mr. Jochen Tietze, who had spoken with

16   him before and during the auction.  In fact, Mr. Finlay

17   testified that during the auction he requested a break

18   specifically to call Mr. Tietze and tell him the status of

19   the bidding.  Nevertheless, Mr. Finlay testified at that time

20   that he had no formal or informal agreement in place to sell

21   the interest to Mr. Tietze or any other purchaser.  In fact,

22   Mr. Tietze had initially contacted the trustee as a potential

23   bidder on the interests but later withdrew for various

24   reasons.

25          In light of the testimony, the Court confirmed the

174

1  sale by the trustee to Sinofirst and to Consolidated Seven

2  Rocks, counsel for Consolidated and Mr. Robertz each argued

3  at the March 30, '06 hearing that the Court could not find

4  that Mr. Finlay was a good faith purchaser because of his

5  contacts with Mr. Rauball and Mr. Tietze.   Over these

6  objections, the Court found as an issue of fact and made a

7  finding of fact and conclusion of law that the purchasers

8  were buying the interests as good faith purchasers.

9          On April 28, '06, Mr. Robertz filed a Motion to Set

10  Aside the Court's order confirming the sale in Eurogas

11  Polska.   Through his motion Mr. Robertz argued the new

12  evidence had been discovered which shows that Mr. Finlay was

13  not a good faith purchaser on March 30, '06 because he was in

14  collusion with Mr. Tietze and Mr. Rauball.   Consolidated

15  joined in the motion and also requested the Court set aside

16  the order confirming the sale of the debtor's interest in

17  Global Gas.   These motion are the subject of the hearing.

18  Through these motions Mr. Robertz and Consolidated alleged

19  that they have uncovered new evidence that Mr. Finlay

20  colluded with Mr. Wolfgang Rauball and Mr. Tietze in bidding

21  at the auction to procure the purchased interests for Mr.

22  Rauball.   Specifically the motions and the evidence and the

23  parties here today argue that (1) Wolfgang Rauball, Hank

24  Blankenstein and Andre Anacheck, former shareholders held a

25  secret shareholder meeting in November 25, '06 wherein they

175

1   elected Mr. Tietze to the board of directors of Eurogas.

2   That was alleged and I find that as a fact too that they

3   attempted to do that.  There's no dispute that they attempted

4   to do that.  Mr. Tietze took actions to change management of

5   record with the Polish government to recognize himself as a

6   director.  Mr. Wolfgang Rauball sent a threatening e-mail to

7   Mr. Andraczke, the former manager of Eurogas Polska and also

8   is alleged that on April 2, 2006, Mr. Finlay appointed Mr.

9   Tietze as a representative to Poland.  That's established as

10  a fact too for purposes of meeting with the Polish ministry.

11          The other allegation that Mr. Finlay had a close

12  relationship with Mr. Tietze in the days leading up to the

13  trustee's auction, the evidence is that there was a

14  relationship between Mr. Finlay and Mr. Tietze and there were

15  contacts between the two prior to the auction.

16          At the hearing on this matter today, Mr. Finlay

17  testified that he purchased the debtor's interest in Eurogas

18  Polska and Globe Gas with the intent of reselling it for more

19  money to another purchaser.  I find that as a matter of

20  finding of fact.  He testified further that Mr. Tietze has

21  approached him as a representative of investors interested in

22  purchasing these interests.  I find that is a fact as well.

23          I find further that he submitted bids at the

24  auction and he did not do so in collusion or concert with any

25  party.  He further testified and I find that he did appoint

176

1    Mr. Tietze as his agent for purposes of attending a meeting

2    with the Polish Ministry of Environment but at the time had

3    no knowledge of a secret shareholder meeting appointing Mr.

4    Tietze to the board of Eurogas Polska.   Under Federal Rules

5    of Civil Procedure 60-B2, extent of this proceeding under

6    Rule 90-24, the Court may relieve a party from a final order

7    upon a showing of newly discovered evidence which by due

8    diligence could not have been discovered in time to file for

9    a new motion under Rule 59-B or 59-E.

10           In context of a motion under Rule 60-B2 to set

11   aside an order confirming sale, if the newly discovered

12   evidence proves that the sale involved fraud, accident,

13   mistake or other cause for which equity would avoid a like

14   sale between the parties.   That's reference to the BCD

15   Corporation case decided by the Tenth Circuit.   As part of

16   the standard, court's recognize that collusion may be grounds

17   to set aside a sale.   That in the in re: Suchi case out of

18   the Ninth Circuit.

19           At the same time, the Court must be mindful that

20   once the Court affirms a sale of property of the estate, the

21   Court should only alter the order in narrow circumstances.

22   Again, I refer to the BCD case decided by the Circuit in

23   1997.   Counsel for Sinofirst points to a definition of

24   collusion which the Court believes is helpful.   The Collier

25   treatise states that "What must be shown is an agreement that

177

1    controls the sale price and not merely an agreement which

2    affects the price."   The Court believes that the type of

3    collusion alleged by Mr. Bernd and Consolidated would qualify

4    as proper grounds to set aside the sale.   The parties allege

5    that Sinofirst was colluding at the time of the March 30, '06

6    hearing and auction to produce the purchase of Eurogas Polska

7    and Global Gas from the estate.   If there was such collusion,

8    Sinofirst would effectively would have precluded the estate

9    from the benefit of additional bidders and thereby depriving

10   the estate of potentially more funds.

11          Nevertheless, in light of the evidence presented at

12   the hearing on this matter today, the Court does not believe

13   that the evidence shows that newly discovered evidence proves

14   by a preponderance of evidence that Sinofirst and Mr. Finlay

15   were colluding with Mr. Rauball and Mr. Tietze at the March

16   30 hearing or at the March 28 auction.

17          At the March 30, 2006 hearing, the Court considered

18   evidence of all but two of the allegations made by the

19   motions in this matter.   The Court considered evidence of Mr.

20   Finlay's long standing relationship with Wolfgang Rauball.

21   The Court considered evidence of Mr. Finlay's introduction to

22   and conversations with Mr. Tietze.   The Court at that time

23   also heard testimony as to Mr. Finlay's conversation with Mr.

24   Tietze during the break in the trustee's auction.   These

25   matters were before the Court before.

1          The only newly discovered evidence presented at the

2    hearing on this matter today is that Mr. Finlay recently

3    appointed Mr. Tietze as his agent to attend the meetings with

4    the Polish government, that a secret shareholders meeting

5    attempted to appoint Mr. Tietze as a director of Eurogas

6    Polska and that Mr. Rauball recently sent the manager of

7    Eurogas Polska a threatening e-mail.  To the extent it

8    constitutes newly discovered evidence, the parties also

9    presented further evidence of Mr. Finlay's conversations with

10   Mr. Tietze.

11          This new evidence is probative of whether Sinofirst

12   was in collusion with Mr. Rauball and Mr. Tietze but it is,

13   as I find, insufficient to carry the movant's burden in this

14   matter.  All of the evidence produced in this matter is

15   circumstantial.  There are just too many blanks that the

16   parties want the Court to fill in to connect the dots from

17   Mr. Rauball to Mr. Tietze to Mr. Finlay and I find that those

18   blanks cause this Court some concern and I find that it is

19   insufficient to establish that there was collusion sufficient

20   to set aside the sale as that standard has been articulated.

21          In light of the evidence presented in this matter,

22   the Court determines that the movants have not carried their

23   burden to show that newly discovered evidence proves that

24   Sinofirst was in collusion with Mr. Tietze and Mr. Rauball at

25   the time of the trustee's auction.  The Court notes that

1   parties seeking to set aside the sale were active at the

2   auction of these interests and were outbid by Sinofirst.

3   Further, the parties in the motion seek only to match

4   Sinofirst's winning bids.  From the evidence produced as the

5   hearing on this motion today, it is hard to see how the

6   estate was deprived of a higher big as a result of the

7   relationship between Mr. Finlay and Mr. Tietze.  If the

8   relationship between Mr. Finlay, Mr. Tietze, and Mr. Rauball

9   did rise to the level of improper collusion, the evidence

10  produced  does not sufficiently support that inference.

11          But let me state this and make it clear that

12  regardless of the dollars involved, if the Court had found

13  evidence sufficient of collusion in this matter, it would

14  make no difference in the Court's mind how much was bid or

15  how much the parties was at stake.  The sanctity of a court

16  order ranks first in my mind and will always be no matter how

17  much the dollars are involved but I just don't find that the

18  evidence is sufficient to rise to the standard of newly

19  discovered evidence sufficient to show that collusion was

20  involved.  Accordingly, the motions to set aside the sale of

21  Eurogas Polska and Global Gas are denied.

22          Now, Mr. McCardell, will you prepare an appropriate

23  order which memorializes this ruling?  You do not need to go

24  into the detail of findings and conclusions as I have.  You

25  can make reference to the fact that I made detailed findings

1   and conclusions on the record after a lengthy evidentiary

2   hearing and based upon those, the Court denies the motions.

3           MR. MCCARDELL:  I will, Your Honor. Thank you.

4           THE COURT:  Thank you.  Any other questions?

5           MR. LOCHHEAD:  Thank you, Your Honor.

6           THE COURT: Thank you counsel for your

7   participation.  The Court stands in recess.

8           MR. MARKER:  Your Honor?

9           THE COURT:  Yes.  There's one more matter on the

10  calendar.

11          THE COURT:  You're always doing that to me, Mr.

12  Marker.  Have a seat.  There is.

13          MR. MARKER:  I won't take long, I promise.  It's

14  Mr. Finlay's motion but I have - because all the parties have

15  been arguing from the same documents, I have prepared a set

16  of exhibits that involve (inaudible).  May I submit those,

17  Your Honor?

18          THE COURT:  Go ahead.  So we've lost Mr. Lochhead

19  and his associate.  We've retained Mr. Boley because he was a

20  successful bidder for one of the assets.  Am I correct on

21  that?

22          MR. BOLEY:  Yes, Your Honor.  I have one additional

23  exhibit if I may approach and have it marked. I think we've

24  got up to number 14, so this would be number 15.

25          THE COURT:  Go ahead, get it marked.

181

1              Are these duplicates, Mr. Marker?

2          MR. MARKER:  There is one set for your clerk, Your

3     Honor, and one set of originals.

4          THE COURT:  Oh, okay.  Wait a minute.

5          MR. MARKER:  You get two sets of copies and one set

6     of originals.

7          THE COURT:  Candice, do you have the original

8     exhibits handed to you by Mr. Marker?

9          COURT CLERK:  (Inaudible).

10         THE COURT:  Okay.  What the Court has are copies

11    then.  This document that Mr. Boley just handed up, Sale and

12    Purchase Agreement, is that the one, Mr. Boley?

13         MR. BOLEY:  That would be Exhibit 15.

14         THE COURT:  This is 15, okay.  Can I write on my

15    copy that I've got?

16         MR. BOLEY:  Yes, Your Honor, that's courtesy copy.

17         MR. MARKER:  As you see from the exhibit schedule,

18    Your Honor, there are 14 exhibits plus the one Mr. Boley just

19    handed you number 15 and I want to review them quickly.

20             Exhibit 1 is the draft of the Sale and Purchase

21    Agreement that was submitted as an exhibit at the March 30

22    hearing conducted by Judge Boulden to confirm the sale.

23    Exhibit 2 is a copy of the order confirming the sale.

24    Exhibit 3 is a copy of the Sale and Purchase Agreement on the

25    Pol-Tex Methane asset executed by Consolidated.  Number 4 is

1    the assignment, form of assignment that I executed in favor

2    of Consolidated for the Pol-Tex asset.

3            THE COURT:  That's the one they don't like?

4            MR. MARKER:  That's the one Mr. Finlay doesn't

5    like, yes.  Exhibit 5 is an Irrevocable Stock Power for Pol-

6    Tex Methane.  Six, 7 and 8 are the same three documents for

7    the McKenzie asset sold to Consolidated; Purchase and Sale

8    agreement, 6; Number 7 is the assignment; Number 8 is the

9    stock power.  Nine and 10 are the Sale and Purchase Agreement

10   and Proposed Assignment regarding Eurogas Polska.  Number 9,

11   the Sale and Purchase Agreement was executed by me and by Mr.

12   Finlay on behalf of Sinofirst.  Number 10 is the disputed

13   document.  Eleven is the executed Sale and Purchase Agreement

14   on Globe Gas.  Twelve is the proposed assignment.  Thirteen

15   is the form of assignment requested by Mr. Finlay, by

16   Sinofirst.  If you look at 13, Your Honor, Mr. Finlay of

17   Sinofirst simply proposes to delete three paragraphs of the

18   proposed assignment and then Number 14, is and e-mail between

19   me and Mr. Finlay —

20           THE COURT:  Those are your reservation paragraphs.

21           MR. MARKER:  That's correct, Your Honor and I'll

22   now let —

23           THE COURT:  Are you offering these?

24           MR. MARKER:  Yes.

25           THE COURT:  Any objections?

                                                            183

1          MR. BOLEY:  None, Your Honor.

2          THE COURT:  Exhibits 1 through 14 are received.

3          (Exhibits 1-14 received)

4          MR. MARKER:  Mr. Keith will proceed with his

5   argument.

6          THE COURT: Okay.

7          MR. KEITH:  Well, the prior hearing gave us a lot

8   of background, Your Honor, and I'll try not to backtrack over

9   it.

10         Mr. Marker has framed exactly the issue here today.

11  We are asking the Court to chose among two proposed

12  assignments.  The proposed assignments relate to the transfer

13  of title of Eurogas Polska and Globe Gas.  Mr. Marker's

14  proposed assignments are numbers 10 and 12.  The markup

15  proposed by Sinofirst is number 13 and this Court has the

16  background and has spent a long time hearing about the

17  purchase of these interests and reviewing the previous

18  transcript from the sale hearing.  Let me just try and sum up

19  though Mr. Marker's previous description of this sale to

20  Judge Boulden.  He says, "Because I don't have any other

21  information, reliable information to proceed with, this has

22  been an auction without warranty or representation and it's a

23  sale of assets as is, whereas and if is, meaning that I don't

24  know if these assets actually exist.  The parties that are

25  bidding are assuming all of the responsibility for doing the

1    due diligence." And Your Honor, that sentiment expressed by

2    Mr. Marker at the hearing is borne out in these documents.

3    The trustee was not warranting that he was selling anything

4    essentially.  He said, look, there's an allegation out there

5    that this company owns Pol-Tex and McKinsey and Eurogas

6    Polska and Globe Gas but I'm going to sell whatever interest

7    the estate has in those four entities and bidders showed up

8    despite that.  If I'd seen a warning like that, I would have

9    headed for the hills but there were a courageous few that

10    decided to come here and bid on those assets and as this

11    Court knows, Sinofirst was successful in obtaining Eurogas

12    and Globe Gas.  Those were the two entities.  It subsequently

13    entered into a Sale and Purchase Agreement for each one of

14    those entities and let me just refer to the Sale and Purchase

15    Agreements for those entities.

16           THE COURT:  What exhibit?

17           MR. KEITH:  Since they're largely the same, I'm

18    going to read out of the Sale and Purchase Agreement for

19    Globe Gas which is Exhibit 11.

20           THE COURT:  Okay, I've got it.

21           MR. KEITH:  Paragraph 1 in Exhibit 11 states that

22    subject to conditions set forth in Paragraph 5 below, sellers

23    shall sell any and all rights, title, and interest to the

24    property held by the debtor to the purchaser and —

25           THE COURT:  Wait a minute, what paragraph was that?

185

1           MR. KEITH:  That is Paragraph 1, sorry, it's on

2    Page 2.  That defines what is being sold.

3           THE COURT:  All right.

4           MR. KEITH:  But to understand what the property is,

5    we have to flip the page back and take a look at the

6    definition of property and that actually shows up, six

7    whereas clauses down and it says, "Pursuant to Section 541 of

8    the Bankruptcy Code the equity interests in the subsidiary

9    was defined as the property."  And now we need to find out

10   what equity interest means so we skip up one more 'whereas

11   clause' and the definition of equity interest is, "As of the

12   petition date it is believed upon information and belief that

13   the debtor directly or through one or more subsidiaries owned

14   the equity interests in Globe Gas BD."  So he said you know,

15   we may own this, we may own it directly, may own it

16   indirectly, but nevertheless, I am going to sell whatever the

17   estate's interest is in those entities, and he did.  There

18   were successful bidders and what's left now, Your Honor, is

19   to assign.  The sale has essentially closed.  The money has

20   been paid, the agreements signed.  So now what we're left

21   with is transferring title to Sinofirst of Globe Gas and of

22   Eurogas and the transfer of title paragraph is Paragraph 4 on

23   Page 2 and that basically says, "The property shall be

24   transferred by seller to the purchaser upon closing.  Upon

25   receipt of the purchase price, seller shall execute any and

                                                              186

1   all documents necessary and as required by purchaser to cause

2   a transfer of debtor's ownership and rights."

3          So the sequence of this is as follows, Your Honor,

4   Consolidated purchased the two other entities.  They closed

5   their transaction first.  Their transaction is done.  Mr.

6   Boley, I assume, proposed some forms of assignment that were

7   used in that transaction.  Mr. Marker customized those forms

8   of assignment and sent them to our client.  Our client looked

9   at it and said, you know, I don't like this.  I don't like it

10  because it restricts, it reserves something that I didn't

11  agree to.  I thought I had bought all right, title, and

12  interest to Globe Gas.  The assignment agreement – and let's

13  turn to it, proposed by Mr. Marker which is exhibit...

14          THE COURT: Thirteen?

15          MR. KEITH:  Thirteen, yes, Your Honor.

16          THE COURT: (inaudible) marked up.

17          MR. KEITH: – contains some language that was not

18  acceptable to the purchaser and specifically it's the

19  sentiments expressed in Paragraph 5 and that is the assigner

20  reserves unto itself any right in and to the related

21  subsidiary, securities whether held directly or indirectly by

22  the assignor or any subsidiary of the assignor including

23  Globe Gas.

24          Assignor hereby further, here's another

25  reservation, they reserve the right to vote Globe Gas

187

1    securities to the extent necessary to transfer related

2    subsidiaries, securities to any third party.  So my client

3    read that language and decided that was not acceptable and

4    that he had the right under paragraph 4 of the Purchase Sale

5    Agreement, to specify the form of assignment for this

6    particular entity and he did that.  He did that.  The mark up

7    which is the next agreement, 13, shows his interlineation

8    where he rejects any sort of reservation of rights.

9         Now why did he do this?  He did it because of the

10   following reasons.  There was an auction that was as caveat

11   emptor as probably any auction I've ever seen.  People walked

12   into this, they had to know what they were doing if they were

13   going to come bid at this hearing and they did bid and they

14   obtained the equity interest held by the estate.

15        Now, Mr. Boley's as evidenced here are

16   Consolidated.  Their deal is done.  They have been

17   transferred now pursuant to their assignment documents, all

18   the interest that the estate holds in the two companies they

19   bought.  That's a done deal, whatever interest that was.  And

20   so it is unnecessary for this reservation of right.  Why do

21   you need to reserve any rights?  They've already got every

22   interest the estate had.

23        Now here's the thought.  I think this is what's

24   going on is that somebody thinks that one of the companies

25   that was purchased by Sinofirst holds an equity interest in

188

1    some of the companies purchased by Consolidated and so what

2    they're trying to do is say, okay well, we've sold all the

3    estate properties but now we want to get Sinofirst's

4    interest.  We want to make sure that whatever equity interest

5    Sinofirst bought by virtue of the transfer of their equity

6    interest, somehow is reserved by the estate and is

7    transferred to the other purchasers and, I mean that's the

8    only explanation.  Otherwise —

9            THE COURT:  What was the subsidiary interest that

10   Sinofirst bought?

11           MR. KEITH:  It bought Eurogas Polska and it bought

12   Globe Gas.

13           THE COURT:  So the restriction on Paragraph E that

14   says the trustee, assignor, may be obligated to assign a

15   transfer to parties other than assignee, Sinofirst, the

16   right, title, and interest in related companies, Pol-Tex,

17   McKinsey.

18           MR. KEITH:  Right and those were the companies

19   purchased by Consolidated and what this is trying to say is

20   that I mean, you cut through it all, what they're saying is

21   okay, their deal is closed and they've got all the equity

22   interest the estate held.  They say, wait a minute, what if

23   the estate really did not hold these equity interests held by

24   the subsidiaries?  What if they're still in the two

25   subsidiaries purchased by Sinofirst?  We say well, what we've

189

1  got to do to remedy that is to get Sinofirst to reserve for

2  us, sort of upstream back to the estate any equity interests

3  that these purchased subsidiaries may have in the two

4  subsidiaries purchased by Consolidated.  That's improper Your

5  Honor, because the sale agreement that was entered into by

6  Sinofirst said simply, any and all interest the estate had in

7  these two subsidiaries, Eurogas and Globe Gas.  It said

8  nothing about reserving any asset that might be held by those

9  two subsidiaries.  That's nowhere to be found in any

10 document.

11        Now, the argument maybe and I'm sure this is the

12 good intention is that Mr. Marker may well have had the right

13 to sell whatever interest was lodged in the two subsidiaries

14 purchased by Sinofirst that were equity interests of the two

15 companies purchased by Consolidated.  He may well have had

16 that right.  We're not disputing that.  The Court doesn't

17 need to decide today and it is not in front of the Court who

18 bought what.  That's not the issue here.  I mean, what is

19 done is done and the old saying, it is what it is.  What's

20 done is done.  The equity interests, he may well have reached

21 down into these subsidiaries and plucked out of them whatever

22 equity interests were held in the companies my client has

23 bought and if he's done that, so be it.  It's past but that's

24 no the litigation for today.  What we're trying to decide

25 today is whether it's right for him to say, okay, assuming

190

1  that that didn't happen, assuming that I didn't pluck from

2  these companies the equity interest for the other two

3  companies, I'm going to turn that around and I'm going to

4  make that right through a reservation in the assignment that

5  wasn't bargained for.

6         Your Honor, I would submit that this could be

7  decided just based on Paragraph 4 which says it's my client

8  that has the right to suggest a form of assignment acceptable

9  to him.  He's done that.  There's nothing unreasonable about

10  it.  All it does is cut out this language that says hey, if

11  there was any residual interest in their companies held by

12  out companies, you know, than that's [unintelligible], that's

13  what we accomplish by interlineating through those various

14  paragraphs and so we'd ask the Judge to pick the form of

15  assignment proposed by Mr. Finlay and Sinofirst.

16         THE COURT:  Okay.  Mr. Boley, where do you weigh in

17  on this?  I saw some papers filed by you.

18         MR. BOLEY:  Where I weight in, Your Honor, is my

19  clients spent $330,000 for some assets they bought pursuant

20  to an agreement that this Court approved.  The definition of

21  what we bought and we want to make sure we get what we

22  bought.  Before we get into argument, I think first I'd like

23  to offer Exhibit 15.

24         THE COURT:  Any objection to that?  Objection 15 is

25  received.

191

1          (Exhibit 15 received)

2          MR. BOLEY:  Second, with the Court's indulgence and

3    I don't want to - Mr. Marker has been on the stand a lot

4    today so I don't want - I'm not going to have a lot of

5    questions but I would like to call Mr. Marker to the stand

6    briefly.

7          THE COURT:  For what purpose?

8          MR. BOLEY:  To give testimony about how this

9    auction proceeded, about the intent of the parties and the

10   original Sale and Purchase Agreement that attached to the

11   sale motion the Court approved when it granted that motion.

12         THE COURT:  Trying to get some parole evidence in

13   here, Mr. Boley?

14         MR. BOLEY:  No.  If there's a parole evidence

15   objection you can hear it at that point.  I also need to put

16   into evidence that Mr. Marker - unless counsel is willing to

17   stipulate to this, that Mr. Marker required all bidders to

18   sign a form of his Auction Procedures and that form of

19   Auction Procedures required the potential bidder to agree

20   that they would agree to the form of the Sale and Purchase

21   Agreement that was attached to the sale motion.  So I need to

22   put evidence of that in.

23         MR. MARKER:  Your Honor, I haven't seen the Auction

24   Procedures.  They're not in front of us but I'll stipulate

25   that we signed the Sale and Purchase Agreement (inaudible).

192

1    They're largely identical, all four of them so I don't know

2    what the purpose of that would be.

3         THE COURT:  Well, you're raising some - I thought

4    this was going to be a little easier than it appeared.  I'm

5    almost ready to say this is requiring injunctive and

6    equitable relief under 7001 and we'll see an AP.  Do you guys

7    want to come back for that?

8         MR. BOLEY:  Come back, I'm sorry, Your Honor?  Come

9    back when?

10        THE COURT:  You're asking for equitable relief

11   under Rule 7001 and one of the motions is asking for an

12   injunction which can only be granted under an adversary

13   proceeding and if that's where we are, then we'll see you

14   another day.  Your objection to their motion.

15        MR. BOLEY:  Yes, Your Honor.  Before I put it in

16   evidence do you want to hear the --

17        THE COURT:  Tell me what you think he would say by

18   way of - what evidence you want to get out?

19        MR. BOLEY:  I apologize, Your Honor, because I did

20   not receive that motion until Wednesday night and I had to be

21   at a deposition all day yesterday.  I was not able to prepare

22   and file this response until 1:00 this morning.  So I

23   apologize I couldn't get it to the Court sooner.

24        THE COURT:  I would have read it at 1:00 if I was

25   up.

1          MR. MARKER:  Your Honor, it might short circuit

2    things if you'd let me go before Mr. Boley?

3          THE COURT:  Okay.  Let me hear you Mr. Marker.

4          MR. MARKER:  This won't take long.

5          MS. JARVIS:  Your Honor, we also (inaudible).

6          THE COURT:  I'll give you that chance.

7          MR. MARKER:  Three quick points I want to make.

8    One, this present dispute I think can be - it's fairly

9    discreet and I think we would all like to get it decided

10   today.  Mr. Finlay doesn't want this to drag on, I certainly

11   don't.  It's caused when I thought I was trying to do the

12   best for the estate and break the one lot option into four

13   lots and what I didn't anticipate and what the other parties

14   I don't think anticipated was the result of that when one of

15   these entities maybe owned by another and if I can use the

16   board for just 30 seconds?

17         THE COURT:  Go ahead, go ahead.  Pull it out here

18   so we can all see what you're doing.  We got markers over

19   there?  Too many markers. One too many markers.

20         MR. MARKER:  You can't have too many, Your Honor.

21         THE COURT:  Can you see, Mr. Boley?  Can you see

22   what he's doing?

23         MR. BOLEY:  Yes.

24         THE COURT:  Flip the page.

25         MR. MARKER:  Again, Your Honor, with one lot of

                                                    194

1    four entities being purchased by one party, there would never

2    had been this issue but when the lots are broken up we have

3    Eurogas Polska and Globe Gas and McKinsey Methane and Pol-

4    Tex, for different entities and what I think - and again,

5    we're all supposing this because none of us put the this

6    corporate structure together but the information that I'm

7    getting, some of it from Mr. Andraczke who is here, is that

8    Globe Gas - all these are owned - well, I thought they were

9    all owned by the debtor.  What I'm hearing now is that Globe

10   Gas owns Pol-Tex and that this is owned by the debtor and

11   Eurogas Polska is owned by the debtor and McKinsey Methane is

12   owned by the debtor.  So the problem is - switching colors

13   now.  Sinofirst purchased this entity and this entity,

14   Eurogas Polska and Globe Gas.  Mr. Boley's client,

15   Consolidated, purchased this entity and this entity.  My

16   intent - and I want to thank Mr. Keith for ascribing good

17   intent, my intent was that everybody at the auction would get

18   what they purchased.  The language that backs that up in the

19   document that both entities signed is in the recital clause

20   of all these Sale and Purchase Agreements which says

21   "Whereas, as of petition date" and this is recital number 5.

22            THE COURT:  What exhibit?

23            MR. MARKER:  Actually any of the Sale and Purchase

24   Agreements, Your Honor.  Nine, 11...

25            THE COURT:  Okay.

195

1          MR. MARKER:   The 5th recital, "Whereas, as of the

2    petition date it is believed, upon information and belief,

3    that the debtor directly or through one or more subsidiaries

4    owns the equity interest in Globe Gas."   Now all four say

5    that, directly or indirectly, and what I intended to do was

6    to convey this and this, Pol-Tex and McKinsey Methane to

7    Consolidated because that's what they purchased.

8    Consolidated paid $325,000 for this entity and I want to make

9    sure they get what they bid for.

10         Mr. Finlay, Sinofirst, bid $10,000 for Globe Gas.

11   There is no fairness at all to allow him to say to

12   Consolidated, you'd have to go through me to get what you

13   paid big money for.   It's not what I intended, that's not

14   what the document provides for and so I believe the

15   assignments that I proposed to Sinofirst should be approved

16   by the Court.   They contain the reservations that allow me

17   both to be consistent with the assignments I've already

18   signed in favor of Consolidated and allow me to be fair to

19   Consolidated and fair to Sinofirst.

20         THE COURT:   You started out by saying you wanted to

21   make three points.   I wrote that down in my notes.   Summarize

22   briefly what your three points are.   You went into some great

23   detail.

24         MR. MARKER:   The three points, Your Honor were,

25   one, there is this express language in the form of the Sale

196

1  and Purchase Agreement which the parties have had since early

2  January that provides for a sale of all interest owned

3  directly or indirectly by the debtor.

4          Second is the fact that I don't think anybody

5  contemplated this particular issue when the auction was

6  conducted as a four lot auction.

7          And then the third is, my intent was that each of

8  the parties who bid and wanted the auction, get what they bid

9  for and that's what I'm trying to accomplish with the form of

10  assignment that I proposed.

11          THE COURT:  All right.  Ms. Jarvis?

12          MS. JARVIS:  We support the trustee's position on

13  this.  We were at the auction.  I think it was very clear

14  that we had four different entities and that each entity was

15  being sold separately.  Mr. Finlay is a former attorney for

16  Eurogas.  He may understand the structure and certainly Mr.

17  Rauball who is his close friend would understand the

18  structure but the rest of us did not and where the intent was

19  very clear that these four entities were separated and each

20  of the bidders bought all interests in the entities, because

21  it ends up this structure is a little bit different than we

22  understood, Mr. Finlay should not allowed to take advantage

23  of the situation and probably have information that he knew

24  more about than rest of us did to put this estate in a

25  situation where we can have litigation which would then

197

1    dissipate the assets of this estate.  It's so clear that

2    these four entities were to be sold separately and I think,

3    as Mr. Marker pointed out, it's clear from the agreement and

4    therefore we would support the form that trustee is

5    proposing.

6             THE COURT:  Okay.  Well, Mr. Boley, you don't need

7    to put on any evidence.

8             MR. BOLEY:  Are you ready to rule?

9             THE COURT:  I'm ready to rule.

10            Do you want to say anything further?

11            MR. KEITH:  May I have rebuttal, Your Honor?

12            THE COURT:  Go ahead.

13            MR. KEITH:  Your Honor,  we're not against

14   achieving this result.  I mean, if this is what happens,

15   that's what happens.  What we're against is achieving it in

16   our assignment.  If there's a way for Mr. Marker to reach

17   down through this company and sell that to Mr. Boley, that's

18   great.  We're happy and we think that - Mr. Boley argues in

19   his paper that that already happened.  We just don't think

20   the proper document for that to happen in is our assignment

21   agreement, we'll take that assignment agreement around to

22   people and they'll look at it now and they'll say whoa, so

23   there's a reservation for somebody to vote shares with

24   certain issues?  I mean, it's not the cleanest —

25            THE COURT:  It's not an asset that your client

1    bought though.  It's a reservation on the recital.

2          MR. KEITH:  No, it's not a recital, it's a

3    covenant.

4          THE COURT:  Go onto the next page for that.

5          MR. KEITH:  The point we're trying to make is that

6    that may well be the fair result and that may well be the

7    right result but not in our assignment agreement.  It needs

8    to be done some other way so we get a clean assignment.  If

9    it's stripped of that company, it's stripped of that company

10   and I'm not a corporate genius.  I don't know how to do that

11   but we do not like having debtors on the assignment that we

12   get that other people may read some day in Poland and say

13   well, what does this all mean?

14         THE COURT:  I've got two options in this matter.

15   One, I can either grant or deny your motion.  That's pretty

16   easy.  Those are the two options.  Here's the problem we've

17   got.  You guys have made a perfect argument for mutual

18   mistake, resend the whole thing, go back to square one and

19   have a new auction.  That's one possibility and if you want

20   that, file the proper motion and I'll consider it.  I'm not

21   inclined to grant the motion.  I feel the trustee's proper

22   exercise of business judgment and the documents as proposed

23   by the trustee are appropriate.  That'll be the order.

24   Motion denied.  Court is in recess.

25              (Whereupon the hearing was concluded)      -c- -

CERTIFICATE

I HEREBY CERTIFY that the foregoing transcript in

the before mentioned proceedings held before Judge William

T. Thurman transcribed by me from a CD recording

and is a full, true and correct transcription of the

requested proceedings as set forth in the preceding pages

to the best of my ability.

Signed this 27th day of May, 2006 in Sandy,

Utah.



Carolyn Erickson
Certified Shorthand Reporter
Certified Court Transcriber

My Commission expires May 4, 2010

NOTARY PUBLIC
CAROLYN ERICKSON
1775 Ellen Way
Sandy, Utah 84092
My Commission Expires
May 4, 2010
STATE OF UTAH